UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARIO E. MENDES,     )
    Plaintiff       )      C.A. No. 05-11292 DPW
             )
v.              )
             )
BRIAN SWEET and   )
JOAQUIM MIRANDA,  )
    Defendants    )

**DEFENDANT JOAQUIM MIRANDA'S  MOTION FOR SUMMARY JUDGMENT**

The defendant, Joaquim Miranda,  moves for summary judgment in his favor on Counts III, IV, V and VI of the First Amended Complaint asserted against him.  See Fed. R. Civ. P. 56.  As grounds, the defendant states that the plaintiff's claims fail to state a claim for relief against him.

In support of his motion, the defendant relies upon and incorporates by reference the following as if set out herein:

1.    The plaintiff's Answers to the defendant Brian Sweet's Interrogatories, Exhibit 1;

2.    The Massachusetts State Police Report of Trooper Joaquim Miranda, Exhibit 2;

3.    Pertinent excerpts from the deposition testimony of Joaquim Miranda, Exhibit 3;

4.    Pertinent excerpts from the deposition testimony of Mario Mendes, Exhibit 4.

5.    Affidavit of  Charles Glancy, Exhibit 5;

6.    Pertinent excerpts from the deposition testimony of  Beth Corrigan, Exhibit 6;

7.    Pertinent excerpts from the deposition testimony of  Stephen Brady, Exhibit 7;

8.   Letter from plaintiff's attorney to Attorney General Thomas Reilly dated October 20, 2004, Exhibit 8.

9.   The accompanying memorandum of law.

Wherefore, defendant Joaquim Miranda, requests that summary judgment enter in his favor on Counts III, IV, V and VI of the First Amended Complaint against him.

Defendant,
Joaquim Miranda,
By his attorneys,


/s/ Jeremy I. Silverfine
Leonard E. Kesten, BBO # 542042
Jeremy Silverfine, BBO # 542779
Pamela J. Fitzgerald, BBO#563130
Brody, Hardoon, Perkins & Kesten, LLP
One Exeter Plaza
Boston, MA 02116
(617) 880-7100

Dated:  August 28, 2006

# EXHIBIT 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARIO E. MENDES,　　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　)　　　　No. 05-11292DPW
　　　　　　　　　　　　　　　　　　)
BRIAN SWEET and　　　　　　　　　　)
JOAQUIM MIRANDA,　　　　　　　　　)
　　　　Defendants　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　)

### PLAINTIFF, MARIO E. MENDES, ANSWERS TO DEFENDANT BRIAN SWEET'S FIRST SET OF INTERROGATORIES

#### GENERAL OBJECTIONS

1.　　Plaintiff hereby objects to each and every interrogatory to the extent it seeks information which is protected from discovery by the attorney-client privilege.

2.　　Plaintiff hereby objects to each and every interrogatory to the extent it seeks information which is protected from discovery by the work-product doctrine.

3.　　Plaintiff hereby objects to each and every interrogatory to the extent that it seeks information that is protected from discovery on the grounds that such information was compiled, gathered or created in anticipation of litigation, during the pendency of this lawsuit or not otherwise in the ordinary course of his business.

4.　　Plaintiff hereby objects to each and every interrogatory which seeks information in a manner not authorized or permitted under the Massachusetts Rules of Civil Procedure, including but not limited to the improper use of compound interrogatories in an attempt to circumvent the number of interrogatories authorized or permitted under Mass. R. Civ. P. 33.

Without waiving or limiting any of the general objections, the Plaintiff responds to each individual interrogatory as follows:

## INTERROGATORIES

Interrogatory No. 1

Please state describe your employment history for the last eight years including the name and address of each employer, the dates of employment, your title or office, a description of your duties with each employer, and the salary or wage you were paid by each employer. As part of your answer give the reason why you left each position. If you were self-employed or part of any partnership during that period, then give the dates, describe the work you did, the name of your company or partnership, and give your gross and net earnings. If you were attending any school, identify the school and give the course of study.

ANSWER:    For the past six (6) years, I worked for Synergy Graphics located at 3A Lopez Road, Wilmington, MA 01887. My job title was machine operator. My salary ranged from $35,000 to $45,000.00. My last earning was $19.40 an hour. The company closed on November 5, 2005. I worked previously for Precision Graphics for about eleven (11) years. Precision Graphics merged with Synergy Graphics. I do not remember the address for Precision Graphics. My income with Precision Graphics was significantly higher than my last employer. I have not worked since November 5, 2005.

Interrogatory No. 2

List in chronological order the addresses at which you have resided in the past eight (8) years, indicating the approximate dates at each addresses, commencing with the present, and identify each person residing with you and their relation to you.

ANSWER:    At present, I reside at 1023 Gage Avenue, Deltona, Florida 32738 with my Wife, Vera L. Mendes and our Daughter, Glauccy Mendes and Granddaughter, Ayina Ludox. We have been living at this address since January 2006. I previously lived at 117 Westwind Drive, Manchester, NH 03104 from 1995 to January 2006.

Interrogatory No. 3

Describe all of the injuries and complaints of any nature whatsoever (whether objective or subjective) which you allege occurred as a result of this incident or which you, or your doctors are aware or suspect.

(a)    List and describe each in specific detail, giving the exact location within or upon your body of all your injuries, and the nature of your complaint (whether physical, dental, emotion, nervous, mental or psychological).

ANSWER:    I suffered a collapsed lung, rib fracture and contusions and abrasions on my face, hands, elbow, chest, leg and back. I suffered headache and pain on my chest and right shoulder. I also became fearful of law enforcement officials. I often have nightmares and restless nights. I have not been able to sleep well at

nights since the incident. Please refer to medical records furnished in response to request for documents for further details of my injuries.

(b)    If you have completely recovered from each such injury and complaint, state the date you recovered from each such injury and complaint;

ANSWER:    The contusions and bruises healed after about two to three months.

(c)    List separately all of your present disabilities and complaints (whether objective or subjective), and the frequency and duration of your complaints of pain, the location of and degree of any limitations of motion you now have, and a detailed description of any scars you have at the present time, which you attribute to the incident.

ANSWER:    I continue to have pain on my chest and right shoulder. The pain on my right shoulder is daily. The pain on my chest is about 2/3 times a week. I still have nightmares and difficulties sleeping at night. I am still afraid of law enforcement officials. I do not have any scars.

(d)    Separately list and describe each of your claimed permanent disabilities.

ANSWER:    I continue to suffer a great deal of pain on my chest and right shoulder. The pain on my right shoulder is daily. The pain on my chest is about 2/3 times a week. I still have nightmares and difficulties sleeping at night. I am still afraid of law enforcement officials. It is difficult for me to do any physical activity.

(e)    if you claim any permanent scars, disfigurement or other cosmetic defect, present or potential, as a result of the incident, describe in detail the area of the body affected, the approximate dimension of the area, and the name and address of any person who has taken any photographs showing injury and when taken.

ANSWER:    N/A

(f)    If as a result of any injury in the incident sued upon, any doctor gave you a temporary or permanent disability rating, give the name and address of the doctor, what the rating covers, and when the rating was made, the percentage of rating and the reason therefore.

ANSWER:    Please refer to medical records furnished in response to request for documents.

(g)    If as a result of any injuries sustained in the incident you were unable to perform any of your normal and usual functions, duties or activities or whatever nature of any time since the incident (which you were able to perform before the incident), state such function, duty, and activity you were unable to perform, and also

separately state what functions, duties or activities, if any, you are still unable to perform and why.

ANSWER:    As a result of the injuries I sustained on the date of the incident, I was not able to perform the following activities:

1.    lift heavy objects;
2.    lift box of papers;
3.    home repairs and improvement;
4.    yard work such as mow lawn, repair sprinkler system and clear shrubs and leaves;
5.    shovel snow.

At present, I am not able to perform any of the above functions.  It is difficult for me to do any physical activity.

Interrogatory No. 4

Have you have been examined or have received any medical, psychiatric or other care or treatment from any doctor, chiropractor, therapist or practitioner as a result of injuries allegedly received in said incident? If so, please:

a. Identify each doctor or other practitioner who treated or examined you, indicating his specialty, if any, and each hospital, clinic or other facility in which you were treated or examined;

ANSWER:    Elliot Hospital
One Elliot Way
Manchester, NH 03103

Paul Morbey, MD.
Dartmouth-Hitchcock Clinic
P.O. Box 10547
Bedford, NH 03110

Robert M. Lavery, M.D.
New Hampshire Cardiology Consultants, P.C.
1 Elliot Way, Suite 100
Manchester, NH 03103

b. Provide a detailed description of the injuries or complaint for which you consulted or were treated by each doctor, practitioner, or facility identified;

ANSWER:    See my Answer to Interrogatory #3 above.

c. Give the dates of treatment or examination by each such person or facility;

ANSWER:    On March 8, 2004, I received medical care in the emergency room at Elliot Hospital. From March 10, 2004 to April 29, 2004, I was examined and treated by my Primary Care Doctor Paul Morbey.

d. Describe in detail the treatment or examination received from each such person or at each facility;

ANSWER:    Please refer to medical records furnished in response to request for documents.

e. Describe in detail the diagnosis and prognosis given by each practitioner or at each facility;

ANSWER:    Please refer to medical records furnished in response to request for documents.

f. Describe all medications and narcotics prescribed, identify by whom and for what purpose, where they were obtained, and the frequency and the period of time from date to date over which they were taken;

ANSWER:    I have been taking the following medications daily:

1.    Aspirin                              pain medication

2.    Toprol 50mg or Lopresor 50mg         heart medication

The heart medications are prescribed by my Cardiologist. The Aspirin medication is purchased at the local pharmacy.

g. Describe the nature, extent and duration by dates of any self-administered home care or therapy, and if recommended by any doctor or practitioner, give his name and address;

ANSWER:    None.

h. State whether you are still being treated, examined or attended by any doctor or medical practitioner; and

ANSWER:    I am not being treated by a medical practitioner.

i. Give the date of each doctor's or other practitioners written report, the addresses of those preparing each such report, the name of each doctor or other practitioner making any such report and the name and address of the present custodian of each such report.

ANSWER:    N/A

Interrogatory No. 5

>   Identify each doctor, chiropractor, or other health practitioner who you had seen, consulted or been treated by in the five years prior to the incident. For each such practitioner state;
>
>   ANSWER:   Plaintiff objects to this interrogatory on the grounds that it is overly broad as to scope and that the information sought is not relevant to the subject matter of the pending action, nor appears reasonably calculated to lead to the discovery of admissible evidence.   Subject to and without waiving this objection, Plaintiff states:

>>   Dr. Paul Morbey
>>   Dartmouth-Hitchcock Clinic
>>   P.O. Box 10547
>>   Bedford, NH 03110

>>   Robert M. Lavery, M.D.
>>   New Hampshire Cardiology Consultants, P.C.
>>   1 Elliot Way, Suite 100
>>   Manchester, NH 03103

>>   CMC Catholic Medical Center (heart surgery)
>>   Manchester, NH

>   a. the dates of treatment or consultations;
>
>   ANSWER:   Dr. Morbey has been my primary care physician for the past seven (7) years.   I see Dr. Morbey for my routine medical care and annual physical examination.   I do not recall the dates of my visits with Dr. Morbey.
>   I had an open heart surgery in 1982 and again in 1999.   I have been using a pacemaker since 1999.

>   b. the reason for the consultation or treatment received;
>
>   ANSWER:    I see Dr. Paul Morbey for my routine medical care and annual physical examination.

>   c. all medicines prescribed; and
>
>   ANSWER:    Toprol 50mg and Lopresor 50mg.

>   d. the diagnosis and prognosis given by that practitioner.
>
>   ANSWER:    I had an open heart surgery in 1982 and again in 1999.   I have been using a pacemaker since 1999.   I have been taking the heart medication Toprol since 1999.

6

<u>Interrogatory No. 6</u>

Within five (5) years prior to the alleged occurrence had you undergone or received any treatment for any mental or emotional disturbance? If so, please state as to any such treatment for any mental or emotional disturbance.

ANSWER:    I have not received any treatment for mental or emotional disturbance.
a.    the nature and extent of each such treatment;

ANSWER:    N/A

b.    the dates of each such treatment;

ANSWER:    N/A

c.    the location or place of each such treatment; and

ANSWER:    N/A

d.    the name and address of any doctor, physician, practitioner, hospital, clinic or institution involved in each such treatment.

ANSWER:    N/A

<u>Interrogatory No. 7</u>

Identify and describe in full and complete detail how the incident alleged in your complaint occurred including without limitations, the time of day, the sequence of acts and events, the precise location of each act and event, and what you and each other person present did, saw and heard during the time immediately preceding and immediately following the incident and during the incident itself.

ANSWER:    The incident occurred on March 7, 2004 at approximately 9:30 p.m. on Route 3 North. I had left my son's house in Bedford, Massachusetts and was on my way home. I was pulled over by State Trooper Joaquin Miranda. I stopped at the breakdown lane. I gave my New Hampshire driver's license and car registration to Trooper Miranda. Trooper Miranda took both documents. I waited inside my automobile. While inside my automobile, a tow truck arrived at the scene. Trooper Miranda returned to my automobile and asked me to come out of my vehicle. I came out of my automobile. Trooper Miranda told me that my license was suspended. I told Trooper Miranda that my license was not suspended and that I had a Letter of Clearance inside my automobile that shows that my license was not suspended. Trooper Miranda did not listen to me or allow me to retrieve the letter from my automobile. Trooper Miranda pushed me against my automobile. My chest struck the automobile. I continued to try to explain to Trooper Miranda about the Letter of Clearance and that I use a

pacemaker for my heart condition. I covered my pacemaker with my left hand so that it would not disconnect or become dislodged. Trooper Miranda did not listen to me. Trooper Miranda next pushed me onto the ground. My chest struck the ground. I became even more nervous and afraid that my pacemaker would get disconnected or dislodged and that I could die. I continued to try to protect my pacemaker with my hand. Trooper Miranda called for help and other law enforcement officers arrived. I was sprayed with pepper, handcuffed and placed inside the back seat of Trooper Miranda police cruiser.

While inside the police cruiser, Trooper Brian Sweet came over, opened the back door and viciously kicked me on my chest repeatedly. Trooper Sweet closed the door and walked away. Trooper Sweet returned and opened the door and again attempted to kick me. I was so afraid of dying that I bent down to avoid the kicks to my chest area. While I was bending down, I noticed my glasses were on the ground and asked Trooper Sweet for them. Trooper Sweet responded "oh these" and stomped on them. The other law enforcement officers were not in my immediate area while I was being attacked by Trooper Sweet.

I was taking by Trooper Miranda to the Andover State Police barrack and booked and charged with speeding, driving with a suspended license, disorderly conduct, resisting arrest, and assault and battery on police officer. At the police barrack, I was experiencing difficulty breathing and severe pain all over my body. I was not offered any medical care. I was released on my personal recognizance to my wife.

My wife took me to the Elliot Hospital emergency room the same night. The emergency room physician found that I had suffered a collapsed lung, fractured rib and contusions and abrasions on my face, hand, elbow, leg, chest and back. I was examined, treated and discharged with instructions to follow up with my primary care physician.

## Interrogatory No. 8

State the names, addresses and telephone numbers of all persons that witnessed or may have knowledge of any part of the incident or your claim of damages. As part of your answer, state the following;

(a)    Identify all persons who may have seen or heard the incident referred to in your lawsuit. State the relationship of each witness to you;

ANSWER:    Trooper/Defendant:  Joaquin Miranda
I am not related to the State Trooper

Trooper/Defendant:  Brian Sweet
I am not related to the State Trooper

I do not know the identity of the other witnesses at the scene of the incident.

(b)    Identify all persons who heard, or claim to have heard, any statements made by any person concerning how the incident happened or the person or persons at fault in the occurrence;

ANSWER:    See my Answer to Interrogatory #8 (a) above.

(c)    Identify all persons who have or claim to have any knowledge concerning the injuries or damages sustained by you in the incident; and

ANSWER:    Trooper/Defendant:  Joaquin Miranda

                Trooper/Defendant:  Brian Sweet

                Wife:               Vera L. Mendes

                Daughter:        Glauccy Mendes

                Emergency room physicians and nurses at Elliot Hospital

                Dr. Paul Morbey

(d)    Of all persons who rendered or offered assistance at the scene of the incident, or who gave their names, or assisted you in making any report of the incident.

ANSWER:    See my Answer to Interrogatory #8 above.

Interrogatory No. 9

As to each person named in your answer to the preceding interrogatory, state:

(a)    Describe in detail what each person saw, heard and did, and describe how you became aware of that information;

ANSWER:    See my Answer to Interrogatories # 8 and 9 above.

(b)    Identify all documents containing any statement or account by each such person, describe the document, and identify the holder of the document.

ANSWER:    See Police Incident report prepared by Trooper Joaquin Miranda, booking report and internal affairs reports.

Interrogatory No. 10

Please give an account, itemized as fully and carefully as possible, of all losses and expenses or other damages which you claim were incurred by you as a result of the incident set forth in your complaint, stating specifically but not limited to those losses or expenses for medical care and attendance, and lost time from employment. If you claim lost wages or earnings, as part of your answer:

ANSWER:    I incurred the following medical bills:

| | |
|---|---|
| Elliot Hospital | $3,964.19 |
| Dartmouth-Hitchcock Clinic | $557.00 |
| Out of Pocket Expenses (co-pay + medications) | to be provided |

(a) provide a detailed list of the days and hours you were unable to work, and, for each day give the reason;

ANSWER:    I was not able to work the entire week from March 8, 2004 to March 12, 2004. My entire body was sore and in great pain. It was difficult for me to get out of bed. I was not able to perform my usual job duties which required lifting boxes, bending, kneeling and prolonged standing.

(b) give your hourly wage before the incident, after your return to work and currently;

ANSWER:    Prior to the incident, I was earning $19.00 an hour and working 40+ hours a week. My hourly rate was the same after I returned to work. My last earning was $19.40 an hour.

(c) state whether you received sick leave, worker's compensation or disability pay or insurance, and, if so, the dates and amounts of all such payments. Identify the source of any such payment.

ANSWER:    I used my vacation time while I was out work during the week of March 8, 2004. I do not recall the amount I was paid for the week.

(d) Identify each employer or business from which you lost work.

ANSWER:    Synergy Graphics
3A Lopez Road
Wilmington, MA 01887

Interrogatory No. 11

For each expert witness who is expected to testify on your behalf at the trial of this case:

ANSWER:    My attorney had advised me that a determination has not yet been made as to who might be called to testify on my behalf as an expert witness at trial.

(a)    identify said expert witness and his area of expertise;

(b)    describe the substance of the facts to which each expert witness will testify;

(c)    describe the opinions to which each expert witness will testify;

(d)    summarize the grounds for each opinion;

(e)    specify the amount of any monetary compensation provided or promised to each such expert witness, and state how much of that amount has been paid.

ANSWER: (a-e) See my Answer to Interrogatory #11 above.

Interrogatory No. 12

With regard to your allegations that Mr. Sweet intentionally inflicted emotional distress upon you, state the following;

(a)    describe separately and in detail each action of Mr. Sweet that you contend to be extreme and outrageous, utterly intolerable in a civilized society, or which was otherwise done for the purpose of inflicting severe emotional distress upon you;

ANSWER:    Plaintiff objects to this interrogatory to the extent that it requires him to make conclusions of law and apply law to fact which the plaintiff is not qualified to make. Without waiving or limiting this objection, Plaintiff states the following: See my Answer to Interrogatory #3, 4. 5, 7 and 10 above.

(b)    describe in detail the severe emotional distress that you suffered, giving the dates and type of all treatment or counseling that you received for that distress.

ANSWER:    Plaintiff objects to this interrogatory to the extent that it requires him to make conclusions of law and apply law to fact which the plaintiff is not qualified to make. Without waiving or limiting this objection, Plaintiff states the following: See my Answer to Interrogatory #3, 4. 5, 7 and 10 above.

Interrogatory No. 13

Describe in detail each act of Mr. Sweet that you claim constituted an assault and/or a battery, specifying which it constituted, and for each act describe state when and how it occurred, and specify all injuries arising from each act.

ANSWER:    Plaintiff objects to this interrogatory to the extent that it requires him to make conclusions of law and apply law to fact which the plaintiff is not qualified to make. Without waiving or limiting this objection, Plaintiff states the following: See my Answer to Interrogatory #3, 4. 5, 7 and 10 above.

Interrogatory No. 14

State the basis, as that term is defined above, for your claim that Mr. Sweet acted with malice towards you.

ANSWER:    Plaintiff objects to this interrogatory to the extent that it requires him to make conclusions of law and apply law to fact which the plaintiff is not qualified to make. Plaintiff also objects on the ground that the interrogatory states as malice is defined above but failed to provide the definition for "malice". Without waiving or limiting this objection, Plaintiff states the following: See my Answer to Interrogatory #3, 4. 5, 7 and 10 above.

Interrogatory No. 15

With regard to the status of your motor vehicle license at the time of the incident, describe in detail why it was listed as suspended, give the reason why it had been previously suspended, give the date that it was reinstated and the reason, state whether you were aware that it was still listed as suspended, and describe in detail all steps that you took correct that listing.

ANSWER:    My license was not suspended at the time of the incident. My license was previously suspended based on incorrect information which the registry of motor vehicle issued a Letter of Clearance. I carried the Letter of Clearance in my automobile at all times. I made several attempts to give a copy of the Letter of Clearance to the Defendants at the scene of the incident but they refused to listen to me or to examine the letter.

Interrogatory No. 16

Describe separately and in detail each act of Mr. Sweet that you claim constituted any of the following, and for each act describe state when and how it occurred, and specify all injuries arising from each act;

(a)    a beating;

ANSWER:    Plaintiff objects to this interrogatory to the extent that it requires him to make conclusions of law and apply law to fact which the plaintiff is not qualified to make. Without waiving or limiting this objection, Plaintiff states the following: See my Answer to Interrogatory #3, 4. 5, 7 and 10 above.

(b)    physical abuse or brutality;

ANSWER:   Plaintiff objects to this interrogatory to the extent that it requires him to make conclusions of law and apply law to fact which the plaintiff is not qualified to make.  Without waiving or limiting this objection, Plaintiff states the following: See my Answer to Interrogatory #3, 4. 5, 7 and 10 above.

(c)    excessive force.

ANSWER:    Plaintiff objects to this interrogatory to the extent that it requires him to make conclusions of law and apply law to fact which the plaintiff is not qualified to make.  Without waiving or limiting this objection, Plaintiff states the following: See my Answer to Interrogatory #3, 4. 5, 7 and 10 above.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS _14_ DAY OF FEBRUARY 2006.

_____
Mario E. Mendes

As for Objections:

_____        07-16-06
Jose Couto Centeio, Esquire
BBO# 554440
NATHANSON & GOLBERG, P.C.
Two Oliver Street
Boston, MA 02109
617-210-4815
F:\windoc\jcc\pi\mendesanswerints.doc

# EXHIBIT 2

# Massachusetts State Police
## Arrest Report

Printed By: MSP1555

Print Date: 19:55:00 PM

## Incident Information

Incident #: 2004-0A1-0389
SBTN: TSA1200401465
Date/Time: 3/7/04 9:55:00 PM
Court Loc.: LOWELL DC
City: CHELMSFORD
Invest. Type: MOTOR VEHICLE VIOLATION

Loc.Street/Route #: RT 3, DIR N, PROX SOUTH OF, EXIT F
City/Town: CHELMSFORD
Invst.Officer #: 1555   Name: TROOPER MIRANDA, J(
Duty Station: A-1
Address: RTE. 125
City, State: ANDOVER, MA   Zip: 01810
Telephone: (978) 475-3800



## Subject Information

Wanted: N
Name: MENDES, MARIO E
DOB: 3/16/39
POB: PORTUGAL
Address: 117 WESTWIND DRIVE
City: MANCHESTER
State: NH   Zip: 03104
Phone:
SSN: 001881141
Marital Status: MARRIED
Father's Name: JOSEPH MENDES
Mother's Maiden: MARIA ESTAVES
Spouse's Maiden: RODRIGUEZ, VERA

Sex: MALE
Age: 064
Race: WHITE
Height: 502
Weight: 145
Hair: GRAY
Eye Color: HAZEL
Build: THIN
Complex: LIGHT
Num. Of Children: 2
Occupation: PRINTER
Emp./School: SYNERGY
Address: 3A LOPEZ RD WILMINGTON MA

## Charges

| | |
|---|---|
| 90-23-D | LICENSE SUSPENDED, OP MV WITH |
| 90-18-A | SPEEDING IN VIOL SPECIAL REGULATION |
| 265-13D-A | A&B ON POLICE OFFICER |
| 268-32B | RESIST ARREST |
| 272-53-F | ORDERLY CONDUCT |

## Vehicle Information

License #: 016490339/A08?
State: MA   Class: D
Status: REVOKED
Vehicle. Owner: MENDES, MARIO E
Owner Address: 117 WESTWIND DRIVE
City: MANCHESTER
State: NH   Zip: 03104
Lic Susp/Rev Date: 4/3/99
Reason: PAYMENT DEFAULT
Veh. Reg Number: 1634567   State: NH
Issued: 11/28/03   Expiration: 11/2004
Veh Susp/Rev Date:
Reason:
Vehicle Stolen: N
Vehicle Towed By: LOWELL AUTOMATI
M/V Inv Attached: N   Evl. Seized: N
VIN:
Vehicle Year: 2002
Vehicle Make: TOYOTA
Vehicle Color: GREY

## Custody Information

Assisted Officer #:
Rights Adv. Officer #: 1555   Name:
Photo Taken: N   Name: TROOPER MIRANDA, JOAQUIN P
Photo Taken By #: 1555   Printed: N
Desk Officer #: 2328   Name: TROOPER MIRANDA, JOAQUIN P
Person Called: VERA MENDES   Name: TROOPER CHOQUETTE II, ROBER
Number: 603-644-8105

Breath Test Refused:   BT1 Given By #:
BT1 Date/Time:   BT1 Result:
BT2 Date/Time:   BT2 Result:
BT3 Date/Time:   BT3 Result:
BT Action:
Incident Involve Abuse-Defined in Section 209A?   N   Medication: N
Medication Info:

Bailed By/Released To:
Person Contacted If Detox:
Subject Status:

| Investigating Officer/ID#: | Reviewing Officer/ID#: |
|---|---|
| TROOPER MIRANDA, JOAQUIN P1555 | |

## Associated Persons

| Association | Name |
| --- | --- |
| WITNESS | CLANCY, CHARLES |

## Narrative

1. On 03/07/2004 at approximately 21:49 hrs, I was performing selective enforcement on Route 3 n/b in the area between the B&M Rail Road tracks and Route 40 in the town of Chelmsford. The weather and roads were clear. The flow of motor vehicle traffic was light to medium. The road consists of two lanes north and south and is currently under construction. It is maintain by the Mass Highway Dept. The posted speed is 55 mph.

2. At this time I observed a vehicle traveling in the left lane at a high rate of speed. I estimated its speed to be 80 to 85 mph and then verified the speed to be 83 mph with my Radar unit. I then activated my lights and siren and initiated a motor vehicle stop of the vehicle. The vehicle was a Toyota Corolla bearing New Hampshire registration 1634567. The vehicle was stopped in the area of exit 33.

3. I approached the vehicle and made contact with the operator a w/m/a. I informed him of my observations and requested his lice                          license and registration. As he searched for his license he stated that everybody is speeding but him. I again requested his
   Paper work .He produce a NH license, which identified him as Mendes, Mario E of 117 West Wind Dr. Manchester NH with a        DOB of 03/16/39 NewHampshire License #03MSM39161NH

I proceeded back to my cruiser and had Station "A" dispatched run his information. It was reported that he has a valid NewHampsire license. It was also reported that his Mass license and Right to operate was Suspended under License # 016490339 and A08710652 due to Payment Defaults. I requested a tow and issued Criminal citation M0684879 for Operating after suspension, Unlicensed operation and for speed as I awaited the arrival of the tow truck.

When the tow truck arrived I proceeded back to the Toyota I requested Mr Medes to step out of his vehicle. He exited the vehicle and closed the door. I informed that his Mass license was suspended and I presented him with the criminal summons. I then told him that his vehicle was going to be towed. He stated "NO" I will not let it I am going to Rome!" I told him it was being towed and he could go with the Tow truck operator. He again stated "NO" Then stated I am leaving and attempted to get into his vehicle. He attempted to open the door and I shut it. He then pushed me away and swung at me. I then informed him that he was under arrest and to put his hand behind his back. He stated "NO I am leaving ". A struggled ensued. Mendes refused to allow himself to be cuffed. I was able to place one cuff on his right wrist and he tried to pull away. At one point we were struggling in the right travel lane. Mendes continued to resist by pushing me and flailing arm. He struck me in the chest several times. I then forced Mendes to the ground and he still struggled. We were now both on the ground partially in the right travel lane. Mendes locked his left arm under chest. Verbal and Pain compliance techniques failed. At this point I was in fear for my safety! I was in the travel with vehicle approaching me. All verbal and Pain compliance techniques failed. I informed Mendes numerous times that I was going to spray him with Pepper Mace if he continued to resist. He was now trying to get up I then sprayed with my Pepper Spray .It had little or no effect. I called for a code one and requested back up. The tow truck driver Charles Clancey grabbed Mendes's legs to keep him from kicking and we manage to pull him from the travel lane. Mendes continued to resist. It was not until Trooper Joseph Hickey of the Andover Barracks arrived that we were able to get the second cuff on him.

I requested an ambulance for decontamination and to assess Mendes condition. He had received several scrapes and bumps to his Forehead, Elbows and Hands during the struggle from being on the ground. Trinity Ambulance arrived on scene and EMTs Brady and Corrigan assist Mendes. He was then placed into my cruiser I advised him of his rights and transported him to the Andover Barracks. At the barracks he was booked and advised of his rights again. He made a phone call to his wife Vera Mendes to arrange for bail. Mendes was charged with Oper after Suspension. Unlicensed, Speeding, Disorderly Person, Resisting Arrest and Assault And Battery on a Police Officer. Motor vehicle violation were cited on # M0684880 due to changing the citation to an arrest. It was issued in hand at the barracks,

| Investigating Officer/ID#: | Reviewing Officer/ID#: |
| --- | --- |
| TROOPER MIRANDA, JOAQUIN P1555 | |

Rt 3 N/B  Between the B&M Rail Road Bridge and Rt 40 Chelmsford

Break Down Lane

Tpr Miranda

Mendes—

Mendes—

Mendes—

Tpr Miranda

Tow Truck operator

Trp Miranda & Mendes

Sequence of events

Sequence 3
Mendes was on the ground. Tpr Miranda was on top attempting
cuff him. Mendes was crawling out into the travel lane.
Traffic was bearing down on both parties. Tpr Miranda with
assistance of the wrecker operator pulled Mendes out of the
travel lane. Mendes was Pepper sprayed at this location. He
was not wearing glasses at this time.

# EXHIBIT 3

Page 1

VOLUME:   I
PAGES:  1 - 149
EXHIBITS:  1 - 9

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

- - - - - - - - - - - - - - - - - - - - -x
MARIO E. MENDES,
          Plaintiff,

vs.                          Docket No. CA05-11292-DPW

BRIAN SWEET AND JOAQUIN MIRANDA,
          Defendants.
- - - - - - - - - - - - - - - - - - - -x

DEPOSITION of JOAQUIN MIRANDA,

a witness called on behalf of the Plaintiff, taken

pursuant to notice before Deborah L. Maren, Registered

Professional Reporter and Notary Public in and for the

Commonwealth of Massachusetts, at the offices of Nathanson &

Goldberg, P.C., Two Oliver Street, Boston, Massachusetts, on

Tuesday, June 6, 2006, commencing at 10:00 a.m.

DUNN & GOUDREAU
COURT REPORTING SERVICE, INC.
ONE STATE STREET, BOSTON, MA 02ten9
TEL:  617-742-6900 / FAX:  617-973-9500
www.dunnandgoudreau.com



COPY

Page 42

1   A.    New Hampshire border, Zachim Bridge area as far as the

2   ocean.

3   Q.    When you say Zachim Bridge, you're referring to the

4   Zachim Bridge in Boston, Massachusetts?

5   A.    Yes.

6   Q.    All the way to the New Hampshire border?

7   A.    Right.

8   Q.    That's where the target area is?

9   A.    The Atlantic Ocean to -- I believe it's Bolton, Mass.,

10  the western part of the state.

11  Q.    And how did you learn of the incident?

12          MR. SILVERFINE:  Objection as to the form.

13  Q.    How did you find out about the incident?

14  A.    I was involved in the incident.

15  Q.    Where were you before you encountered Mr. Mendes?

16  A.    I was on Route 3 in Chelmsford.

17  Q.    Which direction were you traveling on Route 3?

18  A.    Northbound.

19  Q.    How did you come across Mr. Mendes?

20  A.    I was engaged in stationary traffic enforcement.

21  Q.    And traffic enforcement, can you tell us exactly what

22  that was?

23  A.    I had my radar set up, and I was observing traffic

24  flow.

1  how many travel lanes are there?

2  A.    I believe at the time there was two travel lanes.

3  Q.    Was there any construction in that spot where you had

4  been stationary?

5  A.    I don't recall if there was or not.

6  Q.    And at what point in time did you come across

7  Mr. Mendes's vehicle?

8  A.    Time?

9  Q.    Correct.

10  A.    I don't recall the exact time.

11  Q.    And how did you come across Mr. Mendes's vehicle?

12  A.    I observed a vehicle in the left lane traveling at a

13  high rate of speed.

14  Q.    Can you identify what the high rate of speed was?

15  A.    I estimate it to be 80 to 85.

16  Q.    And was that based on the radar clock?  Or was that

17  based on your estimate?

18  A.    That was my estimate.

19  Q.    Had you used your radar clock at that time?

20  A.    Beforehand -- afterwards, yes.

21  Q.    Were you able to get a reading?

22  A.    Yes.

23  Q.    What was the reading?

24  A.    To the best of my recollection, I think it was 83.

Page 48

1   A.    Can I what?

2   Q.    Identify the color of the individual inside the

3   vehicle.

4           MR. SILVERFINE:   From where?

5   Q.    From where you turn on your light and get out of your

6   vehicle.

7   A.    No, not at that point.

8   Q.    How many -- in terms of distance in feet, how far away

9   was his vehicle from your vehicle?

10  A.    I don't recall.

11  Q.    Was it more than a car length?

12          MR. ROGAL:   Objection to form.   Go ahead.

13  A.    I believe so.

14  Q.    Was it more than two car lengths?

15  A.    I don't recall.

16  Q.    So it would have been between one and two car lengths?

17  A.    I'm not sure.

18  Q.    What did you do after you turned on your lights?

19  A.    Proceeded up to the operator.

20  Q.    And what did you do next?

21  A.    I informed him of his -- my observations and requested

22  his license and registration.

23  Q.    You informed him of your observations?   What were your

24  observations that you informed him of?

1    A.    That he was speeding.

2    Q.    And then you asked him for his registration and

3    license?

4    A.    Yes.

5    Q.    Did he give you his registration and license?

6    A.    Not immediately.

7    Q.    How long did it take for him to give it to you?

8    A.    A few seconds.

9    Q.    Did he speak to you between you asking him for the

10   registration and license until the time he gave it to you?

11   Did he say anything to you?

12   A.    Yes.

13   Q.    What did he say?

14   A.    What about everybody else that's speeding?

15   Q.    Were those his exact words?

16   A.    As close as I can recall to the exact words.

17   Q.    And then what happened after?

18   A.    He presented me with his license and registration.

19   Q.    And at that point had you made a determination of what

20   kind of vehicle he was driving?

21   A.    Yes.

22   Q.    What kind of vehicle was it?

23   A.    I believe it was a Toyota.

24   Q.    And he gave you -- and you said it took seconds for

DUNN & GOUDREAU

Page 50

1    him to give you those two documents, registration and

2    license; correct?

3              MR. SILVERFINE:  Objection as to the form.

4    A.    Yes.  A few seconds, yes.

5    Q.    But less than a minute?

6    A.    Pardon me?

7    Q.    Less than a minute?

8    A.    Within that.

9    Q.    Did he give you the registration to the Toyota motor

10   vehicle you identified?

11   A.    Yes, he did.

12   Q.    And what kind of a license did he give you?

13   A.    A New Hampshire license.

14   Q.    And what did you do next after he gave you those two

15   documents?

16   A.    Proceeded back to my vehicle.

17   Q.    And what did you do next?

18   A.    I then ran his license and registration through

19   Station A, dispatch.

20   Q.    And you did not run it within your vehicle?  You had

21   to call the dispatcher to obtain information on the

22   document; is that correct?

23   A.    Yes.

24   Q.    And the dispatcher, where were they located?

Page 52

1   A.    He reported that his New Hampshire license was valid,

2   but his right to operate in Massachusetts was suspended due

3   to payment default, I believe.

4   Q.    And that was the information that the dispatcher

5   relayed back to you?

6   A.    Yes.

7   Q.    And what did you do with that information?

8   A.    I don't understand.

9   Q.    They told you that his Massachusetts license was

10  suspended.  What did you do after you got that information?

11  A.    I then issued a criminal summons for operating after

12  suspension, unlicensed operation, and speeding.  And I

13  called for a tow truck.

14  Q.    Now, if a person has a New Hampshire license, can they

15  use that New Hampshire license to operate a motor vehicle in

16  Massachusetts?

17        MR. SILVERFINE:  Objection as to the form.

18  A.    Can they use that?

19  Q.    Correct.

20  A.    Yes.

21  Q.    So if a person has multiple licenses, all the licenses

22  have to be maintained in a valid status; correct?

23  A.    I don't understand multiple licenses.

24  Q.    If I have a New Hampshire license and a Florida

Page 54

1          (Question read.)

2          MR. SILVERFINE:  Objection as to the form.  You

3  can answer.

4  A.    I don't know what New Hampshire does.  I don't know.

5  Q.    At the beginning when you stopped and you were telling

6  him it was for speeding; correct?

7  A.    Yes.

8  Q.    And then after you validate his information, it came

9  back that his license was suspended in Massachusetts, you

10  went back.  And what did you tell him?

11  A.    I told him that his license was suspended in

12  Massachusetts and that he couldn't drive the vehicle and it

13  was going to be towed.

14  Q.    And what was his response?

15  A.    He was outside the car.  He said, No.  I'm leaving.

16  I'm going to Rome.

17  Q.    And was the word "Rome," home?  Or that's what you

18  heard?

19  A.    I heard distinctively, "Rome."

20  Q.    Did he tell you any other words?

21  A.    Just that he was leaving.  He wasn't -- he was going

22  to Rome.  I think he said it twice, if I recall.

23  Q.    What happened next?

24  A.    He attempted to get in his vehicle.

Page 55

1   Q.    What did he do?

2   A.    He opened the door.

3   Q.    Did he get in the vehicle?

4   A.    No, he did not.

5   Q.    What happened?

6   A.    I shut the door.

7   Q.    At that point, when he was trying to get into his

8   vehicle, did he tell you he was looking for something?

9   A.    No, he did not.

10  Q.    Did he mention any words to you whatsoever?

11  A.    Just that he was -- he was going home.

12  Q.    Did he say anything else?

13  A.    He was leaving.

14  Q.    Did he say anything else to you?

15  A.    No, he did not.

16  Q.    Did he say he was obtaining a paper or a document?

17  A.    No, he did not.

18  Q.    Up until this point, were you able to understand him

19  clearly?

20  A.    Yes.

21  Q.    Based on your observation, did you feel that he was

22  able to understand you?

23  A.    Yes.

24  Q.    Did he have an accent when he spoke to you?

Page 56

1    A.    I don't recall.

2    Q.    Were you able to tell if he was a foreigner?

3          MR. SILVERFINE:  Objection.

4    A.    I don't recall at that time.

5    Q.    You looked at his license and registration.  Was the

6    vehicle under his name, Mario Mendes?

7    A.    I don't recall at this time.

8    Q.    But you looked at his license and you saw his name?

9    A.    Yes.

10   Q.    And were you able to tell if he was of Spanish,

11   Portuguese, or any background?

12   A.    I couldn't tell what it may be.

13   Q.    Do you speak any other language yourself?

14   A.    No.

15   Q.    Do you speak Spanish?

16   A.    No.

17   Q.    Do you understand Spanish?

18   A.    No.

19   Q.    Do you speak Portuguese?

20   A.    No.

21   Q.    Do you understand Portuguese?

22   A.    No.

23   Q.    Because of your last name, Miranda, which could be

24   from a Portuguese background, I want to get an understanding

Page 57

1    that you do not speak Portuguese.  Correct?

2    A.    Correct.

3          MR. SILVERFINE:  Objection as to form, and he's

4    already answered that.

5          MR. ROGAL:  Objection.  Because his last name is

6    Miranda doesn't mean --

7          MR. CENTEIO:  No, but that's what I'm trying to

8    find out.

9          MR. ROGAL:  We're not stereotyping, are we?

10          MR. CENTEIO:  No, but I'm just finding out.

11    Q.    So you did not speak to him in any other language?

12    A.    No.

13    Q.    English --

14    A.    English.

15    Q.    -- correct, was the only language you spoke?  And you

16    were -- up until this point that he was trying to get back

17    into the car, you understood him a hundred percent?

18    A.    Yes.

19    Q.    And you felt that he understood you a hundred percent?

20    A.    Yes.

21    Q.    You didn't think there was any language barrier?

22    A.    Correct.

23    Q.    And you didn't hear him say, I need to get you a

24    document?

Page 60

1   Q.   How frequently were the cars passing by?

2   A.   I don't recall.

3   Q.   Was it a car every second?  A car every minute?

4   A.   I don't recall how frequently they were going by.

5   Q.   And up until this point, it was only your cruiser and

6   Mr. Mendes at the scene; correct?

7   A.   No.

8   Q.   Okay.  You were telling him that his vehicle was going

9   to be towed and he can go with the tow truck driver?

10  A.   Yes.

11  Q.   Was there any other cruiser at the scene?

12  A.   No.

13  Q.   No?  Any other vehicles at the scene?

14  A.   Yes.

15  Q.   What vehicle?

16  A.   Tow truck.

17  Q.   Who summoned the tow truck?

18  A.   I did.

19  Q.   When was that done?

20  A.   While I was in the cruiser.

21  Q.   Do you recall, was that after the information came in

22  from the dispatcher that his Massachusetts license was

23  suspended?

24  A.   Yes.

DUNN & GOUDREAU

Page 66

1    A.    He said, No, I'm leaving.  And he pushed me.  And I

2    responded to him, Put your hands behind your back; you're

3    under arrest.  He said, No, I'm leaving.  And then a

4    struggle ensued.

5    Q.    And explain to us what was the struggle.

6    A.    As I attempted to put a cuff on his right hand, he

7    began to resist.  I then -- as a struggle ensued, I then --

8    they put him up against the car.  I had --

9    Q.    At that point, how was he facing?  Was he facing his

10    car or the back of his car?

11    A.    He was facing the side of his car between the driver's

12    door and the passenger's door, in that area.

13    Q.    Were you on his side, or in the back of him, or in

14    front of him?

15    A.    I was behind him.

16    Q.    And you had his right hand; correct?

17    A.    I believe it was his right hand.

18    Q.    And at that point had you had the handcuff on the

19    right hand?

20    A.    At one point in time I did.

21    Q.    What happened next?

22    A.    He then continued to resist.  He resisted and --

23    Q.    When you say resisted, because it was the law or --

24    that's a conclusion.  How do you define resist?

Page 69

1    and you told him he was under arrest, the tow truck driver

2    was already at the scene; correct?

3           MR. ROGAL:   Objection.   You can answer.

4    A.    He had been there already, yes.

5    Q.    Now, can you put a -- draw the box for the tow truck,

6    where he stopped in relationship to your vehicle.

7    A.    Somewhere in the area over here.

8    Q.    You put it there for us.   Thank you.   So from the time

9    that you told him he was under arrest, Mr. Mendes, and

10   you've been struggling for about several minutes, the tow

11   truck was inside his vehicle; correct?

12          MR. SILVERFINE:   Objection.

13   A.    I don't know where he was at that time.

14   Q.    But the tow truck had been there; correct?

15   A.    Yes.

16   Q.    What happened next?

17   A.    We ended up struggling out in the travel lane, the

18   right travel lane of Route 3.

19   Q.    And this point, it had -- several minutes had gone by?

20   A.    It felt that way.

21   Q.    But you don't know if it was three minutes, five

22   minutes --

23   A.    Exactly.

24   Q.    -- right?   What happened next?

Page 70

A.    We continued to struggle.  At one point we went to the ground.  I tried -- while we were on the ground, I kept telling him to submit to the arrest.  If he -- he continued -- as he was on the ground, he was trying to drag himself further in the lane, trying to crawl and get up.

Q.    Before you move on, he was on the ground.  Were you also on the ground?

A.    Yes.

Q.    How was he facing on the ground?

A.    I believe he was either -- he was on his side.

Q.    In relation to him, how were you facing?

A.    I don't exactly recall.

Q.    Were you on the side of him?  On top of him trying to get his hand?

A.    I was all over him.

Q.    For how long would you say you were on the ground with him?

A.    I don't -- I couldn't tell you.

Q.    Minutes?

A.    I couldn't -- to be honest with you, I can't tell you. I don't know how long it was.

Q.    And you told us that he was trying now -- this is where I stopped you.  You can continue.  He tried to get on the travel lane.

Page 71

1   A.    We were already in the travel lane.

2   Q.    For how long do you believe you were in the travel

3   lane?

4   A.    I don't know.

5   Q.    Were any vehicles passing by you at that time?

6   A.    Yes.

7   Q.    How many vehicles would you say had passed by?

8   A.    I don't know.  I had only seen a couple.  At that

9   point in time I wasn't counting cars.

10  Q.    Would you say more than five?

11  A.    I have no idea.  All I know is I saw two sets of

12  headlights coming from my head.  That's all I remember.

13  They swerved out of the way.

14  Q.    What did you two do next?

15  A.    I told him to submit to the arrest.  If he didn't

16  submit to the arrest, I was going to pepper spray him with

17  pepper Mace.

18  Q.    What would you say the passage of time has been now

19  from the time that he was next to his car and you told him

20  he was under arrest until the time you told him, I'm going

21  to use the pepper spray?  What would you say?  Five minutes?

22  10 minutes?

23  A.    I don't -- I don't remember.  It seemed like an

24  eternity.

Page 72

1    Q.    So you don't know how to define --

2    A.    I couldn't tell you how long it was.

3    Q.    And what did you do after you gave him the pepper

4    spray warning?

5    A.    I told him several times --

6    Q.    Do you remember how many times?

7    A.    I know it was several times.

8    Q.    More than three times?

9    A.    I don't recall how many.

10    Q.    More than five times?

11    A.    I don't recall exactly how many.

12    Q.    And at this time that you tried to warn him, were you

13    two still on the ground?

14    A.    Yes.

15    Q.    What happened next while you two were still on the

16    ground?

17    A.    I tried pain compliance.

18    Q.    What is pain compliance?

19    A.    It's a technique they teach you in defensive tactics.

20    By applying pressure to different locations --

21    Q.    What pressure did you apply?

22    A.    I applied pressure to the mastoids.

23    Q.    What is that?

24    A.    Right behind your ears.

Page 73

1   Q.    And how did you do that?

2   A.    With one hand I was trying to apply pressure so that

3   he would take his hand a submit to the arrest with his left

4   hand.

5   Q.    Did that work?

6   A.    No.

7   Q.    How many times did you try that technique?

8   A.    I don't recall.  Several times.

9   Q.    More than three times?

10  A.    I don't recall exactly.

11  Q.    Did you use any other pain techniques?

12  A.    I don't recall if I did or not.

13  Q.    Okay.  Now, while you were still on the ground, were

14  you on top of him?  On the side?

15  A.    I was all over him at one point in time.

16  Q.    Were you on your knees as you were trying to grab his

17  hand at some point?

18  A.    I was on my knees at one point in time.

19  Q.    What happened next?

20  A.    At which point I did -- I warned him several times

21  again.  And then --

22  Q.    But you don't know how many times?

23  A.    I don't know how many times.  And then I gave him a

24  burst of pepper spray.

DUNN & GOUDREAU

1  Q.    What was the passage of time from the time that he was

2  outside of his vehicle and the time that you were about to

3  use the OC spray?  What would you say the passage of time

4  was?  Five minutes?  10 minutes?

5  A.    A lifetime for me.

6  Q.    Okay.

7  A.    I don't know.

8  Q.    And what happened?

9  A.    It had little to no effect on him.

10 Q.    So you did -- let's go back.  You did use the OC

11 spray.  Did you spray it once?  Or what did you do?

12 A.    I don't recall.  I think I sprayed him once or twice.

13 Q.    What do you do?  Is there a button you press?  Can you

14 tell us how it's applied?

15 A.    It's a cannister.  There's a button you apply.  And it

16 comes out in a spray form.  Form, not foam.

17 Q.    So you spray it?

18 A.    Yes.  Like an aerosol can.

19 Q.    Okay.  So is there like a feature or system that if

20 you spray it a certain amount it's released?  Or do you put

21 your finger there and it continues to spray?

22 A.    I believe if you keep your finger there, it will just

23 continue to spray.

24 Q.    Do you recall how many seconds you had your finger

Page 78

1    They become very passive, and all they want to do is get

2    that stuff off their face.  It becomes very irritant so they

3    try to put their hands to their face -- some people do.  It

4    varies.

5    Q.    How did Mr. Mendes react to the spray?

6    A.    As I said, it was little to no effect.

7    Q.    And at that point were you able to put both handcuffs

8    on his hands?

9    A.    No.

10   Q.    What happened?

11   A.    He still continued to resist.

12   Q.    Were you two still on the ground?

13   A.    Yes.

14   Q.    And how many minutes had passed up until this time?

15   A.    Again, I don't recall how long it was.

16   Q.    More than 10 minutes?

17   A.    I don't know.

18   Q.    More than 20 minutes?

19   A.    I don't recall.

20   Q.    What happened next?

21   A.    Traffic was bearing down on me -- on us.  And I yelled

22   to -- I called for backup on the radio.

23   Q.    How were you able to do that?  Is the radio still

24   something that comes over your shoulder and you can just

Page 80

1    can receive the call?

2          MR. SILVERFINE:  If you understand the question.

3    A.    I don't understand the question.

4    Q.    When you say code one when you are on the radio, is

5    that call directed to the dispatcher?  Or who is it directed

6    to?

7    A.    It depends on the circumstances.  It depends on what's

8    going on at the time.

9    Q.    In your circumstances, what happened?

10   A.    I just believe I put out a code one, officer -- I need

11   some assistance.  I don't remember if I called --

12   Q.    Who would be at the other end receiving that message?

13   A.    Anybody that's on that frequency system.  It doesn't

14   particularly go to each person.  It goes all out.

15   Q.    And when you say "all out," all out to the other

16   police cruisers?

17   A.    In bay stations, yes.  Anybody that has that Tac --

18   that Tac -- that are monitoring that Tac.

19   Q.    As well as your dispatcher, I guess?

20   A.    Yes.

21   Q.    Now, you've applied the pepper spray a couple of

22   times.  And at that point you two were still on the ground.

23   You had not completed the handcuffing process; correct?

24   A.    Correct.

Page 81

1  Q.    What would you estimate the passage of time?  More

2  than 20 minutes?  More than 30 minutes?

3  A.    I couldn't tell.  I don't know.

4  Q.    What happened next?

5  A.    I saw the tow truck driver.  He was standing outside

6  the car.  I yelled at him to give me a hand.

7  Q.    This was after you had used the code one to call the

8  dispatch?

9  A.    Yes.

10  Q.    What did the tow truck driver do?

11  A.    He came over and --

12  Q.    Do you remember his name?

13  A.    Charles Clancy.

14  Q.    And was he a small-build fellow?  Medium-build?

15  Heavy-build fellow?

16  A.    I don't --

17  Q.    Average?

18  A.    Yeah.  I would say maybe a little above average.

19  Q.    So just medium build?

20  A.    Yeah.  I'd probably say that's correct.

21  Q.    What was his height?

22  A.    I don't know what his height was.

23  Q.    Do you remember approximately what his weight was?

24  A.    No.  I don't know how much he weighed.

Page 86

1    A.    Correct.

2    Q.    What happened next?

3    A.    He was -- again, I called -- I think I called again

4    for backup or --

5    Q.    This was a second time you called?

6    A.    I think so.  I don't recall.  It was happening too

7    fast.  I believe a cruiser arrived on scene.

8    Q.    And this is before he was -- both hands were

9    handcuffed; correct?

10   A.    Yes.

11   ~~Q.    And at this point in time, was the tow truck,~~

12   Mr. Charles Clancy, still helping you holding Mr. Mendes?

13   A.    Yes.

14   Q.    And at this time he is still on the ground?  Or where

15   is he?

16   A.    On the ground.

17   Q.    So Mr. Charles Clancy is with him, and you were on the

18   ground still?

19   A.    Yes.

20   Q.    But the two of you had been pulled away from the road

21   and next to Mr. Mendes's vehicle?

22   A.    Somewhere in this area.  I don't know if we were next

23   to it.  It was somewhere in the area of his vehicle.

24   Q.    And the tow truck driver and you still had Mr. Mendes

Page 87

1    on the ground?

2    A.    Yes.

3    Q.    And you just told us that another state trooper

4    cruiser arrived?

5    A.    Yes.

6         MR. SILVERFINE:    Objection.

7    Q.    Who was that?

8    A.    Trooper Hickey.

9    Q.    Do you recall what his cruiser number was that night?

10   A.    No, I don't.

11   Q.    And was he accompanied by any other state trooper in

12   his vehicle?  Was he alone in his vehicle?

13   A.    He was alone in his vehicle.

14   Q.    What happened next?

15   A.    He then proceeded to my location.

16   Q.    Where was his vehicle when he first arrived?

17   A.    I have no idea.  No idea.

18   Q.    You don't know --

19   A.    I have no idea --

20         THE COURT REPORTER:    I'm sorry.  One at a

21   time.

22   A.    I have no idea.  That's the last thing I was looking

23   for was to see where his car was.

24   Q.    How many minutes do you think it took for Trooper

Page 91

1   Q.    Because you told us that Trooper Hickey came.  He went

2   down where you and the tow truck driver, Mr. Clancy, was

3   disengaging his left hand.  And you were able to place the

4   cuff on both hands, and then you walked him to your cruiser.

5   A.    Right.

6   Q.    Do you recall how many seconds or minutes it took?

7   A.    No, I don't recall that.

8   Q.    What happened next?

9   A.    I believe I called for an ambulance for

10  decontamination.

11  Q.    Before you called the ambulance, do you recall if you

12  called for additional backup?

13  A.    I don't recall.  I don't recall.

14  Q.    So you only made one phone -- code one phone call for

15  assistance?

16          MR. SILVERFINE:  Objection.

17  A.    As I stated earlier, I may have made a second call.  I

18  don't remember right now.

19  Q.    And then you recall that you yourself called for an

20  ambulance; correct?

21  A.    I believe so.  I don't remember for sure.  I don't

22  recall.

23  Q.    What was the purpose for calling an ambulance?

24  A.    As I stated, the purpose would have been for

Page 92

1  decontamination of myself and Mr. Mendes.

2  Q.    Did the ambulance arrive?

3  A.    Yes, they did.

4  Q.    How soon after you placed the call did the ambulance

5  arrive?

6  A.    I don't know.  I have no idea.

7  Q.    More than five --

8  A.    I have no idea, sir.

9        THE COURT REPORTER:  I'm sorry.  You have to wait

10 for him to finish.

11       THE WITNESS:  I'm sorry.

12 Q.    Did one ambulance show up?  Or did more than one

13 ambulance show up?

14 A.    I don't recall.  I know at least one showed up.

15 Q.    How many people arrived with the ambulance?

16 A.    I believe there was two.

17 Q.    Do you know their names?

18 A.    I don't recall at this moment what their names are.

19 Q.    Do you recall if any fire trucks arrived at the scene?

20 A.    I don't recall if there was or not.

21 Q.    Do you recall if any other ambulance arrived at the

22 scene?

23 A.    I don't recall that.

24 Q.    So now you have Mr. Mendes' vehicle, your vehicle, the

DUNN & GOUDREAU

Page 93

1  tow truck, and the ambulance and Trooper Hickey's vehicle.

2  At this point when the ambulance arrived, was there any

3  other vehicles?

4  A.    I believe there may have been several Chelmsford

5  officers.

6  Q.    When you say "several," did they each arrive

7  separately?  Or did they arrive in one car?

8  A.    I have no idea.

9  Q.    Do you remember how many Chelmsford police cruisers

10  were there?

11  A.    No, I don't.

12  Q.    Did any other state troopers arrive?

13  A.    I believe some had.

14  Q.    How many state troopers --

15  A.    I have no idea.

16  Q.    -- arrived?  More than three cars?

17  A.    I have no idea.

18  Q.    More than five cars?

19  A.    I have no idea, sir.

20  Q.    The ambulance came.  Did the ambulance provide any

21  medical assistance?

22  A.    I believe they did.

23  Q.    Who did they provide assistance to?

24  A.    Mr. Mendes.

Page 118

1    Q.    Does Exhibit No. 2 have anything to do with that?

2            MR. SILVERFINE:  Objection.  That's why they have

3    juries.

4    A.    I don't know.

5            MR. CENTEIO:  I'm asking him his opinion.  He's a

6    police officer, a state trooper.

7            MR. SILVERFINE:  That's why they have jury

8    trials.

9            MR. ROGAL:  This is off the record.

10           (Discussion off the record.)

11   Q.    While Mr. Mendes was at the scene and you had summoned

12   the ambulance, you told us you called the ambulance just to

13   provide some decontamination work; is that correct?

14           MR. SILVERFINE:  Objection.

15   A.    I believe so.

16   Q.    Did you have any concern for calling the ambulance

17   besides decontaminating the impact of the pepper spray?  Was

18   there any other reason for contacting the ambulance?

19   A.    Yes, because we both received some scrapes and

20   bruises.

21   Q.    I'm going to show you some pictures to go into that

22   then.  Did Mr. Mendes tell you that he was having difficulty

23   breathing?

24   A.    There was no mention --

# EXHIBIT 4

```
 1              UNITED STATES DISTRICT COURT
                 DISTRICT OF MASSACHUSETTS
 2

 3                          CASE NO.:  05-11292DPW

 4  MARIO E. MENDES,

 5          Plaintiff,

 6  vs.

 7  BRIAN SWEET and
    JOAQUIM MIRANDA,
 8
            Defendants.
 9

10    *   *   *   *   *   *   *   *   *   *   *   *   *

11  DEPOSITION OF:          MARIO MENDES

12  DATE TAKEN:             MARCH 31, 2006

13  TIME:                   11:25 A.M.

14  PLACE:                  1416 EAST ROBINSON STREET
                            ORLANDO, FLORIDA
15
16  REPORTED BY:            JILLIAN P. BAXTER,
                            COURT REPORTER AND
16                          NOTARY PUBLIC

17    *   *   *   *   *   *   *   *   *   *   *   *   *

18

19

20

21

22

23

24                                      COPY

25
```

5

1 many words.

2    Q.    We're -- actually, if any time you don't

3 understand the question as translated, please tell me.

4    A.    Okay.

5    Q.    Do you have any difficulty with the

6 Portuguese language?

7    A.    No.

8    Q.    Mr. Mendes, you were born in Portuguese?

9    A.    Yes.

10    Q.    And at some point, you moved to Brazil?

11    A.    Yes.

12    Q.    When was that?

13    A.    I moved to Brazil when I was 19 years old.

14 I lived in Brazil for 30 years.  After 30 years, I

15 moved to United States.

16    Q.    Why did you move to Brazil?

17    A.    I went to Brazil because Portuguese was a

18 very small country.  I lived in a very, very small

19 town, only 500 families that lived in the town.   In

20 this town, I had no perspective of future life.  And

21 that's why I moved to Brazil.

22    Q.    What kind of work did you do in Brazil?

23    A.    When I moved to Brazil, I worked with a

24 shoe manufacturer.

25    Q.    Doing what?

```
 1        Q.      Were there any problems with the car?

 2        A.      No.

 3        Q.      The trooper cited you as driving 83 miles

 4  an hour in a 55 mile an hour zone.

 5        A.      (By Witness) I don't know.

 6        Q.      You don't know how fast you were going?

 7        A.      No.

 8        Q.      You were stopped on Route 93; is that

 9  correct?

10        A.      Three, three north.

11        Q.      Did you know either Trooper Miranda or

12  Trooper Sweet?

13        A.      No.

14        Q.      Do you believe they knew you prior to this

15  incident?

16        A.      I don't know.

17        Q.      What happened after you were stopped?

18        A.      (By Interpreter) After I stopped the car

19  on the side of the road, the police stopped behind my

20  car.  They came to my car and asked for my driver's

21  license and registration.  I opened the glove

22  compartment and I gave both of them and gave them to

23  the trooper.  And he returned to his car.  It took

24  approximately ten minutes for him to come back to my

25  car.  And when he returned to my car, the tow truck
```

1  was already in front of my car, had been there for,

2  maybe, five minutes.

3       Q.      And did the trooper say anything to you?

4       A.      No.  He asked for me to exit the car,

5  which I turned off the engine and exited the car.  I

6  left the car.  He told me I had no driver's license.

7  And I told him no.  And I had the letter to show it to

8  him.  And he told me that he didn't want to see

9  anything.  And he asked me where I would like to go.

10 I told him I would like to go home.

11          He told me I was being arrested.  Again, I

12 told him no.  I was going to show him the letter.  And

13 I started walking toward the car.  And when I went to

14 grab the letter, he pushed me against the car.  And I

15 put my left hand over my pacemaker, because I was

16 slammed against the car.  And he put the handcuff on

17 my right wrist and pulled behind my back.  And pushed

18 me to the floor.  I went face down on the floor.

19      Q.      Let me stop you.  Did the trooper tell you

20 your car was going to be towed?

21      A.      No.  He did not tell me the car was going

22 to be towed.  But the tow truck was in front of my

23 car, so I assume it was going to be towed.

24      Q.      Did that make you angry?

25      A.      No, no.  Because I would go with the tow

1   truck, and I didn't care.

2        Q.      Was the trooper speaking English?

3        A.      Yes.  He tried to speak in Spanish, but I

4   told him I did not understand Spanish.

5        Q.      So was all the conversation in English

6   then?

7        A.      I speak you know the way I know how to

8   speak.  That's how I did.

9        Q.      Did the trooper speak to you in English?

10       A.      Yes.

11       Q.      And did you try to reply in English?

12       A.      I tried.  The 100 words I speak in

13  English, 90 are incorrect.  It's very hard for me to

14  answer and also to understand.

15       Q.      Well, do you understand English better

16  than you speak it?

17       A.      I believe so.  I understand better than I

18  speak.  I think so.  I don't know.

19       Q.      When you told the trooper that you were

20  going to get a letter, did you say that in English?

21       A.      Yes.

22       Q.      You say you went to get the letter.  Did

23  you open your car door?

24       A.      I don't know it, when I left the car if I

25  closed the door.  I cannot say yes or no.

23

```
 1        Q.      Didn't the trooper tell you to put your
 2   arm behind your back?
 3        A.      When I was on the floor, yes.  And -- but
 4   I would not give him my hand, because I was protecting
 5   my pacemaker.
 6        Q.      By the "floor," you mean the ground?
 7        A.      Yes.
 8        Q.      When you were on the ground, were you
 9   pushing up trying to get up?
10        A.      No.
11        Q.      Weren't you trying to push your chest off
12   the ground?
13        A.      No.  I was only protecting my pacemaker.
14   I actually had my face on the ground.  I don't know if
15   he had his elbow or maybe it was his knee on my back.
16        Q.      What did the tow truck driver do?
17        A.      I don't know exactly what he said.  But I
18   know that he asked Miranda if he needed help.
19        Q.      What did Miranda say?
20        A.      I don't know what Miranda said.  But I
21   know the driver from the tow truck came in and he was
22   holding my legs.
23        Q.      Now, when you were on the ground, where
24   were you?
25        A.      It wasn't on the curb, on the side.  But
```

1    Q.    But you had a cut up there or a bruise?

2    A.    A cut.

3    Q.    How did you get that cut or bruise?

4    A.    I have no idea.

5    Q.    Do you know whether you got that when you

6    hit the ground?

7    A.    It's a possibility.  I don't know.

8    Q.    You indicated you had some scratches on

9    your cheek?

10   A.    Yeah.

11   Q.    And you think that's from the ground?

12   A.    Possibly.  I don't know.

13   Q.    Did -- now, Trooper Miranda is the first

14   trooper that put you under arrest; isn't that right?

15   A.    Yeah.

16   Q.    And he's the trooper that was trying to

17   get you handcuffed; is that correct?

18   A.    Yeah.

19   Q.    Did he punch or kick you at any time?

20   A.    That I remember, only he pushed me against

21   the car.

22   Q.    Did Trooper Miranda hit you with anything,

23   that you're aware of?

24   A.    That I remember, no.

25   Q.    Did you ever push Trooper Miranda?

27

```
 1      A.      No.

 2      Q.      At some point, you were sprayed with

 3 something?

 4      A.      I believe it's what they call pepper

 5 spray, when I was on the ground.

 6      Q.      Who sprayed you?

 7      A.      Trooper Miranda.

 8      Q.      Did he give you any warning?

 9      A.      No.

10      Q.      He didn't tell you I'm going to spray you?

11      A.      No.

12      Q.      And where was he when he sprayed you?

13      A.      I don't know.  We were both on the ground.

14 I don't know if he had his elbow or his knee on my

15 back.

16      Q.      At that point, did he have both of your

17 hands handcuffed?

18      A.      No.

19      Q.      Were you still trying to keep him from

20 handcuffing the left hand?

21      A.      (By Witness) I tried to keep my pacemaker.

22      Q.      You tried to keep your pacemaker off the

23 ground; is that correct?

24      A.      Yes.

25      Q.      And you said that you did two things to do
```

1   that, right, first you kept your left hand over your

2   pacemaker, correct?

3       A.      Yes.

4       Q.      And that kept the trooper from getting

5   your left hand behind your back, correct?

6       A.      Basically, yes.

7       Q.      And you also pushed up to try to get your

8   chest off the ground; is that correct?

9       A.      I could not lift my chest off the floor.

10      Q.      Weren't you pushing up to try to do that?

11      A.      No.

12      Q.      Why couldn't you lift your chest up?

13      A.      (By Interpreter) First of all, because the

14  tow -- the driver from the tow truck was holding my

15  legs.  Second of all, because Miranda weighing around

16  350 pounds, maybe, more.

17      Q.      Okay.  So you believe Trooper Miranda

18  weighed at least 350 pounds?

19      A.      I believe so.

20      Q.      How tall was he?

21      A.      He wasn't very tall, maybe about a little

22  more than me.  But standing next to each other, he

23  would be three times my size.

24      Q.      Did he fall on top of you?

25      A.      I don't think so.  I believe he did --

1    Q.    And even though the officer said stop, you

2   persisted into going into the car?

3    A.    He didn't say stop.  He only said that he

4   didn't want to see anything from me when I told him I

5   wanted to show him a letter.

6    Q.    At that point in time, were you under

7   arrest?

8    A.    No.

9    Q.    Was the officer going to summons you

10  first.  Do you understand what the word summons means?

11   A.    No.

12   Q.    At the time when the officer was talking

13  to you and he said your license came up suspended, was

14  he going to cite you or was he arresting you at that

15  point?

16   A.    I don't know.

17   Q.    But you -- he hadn't placed you under

18  arrest yet?

19   A.    No.

20   Q.    At that point, he said stay here, and you

21  continued to go into the car, correct?

22   A.    No.  He didn't tell me to stay here.  He

23  only told me he didn't want to see anything.

24   Q.    So what did you do when he said that?

25   A.    I tried to go to the car and grab the

1    letter.

2         Q.    At that point what did the officer do?

3         A.    He pushed me against the car.

4         Q.    When did you tell the trooper that you

5    would like to go home?

6         A.    When?  I believe it was before he pushed

7    me against the car.  He asked me where I wanted to go,

8    and I said I wanted to go home.

9         Q.    Why did the trooper ask you where you

10   wanted to go?

11        A.    I have no idea.

12        Q.    Are you sure you understood the trooper?

13        A.    Yes.

14        Q.    Did he understand you?

15        A.    I don't know.  I don't know.

16        Q.    How do you know -- strike that.

17             What was the length of time from the time

18   that you were stopped until the time that you were

19   placed in the cruiser?  How much time elapsed?

20        A.    I don't know how long I was on the ground.

21   I know that when he stopped the car behind me and came

22   to talk to me and back in the computer, it was ten

23   minutes.  But after that, I don't know how long had

24   passed.

25        Q.    When you say you were on the ground, were

1  you on the ground in the travel lane of the highway?

2       A.      No.

3       Q.      Where do you say you were on the ground?

4       A.      Out of the lane.  It's called break down.

5       Q.      The break down lane, is that what you're

6  saying?

7       A.      Yes.  Break down lane.

8       Q.      At one point in time, weren't you

9  struggling with the trooper in the travel lane?

10      A.      No.

11      Q.      Isn't that when the tow truck driver had

12 to come and help bring you off the travel lane?

13      A.      (By Witness) Yes.  Same place.

14      Q.      Right?

15      A.      Yes.

16      Q.      So at some point, the tow truck driver had

17 to bring you with the trooper off the travel lane?

18      A.      (By Witness) No.

19      Q.      Didn't you just say that?

20      A.      (By Witness) No.  It's not travel lane.

21      Q.      Well, how big a lane was those break down

22 lanes?  I thought you said there was construction?

23      A.      (By Witness) This break down lane this

24 time have two lines (sic), traffic lines.  Two

25 lines --

69

1      Q.      Well, that's -- from the map you just

2  drew, that's beyond even the break down lane.

3      A.      The tow truck is exactly the break down

4  lane.

5      Q.      And where do you say, according to this

6  map, that you struggled with Trooper Miranda?

7      A.      Over here (indicating).

8      Q.      In the fourth lane; is that right?

9      A.      This lane (indicating).

10     Q.      Well, I'm just going by what you've drawn,

11  one, two, three, four.  So you're in the fourth lane?

12     A.      Over here (indicating), yes, between both

13  cars.

14     Q.      Between both cars and the fourth lane?

15     A.      Yes.

16     Q.      An you're between your car and the

17  cruiser, that's where you say you had the struggle?

18     A.      Over here (indicating).

19     Q.      And did you move from that spot at all?

20     A.      No.

21     Q.      That's --

22     A.      Only move from -- out from over here when

23  the cop cuffed both the arms and put it in the

24  cruiser.

25     Q.      All moving traffic would have been two

1   lanes over?

2       A.      Yes.

3       Q.      How long after the tow truck driver

4   arrived did the second police officer arrive?

5       A.      Not too -- let me say five, maybe two,

6   three minutes.  I don't know how long.  It's not

7   too -- not long time between.

8       Q.      Not long.  And at that time, you said the

9   second officer is Trooper Sweet?

10      A.      Yes.

11      Q.      At that point, you were only in one

12  handcuff on your right hand?

13      A.      Yes.

14      Q.      Did you hear -- first, did you hear

15  Trooper Miranda give you any commands as it related to

16  putting both hands behind your back?

17      A.      When I'm on the ground, yes.

18      Q.      Prior to that, did you hear him say, I

19  want both hands behind your back?

20      A.      Yes.

21      Q.      How many times did he say it?

22      A.      I don't know, maybe two, three, maybe

23  more.

24      Q.      Maybe more?

25      A.      More, maybe.

1    Q.    And you did not comply with that request?

2    A.    No.  I want to protect my pacemaker.

3 Nothing more.

4    Q.    Did you tell them at that point you had a

5 pacemaker?

6    A.    I don't -- I don't remember if I tell or

7 not.

8    Q.    And after you were on the ground, did he

9 continue to say, put your hands behind your back?

10    A.    I think so.

11    Q.    So even before Trooper Sweet arrived, is

12 that right, this is when it's just you, Trooper

13 Miranda and the tow truck driver?

14    A.    Yes.

15    Q.    And did you hear Trooper Miranda call over

16 for help to the tow truck driver?

17    A.    The tow truck driver called Trooper

18 Miranda if needed help.

19    Q.    And Trooper Miranda responded?

20    A.    Response, I don't know what he say.

21    Q.    What did he say?

22    A.    I don't know.

23    Q.    Did he say, I need a hand with this

24 gentleman?

25    A.    I don't know.  I have no idea what he say.

1    Q.    Right.  So you --

2    A.    Probably I say, it's fine.

3    Q.    So you were angry at him because he

4 wouldn't take the letter --

5    A.    No, no.

6    Q.    -- right?

7    A.    No.  I am not angry to him.

8    Q.    You're not what?

9    A.    I am not angry.

10   Q.    No, not angry?  He's not taking the

11 letter, but you're not angry at him?

12   A.    No.

13   Q.    You're just calm as can be?

14   A.    I'll try to show you the letter, and he

15 push me on the ground.

16   Q.    So at that point, you decide I'm not going

17 to --

18   A.    No.  I don't decide nothing.  I only

19 protect my pacemaker.

20   Q.    And he's saying, I need you to put both

21 hands behind your back, sir --

22   A.    And I -- my pacemaker and --

23   Q.    -- and you wouldn't do it, right?

24   A.    Right.

25   Q.    And he said it several times to you.

1    A.    I don't know how many times he said it.

2    Q.    He said it several times to you.

3    A.    I don't know.

4    Q.    Did you ignore him?

5    A.    I have no idea.

6    Q.    You have no idea.  You didn't care?

7    A.    If he say it one time, two times, three

8 times.

9    Q.    It didn't make a difference to me?

10    A.    It don't make difference.  I don't know

11 how many times he say.

12    Q.    You have a police officer who is on top of

13 you who is making commands to you, and you don't care

14 about that; is that correct?

15    A.    No.

16    Q.    And he's calling for help relative to you,

17 is that right, and you hear him, and you continue to

18 ignore him?

19    A.    I don't know who he talking in the radio.

20    Q.    He's talking on the radio.  What is he

21 talking about?

22    A.    I have no idea.

23    Q.    He's not ordering dinner, right?

24    A.    I don't know.

25    Q.    You don't know?

81

1    heart problem?

2        A.        (By Witness) Yes.

3        Q.        You said you had a heart problem?

4        A.        Yes.

5        Q.        Right from the beginning?

6        A.        Yes.

7        Q.        And what did you say to him about that?

8        A.        (By Interpreter) I told him I have heart

9    problem only.

10       Q.        And you said you had a pacemaker as well?

11       A.        I don't remember if I told him about the

12   pacemaker or not.

13       Q.        And so while your left hand was protecting

14   your pacemaker, you never said a word about it to

15   Trooper Miranda at any time?

16       A.        (By Witness) No.

17       Q.        When your wife arrived that morning, did

18   you tell her about all the complaints you had at the

19   police station, all your physical problems you had?

20       A.        No.

21       Q.        By the way, on that particular night,

22   March 8th, how long did the police officer follow you

23   before you were pulled over?

24       A.        (By Interpreter) Maybe a mile, maybe a

25   mile.  If he had asked me to stop before on the side,

1    I wasn't able to stop because of the construction.

2        Q.      So there was a stretch of time where he

3    had his lights and sirens on where you did not pull

4    over?

5        A.      It's when he put the lights on, I was able

6    to go to the right side and stop.  There were some

7    holes on the ground, but I had to avoid that, but I

8    went to the right lane.

9        Q.      When did you say Trooper Miranda used the

10   spray on you?

11       A.      When I was on the ground holding my arm

12   with his knee on.

13       Q.      He already asked you several times to

14   release your left hand so he could handcuff you,

15   right?

16       A.      Yes.  He had asked me a few times to

17   release my left hand.

18       Q.      And you didn't release your left hand?

19       A.      No.

20       Q.      And this was after several -- as we just

21   mentioned, several times he had said it to you?

22       A.      I don't know how many times he had asked

23   me to give him my left hand.

24       Q.      And are you saying too that you had to

25   purchase new glasses as part of your damages here?

1    Q.    Did you try to pull away from the officer

2  when he told you you were under arrest?

3    A.    No.

4    Q.    Did you flail your arm at him?

5    A.    No.

6    Q.    Even in an attempt to keep his hands,

7  or --

8    A.    No.

9    Q.    -- him away from your pacemaker?

10   A.    No.

11   Q.    At no time?

12   A.    No.

13   Q.    Why didn't you just tell him you had a

14  pacemaker?

15   A.    Maybe I didn't remember at the time.

16   Q.    Well, how can that be if your hand was,

17  you say, protecting your pacemaker the whole time?

18   A.    I think because of the reason that I told

19  him I had heart problems, I assumed that he would

20  think that I had a pacemaker.

21   Q.    How would somebody know that you had a

22  pacemaker if you didn't tell them?

23   A.    I don't know.

24   Q.    How many times did Trooper Miranda tell

25  you he was going to use pepper spray before he applied

1  it?

2      A.      Are you talking about pepper spray after

3  he spray my face, my eyes, after he talk about pepper

4  spray.

5      Q.      And this is after you refused to move your

6  hand --

7      A.      Yes.

8      Q.      -- correct?

9      A.      Correct.

10     Q.      He told you that several times?

11     A.      Yes.

12     Q.      And at any point in time did you lose

13  consciousness?

14     A.      When he push me on the ground, my mind so

15  quickly -- quick, I believe I lost consciousness.

16     Q.      You say you lost consciousness when you

17  were on the ground before he applied pepper spray?

18     A.      Yeah.  I think.  Pushed me on the ground,

19  my arm.

20     Q.      How is that that he just grab your arm

21  then and pull it around and handcuff you then?

22     A.      I have no idea.  I don't know.

23     Q.      Besides the medication you told us about

24  today, any other medication you were on back on March

25  8, 2004?

93

```
 1        Q.      When you say chest, you point to kind of
 2   your lower stomach; is that correct?
 3        A.      It's over here (indicating), rib cage.
 4        Q.      Less than halfway up from your belt?
 5        A.      Yeah.
 6        Q.      It says in here that you noticed your
 7   glasses were on the ground when Trooper Sweet was
 8   kicking you?
 9        A.      (By Witness) Yeah.  The glasses on the
10   ground when Sweet kicked me in the ribs and the knee.
11   The glasses on the ground.
12        Q.      Did you see that when you bent over?
13        A.      I see it from the window.  It's open.
14   Because I said please, will you pick my glasses.
15        Q.      While he was kicking you?
16        A.      I don't know while he was kicking me.
17        Q.      At the same time he was kicking you, you
18   saw the glasses on the ground?
19        A.      I see the glasses before.
20        Q.      Did you ask him while he was kicking you
21   to pick up the glasses?
22        A.      No.  He kicked me first.  I ask for the
23   glasses.
24        Q.      Are you aware that you have an obligation
25   to obey a police officer?
```

94

1     A.     Yes.

2     Q.     If a police officer says you're under

3 arrest, you are supposed to cooperate with that police

4 officer.  You understand that, right?

5     A.     I know that I had to cooperate, but I just

6 wanted to show him the letter, because I knew if he

7 saw the letter, he would have no reason to arrest me.

8 And then if he wanted to read the letter and arrest

9 me, that would be okay, no problem.

10    Q.     So you would have started cooperating

11 after you -- he read the letter?

12    A.     Yes.

13    Q.     What -- with Trooper Miranda, what force

14 did he use that was excessive?

15    A.     He almost broke my arm pulling it back,

16 almost broke it.

17    Q.     The right arm?

18    A.     Right arm.

19    Q.     Any other force that Trooper Miranda used

20 that was excessive?

21    A.     That I remember, no.

22    Q.     Have you ever been treated for gallbladder

23 stones?

24    A.     No.

25    Q.     Who told you you had a collapsed lung?

# EXHIBIT 5

MY NAME IS CHARLES GLANCY
I AM A DRIVER FOR Lowell Automatic TRANSMISSION)
I WAS DISPATCHED TO Rt3 NB NORTH OF EXIT 32
MARCH 7-04 At 956 Pm
   WHEN I ARRIVED CAR 848 HAD STOPPED A MOTORIST
I WAS TOLD HE HAD A REVOKED LICENSE AND I WAS TO
TOW IT BACK TO OUR SHOP  THE DRIVER REFUSED
TO COOPERATE WITH THE TROOPER  THERE WAS A
STRUGGLE AND THEY BOTH WENT TO THE GROUND
THE MAN WOULD NOT BE HANDCUFFED AT ALL
THE MAN REFUSED TO BE ARRESTED  SHORTLY
AFTER HELP ARRIVED

Charles J Glancy
TOW DRIVER  Lowell Automatic Transmission
             202 CHELMSFORD St
                Lowell MA

# EXHIBIT 6

Page 1

Volume I
Pages 1-55

UNITED STATES DISTRICT COURT
COMMONWEALTH OF MASSACHUSETTS

C.A. NO. 05-11292 DPW

MARIO E. MENDES,
       Plaintiff,      :
                          :
vs.                     :
                          :
BRIAN SWEET and       :
JOAQUIM MIRANDA,     :
       Defendants.     :

DEPOSITION of BETH CORRIGAN, taken on
behalf of the Defendant, Joaquim Miranda,
pursuant to the applicable provisions of the
Massachusetts Rules of Federal Procedure, before
Barbara M. Montijo, a Registered Professional
Reporter and Notary Public within and for the
Commonwealth of Massachusetts, at the offices of
Brody, Hardoon, Perkins & Kesten, One Exeter
Plaza, Boston, Massachusetts, on August 4, 2006,
commencing at 10:00 a.m.

DUNN & GOUDREAU
COURT REPORTING SERVICE, INC.
One State Street
Boston, MA  02109
(617) 742-6900

ORIGINAL

1  March 7th, 2004, which is the date that brings

2  us -- the subject matter of this particular

3  suit.  I'm going to ask you if you recall, first

4  of all, working that day?

5  A.  Not -- you know what I mean, I can't really say.

6  Q.  I'm going to help you.  Just for purposes of the

7  record, you're here pursuant to a deposition

8  subpoena?

9  A.  Yes.

10       MR. SILVERFINE:  I'm just going to

11  mark it as Exhibit 1 for the record, so it's

12  clear.

13       (EXHIBIT 1 MARKED FOR IDENTIFICATION)

14  Q.  Showing you what's been marked as Exhibit 1 in

15  this deposition, is that the deposition subpoena

16  that brings you here today?

17  A.  (Witness perusing document) Yes.

18  Q.  Were you working for Trinity Ambulance on or

19  about March 7th, 2004?

20  A.  Yes.

21  Q.  Were you working in your capacity as a

22  paramedic/EMT?

23  A.  EMT.

24  Q.  Do you recall what shift you were working that

Page 13

1   A.   No, I don't.

2   Q.   It gives a location for Route 3 north, south of

3        Route 40.   Where did you receive that

4        information from, if you recall?

5   A.   Dispatch.

6   Q.   Do you remember anything else about the dispatch

7        call that day?

8   A.   No, I don't.

9   Q.   It says, "En route 2230," so can I assume that's

10       10:30 in the evening?

11  A.   Yes.

12  Q.   It says, "On scene 2233."  Can I assume that you

13       arrived on scene in three minutes?

14  A.   Yes.

15  Q.   Do you remember anything about the call itself

16       that got you to Route 3 north, south of Route

17       40?

18  A.   I remember vaguely.

19  Q.   Tell us what you remember.

20  A.   I mostly remember because I talked to Steve

21       about it, because he got this before I got it.

22       He asked me if I remembered it.  He told me it

23       was the gentleman that had gotten sprayed

24       apparently by mace on the highway.  And with his

Page 14

1      talking to me, I do remember it very vaguely.

2   Q.   Tell us what you remember and then I'll follow

3        up with some questions.  Tell us what your

4        memory is.

5   A.   I remember the gentleman was handcuffed, with

6        mace in his eyes.  And I remember him refusing

7        medical care at that time.  So, we just washed

8        out his eyes from the mace.  Normally, we don't

9        do that, because it tends to reactivate it and

10       makes it worse for the patient, but he wanted

11       his eyes washed out.  So, we washed them out.

12       And then, I asked him if he wanted to go to the

13       hospital and he said, "No.  I don't need to go

14       to the hospital."

15  Q.   Anything else that you remember about the

16       incident?

17  A.   I think there was maybe one or two troopers

18       there.

19  Q.   Did you know either trooper?

20  A.   No.

21  Q.   Do you recall their names?

22  A.   No.

23  Q.   Had you ever met them before as far as you know?

24  A.   Not that I know of.

Page 17

1      you saw it?

2  A.   Maybe the knuckles.

3  Q.   For purposes of the record, let's call this

4       gentleman Mr. Mendes.  Did Mr. Mendes make any

5       complaints to you that you recall?

6  A.   Not that I recall.  Just about maybe his eyes, I

7       think.

8  Q.   Besides his eyes, did he make any other

9       complaints about any other part of his body?

10 A.   No.

11 Q.   You said he refused further medical treatment?

12 A.   Yes.

13 Q.   Did you offer him further medical treatment?

14 A.   Yes.  We offered to take him to the hospital, if

15      that's what he chose, to get his eyes washed out

16      better and he said no.

17 Q.   When you talked to him, how long a period of

18      time did you talk to him for?

19 A.   I think it was a while that we were on scene.

20 Q.   So, did you yourself care for both the state

21      police officer and Mr. Mendes?

22 A.   I don't remember taking care of the trooper.

23 Q.   Do you know if your partner took care of the

24      trooper?

Page 20

1    A.    A little bit.  From what I remember he spoke

2          kind of broken English.

3    Q.    Did you understand him?

4    A.    Yes.

5    Q.    Even through his broken English?

6    A.    Yes.

7    Q.    And through his broken English, did he make any

8          complaints other than his eyes?  Did he make any

9          other complaints to you?

10   A.    No.

11   Q.    Did he seem to understand you when you spoke to

12         him?

13   A.    When I asked him if he wanted to go to the

14         hospital, he clearly understood and he said no.

15   Q.    Do you recall if you asked him more than once?

16   A.    Not that I recall.

17   Q.    Did you notice, besides his eyes, any redness

18         or swelling on any part of his body?

19   A.    Not that I recall.

20   Q.    Did he ever tell you he was afraid of dying?

21   A.    Not that I recall.

22   Q.    Did he ever complain to you about breathing?

23   A.    Not that I recall.

24   Q.    And I think I asked you, but maybe it's a little

Page 23

1      eyes, we're cleared.

2  Q.   Is that your initials that appear next to that

3       paragraph?

4  A.   Yes.

5  Q.   Is it your custom and practice if there were

6       other complaints and/or issues involved in the

7       care of a civilian, such as Mr. Mendes, you

8       would have written it here in the description?

9  A.   Yes.  And if he had complained of shortness of

10      breath or something else and still refused to go

11      to the hospital, we would have made him sign the

12      refusal.

13 Q.   And that's because you also want to protect

14      yourself?

15 A.   Yes.

16 Q.   So, if in fact you did observe other injuries,

17      and you thought he had to go to the hospital,

18      you would have written it in here?

19 A.   Yes.

20 Q.   At the bottom of Exhibit 2, at the very bottom

21      it says, "Priority to Scene:  2," what does that

22      mean, the Number 2?

23 A.   That means we used lights and sirens to get

24      there.

Page 24

1 Q. And "Copy Given to Patient on Leaving," you

2   checked off no.  Do you see that?

3 A. Yes.

4 Q. And any particular reason you didn't give a copy

5   of this to the --

6 A. Normally, we only give copies if we get a

7   refusal.

8 Q. When you say "a refusal," is it fair to say you

9   gave him what you thought was appropriate, which

10   was the care for the eyes?

11 A. Yes.

12 Q. And that's all you observed?

13 A. Yes.

14 Q. And therefore, it wasn't considered a refusal?

15 A. Correct.

16 Q. And in your estimation, based upon your medical

17   training or EMT training, you believed there

18   were no other medical needs at that time?

19 A. Correct.

20 Q. You also wrote, "Driving Conditions:  Dry" and

21   at "Night"; is that correct?

22 A. Yes.

23 Q. Do you remember what the temperature was that

24   particular day?

Page 28

1   Q.   At any point in time did the civilian,

2       Mr. Mendes, complain to you or tell you about

3       his eyeglasses?

4   A.   Not that I recall.

5   Q.   At any point in time did the person you dealt

6       with, Mr. Mendes, talk about a problem with a

7       pacemaker?

8   A.   Not that I recall.

9   Q.   When you go to a scene like this, what kind of

10      equipment do you bring with you in the

11      ambulance?

12   A.   Usually, if it's just someone who needs their

13      eyes washed out, it's usually just our first-in

14      bag, which has the sterile water, bandages, that

15      sort of thing.

16   Q.   But you're equipped for a greater response if

17      needed, correct, in the ambulance?

18   A.   Yes.

19   Q.   When you were dispatched, did you know you were

20      just going out there to treat some kind of

21      pepper spray or mace?

22   A.   That, I don't recall.

23   Q.   So, when you went out there, you went out with a

24      full truck?

DUNN & GOUDREAU

Page 30

1   A.   Not that I recall.

2   Q.   Were you in uniform?  Do you wear a uniform

3        when you respond?

4   A.   Yes.

5   Q.   What kind of uniform do you wear?

6   A.   White shirt, black pants.

7   Q.   Does it have some kind of symbol?

8   A.   Yes.  We have a Trinity patch on the right and

9        an EMT patch on the left.

10  Q.   Does it have your name on the uniform?

11  A.   If I have my badge on.

12  Q.   Do you recall that particular night if you did?

13  A.   No, I don't.

14  Q.   When you arrived, did you introduce yourself to

15       anyone, including Mr. Mendes?

16  A.   I would assume that I would have, but I don't

17       recall exactly.

18  Q.   At any point in time did Mr. Mendes tell you he

19       was hurting all over?

20  A.   Not that I recall.

21  Q.   Again, I may have asked you this, but I'll ask

22       it again.  Did Mr. Mendes ever say to you that

23       he wanted to go to the hospital?

24  A.   No.

Page 31

1   Q.   Did he ask you for further treatment?

2   A.   No.

3   Q.   What hospitals, by the way, are close by to

4        that location that you had responded to that

5        night?

6   A.   Lowell General would be the closest one or

7        Saints Memorial.

8   Q.   Where is Saints Memorial located?

9   A.   Lowell.  On the Tewksbury line.

10  Q.   How far are both of those hospitals from that

11       location?

12  A.   Probably about 5 to 10 minutes for Lowell

13       General, maybe 15 for Saints.

14  Q.   Did Mr. Mendes ever tell you he lost

15       consciousness that day?

16  A.   Not that I recall.

17  Q.   Are those the kinds of things, the breathing,

18       complaints about heart, losing consciousness,

19       that would concern you as an EMT/paramedic?

20  A.   Yes.

21  Q.   Would you in a sense be more likely to take him

22       to a hospital for further examination if he had

23       mentioned that?

24  A.   Yes.

DUNN & GOUDREAU

Page 37

1     is correct, is he was kind of going in the

2     police car with some assistance as we were

3     walking back to the ambulance.  I'm not sure if

4     they had already left before we left or not.

5   Q.   Did Mr. Mendes make any complaint to you that he

6        had been injured by any police officer?

7   A.   Not that I recall.

8   Q.   Did he make any complaint that any police

9        officer hit or kicked him?

10  A.   Not that I recall.

11  Q.   Would you have noted that?

12  A.   Probably not.

13  Q.   Did Mr. Mendes in any way make any complaint

14       that he had been abused by the police officers?

15  A.   Not to my recollection.

16  Q.   Did he mention to you that he had a pacemaker?

17  A.   No.

18  Q.   Did you observe anything that indicated he had a

19       pacemaker?

20  A.   No.

21  Q.   Did he have any trouble walking or moving to

22       your observation?

23  A.   Not that I recall.

24  Q.   Do you recall there being a tow truck on the

Page 46

1      somebody appears under the influence of drugs or

2      alcohol, do you make that written observation in

3      your report?

4  A.  No.  We're not allowed to unless the patient

5      says that I had two drinks or I had this, that,

6      or the other thing.  We're not allowed legally

7      to say that they smelled of alcohol on their

8      breath.

9  Q.  Can you recall if Mr. Mendes smelled of alcohol

10     that evening?

11 A.  I don't recall.

12 Q.  And you've told us that Mr. Mendes never

13     mentioned a pacemaker to you?

14 A.  Not to my knowledge.

15 Q.  Did Mr. Mendes mention a pacemaker to anyone

16     else at the scene?

17 A.  Not that I know of.

18 Q.  To your knowledge, did Mr. Mendes complain to

19     anyone else about his breathing?

20 A.  Not to my knowledge.

21 Q.  Did you leave before Mr. Mendes was taken away

22     from the scene; or who left first, you or

23     Mr. Mendes?

24 A.  I don't know.  Like I told the other lawyer, I

DUNN & GOUDREAU

Page 51

1   Q.   And you would put all the pertinent information

2        that had occurred on scene right before that

3        onto that exhibit, Exhibit 2?

4   A.   Correct.

5             MR. SILVERFINE:  Thank you.

6             MR. ROGAL:  It's my turn to ask you a

7        couple of more questions.

8             RE-EXAMINATION BY MR. ROGAL

9   Q.   Did you see anything that you considered to be

10       mistreatment of Mr. Mendes in any way?

11  A.   Not that I recall.

12  Q.   Counsel's now pointed out that, according to

13       this report, it would appear that you were on

14       scene for an hour and a half?

15  A.   Uh-huh.

16  Q.   What's your best recollection?  Do you think you

17       were there that long?

18  A.   I don't think we were there that long.  That may

19       have been an error in dispatch.  Maybe they

20       didn't hear us clear and just cleared it

21       whenever we got back to the base.

22  Q.   Who puts in that number for inservice?  Do you

23       put that in?

24  A.   It goes by -- the dispatchers just put it into

DUNN & GOUDREAU

# EXHIBIT 7

Page 1

Volume I
Pages 1-55

UNITED STATES DISTRICT COURT
COMMONWEALTH OF MASSACHUSETTS

C.A. NO. 05-11292 DPW

MARIO E. MENDES,                     :
        Plaintiff,            :
                                  :
vs.                                  :
                                  :
BRIAN SWEET and                      :
JOAQUIM MIRANDA,                     :
            Defendants.          :

DEPOSITION of STEPHEN BRADY, taken on
behalf of the Defendant, Joaquim Miranda,
pursuant to the applicable provisions of the
Massachusetts Rules of Federal Procedure, before
Barbara M. Montijo, a Registered Professional
Reporter and Notary Public within and for the
Commonwealth of Massachusetts, at the offices of
Brody, Hardoon, Perkins & Kesten, One Exeter
Plaza, Boston, Massachusetts, on August 4, 2006,
commencing at 11:00 a.m.

DUNN & GOUDREAU
COURT REPORTING SERVICE, INC.
One State Street
Boston, MA  02109
(617) 742-6900

ORIGINAL

DUNN & GOUDREAU

1   A.   New equipment comes out, rules change.  The

2        State of New Hampshire as well as the State of

3        Massachusetts have protocols that we have to

4        follow, that we can do certain things.  Those

5        rules change from time to time and we have to be

6        brought up to speed about those changes.

7   Q.   Do you hold any certificates from Massachusetts

8        that allows you to be an EMT here?

9   A.   Yes.  I am a certified Emergency Medical

10       Technician basic level in Massachusetts and an

11       intermediate level in New Hampshire.

12   Q.   Do you need any type of special certificate or

13       license to be a driver of an EMT/ambulance?

14   A.   Just a Massachusetts driver's license or New

15       Hampshire driver's license, depending upon where

16       you work.

17   Q.   I'm going to focus this morning on March 7,

18       2004, which is the date of the incident that the

19       plaintiff, Mr. Mendes, complains of, so that's

20       what I'm referring to.

21   A.   Okay.

22   Q.   Do you recall, first of all, if you were working

23       that particular day?

24   A.   I don't recall actually the day.  I know it was

Page 14

1    A.    Yes.

2    Q.    You were not on a different call and came to

3          this call?

4    A.    No.   Correct.

5    Q.    And you responded to Route 3 north, it says,

6          south of Route 40?

7    A.    Yes.

8    Q.    Do you recall what observations you made when

9          you arrived on scene?

10   A.    All I can say for sure is that I know there was

11         a police cruiser there.

12   Q.    When you say "a," is that one or more than one?

13   A.    I can't be sure of anything more than one

14         cruiser on scene.

15   Q.    When you arrived on scene, what's your memory as

16         to what you did?

17   A.    What I remember is that there was an individual

18         in handcuffs sitting on a guardrail with a

19         police officer next to him and we more than

20         likely were informed that he had been pepper

21         sprayed and flushed his eyes from there.

22   Q.    Let's break that down a little bit.  When you

23         say he was handcuffed, he wasn't handcuffed to

24         the guardrail?

DUNN & GOUDREAU

1    A.    It would have had to have been one of those two

2          responses.  If he said he would have had chest

3          pain, he would have gone to the hospital under

4          the protocols of a patient who has chest pain.

5    Q.    Even if he refused, you would have taken him?

6    A.    If he refused, it would have been different.  We

7          would have explained to the officers on scene

8          he has chest pain, per our guidelines he has to

9          go to the hospital.  At least I would have...

10   Q.    Do you recall seeing any visible injuries?

11   A.    I don't.

12   Q.    Do you recall him complaining of anything at

13         all?

14   A.    If he would have complained about something, we

15         would have dealt with it, but I think it goes

16         back to him not speaking English very well or

17         not being...

18   Q.    Tell me everything you remember him saying to

19         you.

20   A.    I just remember something sort of incoherent,

21         just he was upset at the officer, and seemed to

22         be yelling about something.  I don't even

23         remember what it was.

24   Q.    When you say yelling --

DUNN & GOUDREAU

Page 21

1   Q.   Do you have an independent memory as to what the

2        person was wearing?

3   A.   No idea.

4   Q.   Do you remember what the weather conditions were

5        that night?

6   A.   It was March.  It may have been cold.  Beyond

7        that, I don't know.  I know it wasn't snowing,

8        that's the only thing I can say.

9   Q.   Do you remember any complains made by the state

10       trooper that night to you about his condition?

11  A.   No.  I don't recall.

12  Q.   Do you remember any complaints the civilian,

13       Mr. Mendes, had or did he make any complaints to

14       you?

15  A.   Not that I can remember.  As I stated, if it

16       would have been something, chest pain, shortness

17       of breath or anything that was grossly obvious

18       to us, he would have been transported to the

19       hospital.

20  Q.   Do you remember what kind of vehicle Mr. Mendes

21       had that night?

22  A.   I imagine it was some sort of car.  I know it

23       wasn't anything out of the ordinary, probably

24       just a small car.

Page 23

1    A.    No, I do not.

2    Q.    Did you ever see him wearing eyeglasses that

3          night?

4    A.    I can't say with certainty.

5    Q.    Do you ever recall Mr. Mendes or anyone saying

6          anything about a pacemaker that Mr. Mendes had?

7    A.    No, I do not.

8    Q.    How about Mr. Mendes or anyone saying anything

9          about a heart condition?

10   A.    I do not, no.

11   Q.    Did Mr. Mendes complain about shortness of

12         breath?

13   A.    No.  If he would have, he would have gone to the

14         hospital.

15   Q.    That's something in your background, experience,

16         and training you would have taken very

17         seriously?

18   A.    That is absolutely 100 percent in my experience,

19         someone who has shortness of breath, has chest

20         pain.  And if he had stated that he has a heart

21         condition, not only would he have gotten us, but

22         he would have also gotten paramedics who are

23         trained to a higher level, to put him on a

24         cardiac monitor to actually see what was going

1     on with his heart.

2  Q.  No question about that?

3  A.  Absolutely no question about that.

4  Q.  What about if the patient refused to go to the

5     hospital?

6  A.  I would have explained to -- well, if he was in

7     custody at that time, I believe that the police

8     officer can force someone to get seen if it's in

9     the best interests of the person.

10  Q.  Do you recall any injuries you observed about

11     Mr. Mendes that night?

12  A.  Nothing I can say with certainty, no. Nothing

13     grossly obvious that's standing out in my mind

14     right now.

15  Q.  Did you observe any scrapes?

16  A.  There could have been.

17  Q.  Bumps?

18  A.  Could have been.

19  Q.  Bruises?

20  A.  Could have been.

21  Q.  Anything about his forehead?

22  A.  There could have been. Nothing major that is

23     standing out in my memory that he had, you know,

24     a huge contusion on the side of his face or his

1       arm was broken or something like that.

2   Q.  Is that something that you and Ms. Corrigan

3       would have written in your report?

4   A.  Absolutely.  If there was something, obviously

5       he would have been treated and transported.

6   Q.  Do you remember what equipment, if any, you used

7       with Mr. Mendes that night?

8   A.  If it was just the decon, which is what this

9       states, it would have been the sterile water.

10      It comes in containers about six inches high,

11      and probably clean towels, flushed the water

12      through the eyes and blot it off; and then

13      repeat if it's still -- if you can still see the

14      eyes are irritated, we do that a few times.

15  Q.  Now, you said you recall Mr. Mendes being near

16      the guardrail.  Was he standing or seated when

17      you saw him first?

18  A.  I want to say he was sitting, but I can't say it

19      with certainty.

20  Q.  But he was out of any vehicle?

21  A.  He was absolutely on the guardrail.  I know

22      there was a cruiser on the edge of the breakdown

23      lane.  I don't remember if I pulled my truck

24      behind the cruiser or in front of -- more than

Page 29

1    Q.   Besides what you've already told us, do you

2         recall anything else about his demeanor that

3         night?

4    A.   Nothing that I can say with certainty.

5    Q.   Did Mr. Mendes ever tell you he lost

6         consciousness?

7    A.   No.   That's also another automatic criteria for

8         transport.

9    Q.   So, if he told you that, that would be something

10        you would --

11   A.   We would have again initiated the paramedics to

12        our location.   If he said he lost consciousness,

13        he would have been placed on a backboard with

14        full C-spine precautions to protect the neck and

15        the spine, because people just don't lose

16        consciousness only as a result of a head injury.

17   Q.   While you were on scene, did you notice any

18        problems with Mr. Mendes' breathing?

19   A.   No.   Again, automatic, if something seriously

20        was noted, he would have been transported.

21   Q.   Did Mr. Mendes complain about any pain in his

22        lungs?

23   A.   Not that I recall.

24   Q.   Again, is that one of those things that is

DUNN & GOUDREAU

Page 30

1     automatic?

2   A.   Yes.  Lungs, anything respiratory, cardiac of

3        nature is automatic.

4   Q.   Did Mr. Mendes ever tell you he was afraid of

5        dying?

6   A.   No.

7   Q.   Again, is that something that was significant to

8        you?

9   A.   If he would have, yeah, mentioned that, we would

10       have tried to get more from him, why do you feel

11       like you're dying?  Do you have pain in your

12       chest, can you not breathe?  Again, just to

13       clarify with saying about difficulty breathing.

14       Anytime someone's pepper sprayed, they will have

15       a degree of respiratory difficulty.  And you

16       figure if someone was pepper sprayed, there's

17       normally a struggle or some sort of event

18       leading up to it.  If someone was running,

19       you're going to need a minute or two to try to

20       catch your breath and get back down to where you

21       should be.  So, if there was any sort of heavy

22       breathing, more than likely that's what it was

23       attributed to.

24   Q.   Would you have stayed with Mr. Mendes long

1    shortness of breath, allergies, medications.

2    And depending what we get for answers, that

3    leads us.

4  Q.   Did you get a positive response to any of those

5    questions?

6  A.   If there may have been a positive, yes, of

7    shortness of breath; or yes, I have chest pain,

8    it would have been he's going to come to the

9    hospital with us.

10 Q.   So, I understand you then, it's your best

11    recollection that all of the responses to your

12    standard questions were negative?

13 A.   Negative, or that we couldn't understand him, or

14    that we ascertained that it was a negative

15    answer.

16 Q.   But you also would make observations of the

17    individual?

18 A.   Uh-huh.  Absolutely.  That's part of the

19    assessment.  The demeanor, the posture and stuff

20    of that nature.

21 Q.   Did you observe any injuries?

22 A.   Nothing that stands out.  Nothing that I can

23    recall standing out in my memory.

24 Q.   Did you observe any shortness of breath?

Page 36

1    A.    Just what I had stated before about --

2    Q.    Let me stop you there.  I know this is tough, it

3          was two years ago.  I need to know what you

4          recall.  In some cases, it may also be helpful

5          to know what you inferred or what your standard

6          practice is, but I need to know the difference.

7          So, if I ask you did you observe anything about

8          shortness of breath, if you have a recollection

9          or don't have a recollection, you should tell

10         me.

11   A.    I don't have a recollection -- I don't recall

12         any significant shortness of breath.

13   Q.    And I also take it from your response that had

14         you made such an observation, you would have

15         made some note of that.

16   A.    Made a note and it would have taken us down a

17         different course of treatment.

18   Q.    Do you recall observing any condition on

19         Mr. Mendes that indicated a need for further

20         treatment other than washing his eyes out?

21   A.    No, I do not.

22   Q.    And had you, would you have so noted it?

23   A.    Absolutely.  There would have been a full report

24         with a transport, with the paramedics meeting

Page 38

1    could have been me.  I can't say with certainty.

2  Q.   Did Mr. Mendes make any complaint to you or

3       Ms. Corrigan that you heard?

4  A.   Not that I recall.

5  Q.   Did he complain that he had been injured by the

6       police officers in any way?

7  A.   Not that I recall.

8  Q.   Did he complain that he had been kicked or

9       struck by the police officers?

10  A.   Not that I recall.

11  Q.   Did he complain that he been physically abused

12       in any way?

13  A.   Not that I recall.

14  Q.   Did he complain that he had been falsely

15       arrested or falsely stopped?

16  A.   Not that I recall.

17  Q.   Did he complain about his car being towed?

18  A.   Not that I recall.

19  Q.   Do you recall any observation of his demeanor?

20  A.   Just that I had stated he may have -- it

21       appeared he may have been under the influence of

22       alcohol or some sort of other substance.  He

23       didn't seem as if he were -- as we're just

24       having a conversation here today, it didn't seem

Page 43

1    Q.    Do you recall whether Mr. Mendes ever said

2          anything about having a pacemaker?

3    A.    I do not, no.

4    Q.    Do you recall whether he said anything about

5          having any heart condition?

6    A.    I do not, no.  But again, those are automatic

7          criteria.  If he would have mentioned that, he

8          would have been treated and assessed further.

9    Q.    So, if he said to you I have a pacemaker and I

10         have a concern that it's been somehow affected

11         by this incident, what response would you have

12         given?

13   A.    I would have started paramedic service out of

14         Lowell, they would have intercepted us, and they

15         would have, en route to the hospital, placed him

16         on a cardiac monitor to see if in fact he was

17         having a heart arrhythmia at the time.

18   Q.    So, he would have been transported?

19   A.    Absolutely.  Yes.

20   Q.    Did you observe any scrape, bruise, bump, cut?

21   A.    Nothing that I can recall.  Nothing significant.

22              MR. ROGAL:  Nothing further.  Thank

23         you.

24              EXAMINATION BY MR. CENTEIO

DUNN & GOUDREAU

Page 48

```
 1   A.   I can't recall.

 2   Q.   And you've told us he did not complain in

 3        English about any heart condition?

 4   A.   Nothing that we were able to discern.

 5   Q.   Did he complain in English about a pacemaker?

 6   A.   Not that I recall.

 7   Q.   Did he complain in English about shortness of

 8        breath?

 9   A.   Not that I recall.

10   Q.   For how long would you say Mr. Mendes was in

11        your presence?

12   A.   As I stated before, maybe the whole on scene

13        time, between 30 minutes on one end and maybe as

14        little as 15 on the other, but not with

15        certainty.

16   Q.   What observations did you make about his face,

17        physical appearance?

18   A.   Nothing remarkable that's standing out in my

19        memory.

20   Q.   Any bumps on his face?

21   A.   Not that I can recall.

22   Q.   Any bruise on his face?

23   A.   Not that I can recall.

24   Q.   Any cut on his face?
```

Page 49

1    A.    Not that I can recall.

2    Q.    Any blood on his face?

3    A.    Not that I can recall.

4    Q.    Any blood on his head?

5    A.    Not that I can recall.

6    Q.    Bumps on his head?

7    A.    Not that I can recall.

8    Q.    What about his upper body, had you observed

9          any --

10   A.    Nothing significant that I can recall.

11   Q.    No cuts?

12   A.    Not that I can recall.

13   Q.    No bruise?

14   A.    Not that I can recall.

15   Q.    No scrapes?

16   A.    Not that I can recall.

17   Q.    What about his hands?

18   A.    Nothing significant that I can recall.

19   Q.    What about his legs?

20   A.    Nothing significant that I can recall.

21   Q.    No cuts, no bruises, no bumps?

22   A.    Nothing I can say with certainty.

23   Q.    Any blood on his body?

24   A.    Not that I can say with certainty.

# EXHIBIT 8

# NATHANSON & GOLDBERG

## A PROFESSIONAL CORPORATION
### ATTORNEYS AT LAW

Shannon M. Fitzpatrick
Direct Dial: 617/210-4812
Email: smf@natgolaw.com

October 20, 2004

OCT 22 2004

**VIA FIRST CLASS AND CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**
Attorney General Tom Reilly
McCormack Building
One Ashburton Place
Boston, MA 02108

*[handwritten: 4397 - PoL, assault, 001- 3/8/04, place - Bedford, MA, employer - Trp. Sweet, Trp. Miranda]*

Re: Mario E. Mendes

Dear Sir:

This office represents Mr. Mario E. Mendes. This letter constitutes a request for recovery under the Massachusetts Tort Claims Act, the Massachusetts Civil Rights Act, and 42 U.S.C. §1983 for damages incurred by Mr. Mendes as the result of egregious misconduct by the Massachusetts State Police on March 8, 2004.

The basic facts of Mr. Mendes' claim are as follows:

Mr. Mendes is 65 years old, a resident of New Hampshire since 1992. On March 8, 2004, he was driving home from his son's house in Bedford, MA, going north on Route 3. At approximately 9:30 p.m., he was pulled over by Trooper Joaquin Miranda. He immediately pulled over to the breakdown lane, gave his New Hampshire license and registration to Trooper Miranda, and waited for him to return. While he was waiting, a tow truck pulled up. The officer then returned to Mr. Mendes' car and asked him to get out of the car. Mr. Mendes did so. The officer told him his license was suspended. Mr. Mendes tried to tell him that it wasn't, and tried to show him a letter he had that explained that he was not the Mario E. Mendes who showed up as having a suspension. (This had happened to him before and he had gotten a Letter of Clearance from the Massachusetts Registry of Motor Vehicles). The officer would not listen to him or let him get the letter but instead began to arrest Mr. Mendes. He pushed Mr. Mendes against his car, chest first, and started to handcuff him. Mr. Mendes continued to try to explain about the letter and also told the officer that he had a heart condition.

The heart condition Mr. Mendes was referring to is a pacemaker that he is dependent upon 24 hours a day. The pacemaker protrudes out from his chest because he so slight that he has no layer of fat to cushion it. Two leads connect the pacemaker to his heart. Mr. Mendes has

# NATHANSON & GOLDBERG

### A PROFESSIONAL CORPORATION
### ATTORNEYS AT LAW

Attorney General Tom Reilly
October 20, 2004
Page two

been told that he could die if the leads are disconnected, and he greatly feared that the wires would be dislodged if the pacemaker were knocked against a hard surface.

When the officer pushed his chest against the car to handcuff him, Mr. Mendes covered his pacemaker with his left hand so that it would not be in direct contact with the car. Mr. Mendes does not communicate very well, however, and the trooper apparently did not understand what Mr. Mendes was doing.

Believing that Mr. Mendes was resisting arrest, Trooper Miranda pushed him to the ground, chest down. This made him even more nervous. All Mr. Mendes could think about was his pacemaker and that he needed to protect it because it is what keeps him alive. He struggled to keep his left hand over the pacemaker so it wouldn't get dislodged.

Trooper Miranda called for help and several other officers arrived. His left hand was forced from his chest and he was handcuffed and eventually placed in a police cruiser.

Up to this point, we believe that there was no actionable misconduct by the state troopers. Although it is unfortunate that Trooper Miranda did not allow Mr. Mendes to show him the Letter of Clearance, we can see how Mr. Mendes' conduct of trying to get the letter could be perceived as a threat to the officer. However, it is what happened *after* Mr. Mendes was placed in the cruiser that is beyond the pale.

While Mr. Mendes sat handcuffed in the back seat of Trooper Miranda's cruiser, another state trooper came over, opened the door and forcefully kicked Mr. Mendes in the chest. The trooper closed the door, walked away, returned, opened the door again, and prepared to kick a second time, but this time Mr. Mendes anticipated the kick and scrunched down to avoid it. As he did so, he noticed his glasses on the ground. He asked the trooper for them. The trooper asked, "oh these?" and stomped on them. Trooper Miranda and others were not in the immediate vicinity.

Mr. Mendes was taken to the Andover barracks and booked on charges of driving with a suspended right to drive, driving without a license, disorderly conduct, resisting arrest, and assault and battery on a police officer. He was in severe pain and having trouble breathing. This should have been obvious to anyone who saw him at the police station, but he was offered no medical attention. Finally, he was released on personal recognizance to his wife,

# NATHANSON & GOLDBERG
### A PROFESSIONAL CORPORATION
### ATTORNEYS AT LAW

Attorney General Tom Reilly
October 20, 2004
Page three

who took him to the hospital where he was found to have a collapsed lung, suspected cracked rib, and various bruises and scrapes, including a four-inch bruise over his right pectoris muscle where he was kicked. He lost several days of work and continued to suffer pain for weeks.

Mr. Mendes was called to trial on three different dates and ultimately was acquitted on October 5, 2004, of all charges except resisting arrest. At the first two scheduled trial dates, the Commonwealth had called two witnesses – Trooper Miranda and another Massachusetts State Trooper whose name tag identified him as Trooper Sweet. Mr. Mendes very clearly recognized this trooper as the one had had kicked him and stomped on his glasses. (The trial did not go forward on either of these first two dates. Trooper Sweet was summonsed by the Commonwealth for the third trial date as well, but was let go before trial and never testified.)

Trooper Sweet's conduct constitutes, without limitation, an intentional violation of Mr. Mendes' civil rights, in addition to civil assault, intentional infliction of emotional distress, and negligence and/or gross negligence. In addition, Trooper Miranda falsely charged Mr. Mendes with assault and battery on a police officer for which Mr. Mendes was maliciously prosecuted. Other police personnel whose names are not known were negligent for neglecting to offer Mr. Mendes medical attention.

Mr. Mendes is fortunate that he did not suffer more serious, permanent injuries. But that does not diminish Trooper Sweet's inexcusable conduct of kicking a defenseless, elderly man quietly sitting handcuffed in a police cruiser.

Demand is made in the amount of $150,000 for reimbursement of Mr. Mendes' lost wages, medical expenses and pain and suffering.

Very truly yours,

Shannon M. Fitzpatrick
Encl.
Cc:    Colonel Thomas G. Robbins, Superintendent, Massachusetts State Police
       Edward Flynn, Secretary of Public Safety
       Client