UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARIO E. MENDES,            )
    Plaintiff,              )
                     )
                     )
v.                         )        No. 05-11292DPW
                     )
BRIAN SWEET and            )
JOAQUIM MIRANDA,           )
    Defendants              )

## PLAINTIFF MARIO MENDES' OPPOSITION TO THE DEFENDANT JOAQUIM MIRANDA'S MOTION FOR SUMMARY JUDGMENT

The Plaintiff, Mario E. Mendes, hereby opposes the Defendant Joaquim Miranda's Motion for Summary Judgment.   As grounds for his opposition, the Plaintiff states that it cannot be held, as a matter of law, that no genuine issues of material fact remain.

In further support of his opposition to the motion for summary judgment, the Plaintiff relies and incorporates by reference the following:

1.      The Plaintiff's Answers to the Defendant Brian Sweet's Interrogatories, Exhibit 1;

2.      Pertinent excerpts from the deposition testimony of the Defendant Trooper Joaquim Miranda, Exhibit 2;

3.      Pertinent excerpts from the deposition testimony of Emergency Medical Technician Beth Corrigan, Exhibit 3;

4.      Pertinent excerpts from the deposition testimony of Emergency Medical Technician Stephen Brady, Exhibit 4;

5.      The Massachusetts State Police Report of the Defendant Trooper Joaquim Miranda, Exhibit 5;

6.    Pertinent excerpts from the deposition testimony of the Plaintiff Mario Mendes, Exhibit 6;

7.    Letter of Clearance form the Commonwealth of Massachusetts Registry of Motor Vehicles, Exhibit 7;

8.    X-Ray report dated March 10, 2004 from Dartmouth-Hitchcock Hospital, Exhibit 8; and

9.    The accompanying memorandum of law.

WHEREFORE, the Plaintiff, Mario Mendes respectfully requests that this Honorable Court deny the Defendant Joaquim Miranda's Motion for Summary Judgment as to all counts.


Respectfully submitted,
Mario E. Mendes,
By his attorneys,


September 29, 2006                    /s/ Jose Couto Centeio
                                     Alvin S. Nathanson, BBO # 367480
                                     Jose Couto Centeio, BBO #554440
                                     Nathanson & Goldberg, PC
                                     2 Oliver Street
                                     Boston, MA 02109
                                     (617) 210-4800

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MARIO E. MENDES,　　　　　　　　　)
　　　　Plaintiff,　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)
v.　　　　　　　　　　　　　　　　　　)　　　　No. 05-11292DPW
　　　　　　　　　　　　　　　　　　　)
BRIAN SWEET and　　　　　　　　　　)
JOAQUIM MIRANDA,　　　　　　　　　 )
　　　　Defendants　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　)

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HIS OPPOSITION TO THE DEFENDANT JOAQUIM MIRANDA'S MOTION FOR SUMMARY JUDGMENT

The Plaintiff, Mario E. Mendes, submits the following Memorandum of Law in support of his opposition to the Defendant Joaquim Miranda's Motion for Summary Judgment.

## A.　　SUMMARY JUDGMENT STANDARD

"Summary judgment is appropriate only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. "Calvi v. City of Rockland, 2006 U.S. Dist. Lexis 15713, 2 (D. Me. Mar. 31, 2006) quoting Santoni v. Potter, 369 F.3d 594, 598 (1st Cir., 2004), Royer v. Shea, 2006 U.S. Dist. LEXIS 33270, 3 (D. Me May 17, 2006).

"The party moving for summary judgment must demonstrate an absence of evidence to support the nonmoving party's case". Calvi, 2006 U.S. Dist. Lexes 15713 at 3. "The court must view the record in the light most favorable to the nonmoving party

1

and give that party the benefit of all reasonable inferences in its favor". Id at 3.  See,

Royer v. Shea, 2006 U.S. Dist. LEXIS 33270, 4 (D. Me May 17, 2006).

In examining the evidence in the light most favorable to the plaintiff, the

Defendant Miranda's motion for summary judgment must be denied.

### B.    THE LETTER WRITTEN BY COUNSEL FOR THE PLAINTIFF TO THE ATTORNEY GENERAL DOES NOT EXONORATE THE DEFENDANT MIRANDA FROM LIABILITY

The October 20, 2004 letter from counsel for the plaintiff to Attorney General

Thomas Reilly does not exonerate Defendant Miranda from liability in this case.  The

letter states in relevant part that:

> Trooper Miranda called for help and several other officers arrived.  His left hand was forced from his chest and he was handcuffed and eventually placed in a police cruiser.

> Up to this point, we believe that there was no actionable misconduct by the state troopers.  Although it is unfortunate that Trooper Miranda did not allow Mr. Mendes to show him the Letter of Clearance, we can see how Mr. Mendes' conduct of trying to get the letter could be perceived as a threat to the officer. However, it is what happened after Mr. Mendes was placed in the cruiser that is beyond the pale.

The letter clearly does not exonerate the Defendant Miranda.  It simply states that up

until the time that the plaintiff was placed inside the police cruiser, the Defendant

Miranda had not engaged in any misconduct.   The defendant failed to take into

consideration the rest of the letter which detailed the wrongdoing on the part of the

defendants.  The letter continues on with allegations that Defendant Miranda "falsely"

charged the plaintiff with assault and battery on a police officer, that the Defendant was

negligent for failing to provide the plaintiff with medical care and that the Defendant

permitted another officer to kick the Plaintiff and break his glasses.

2

Furthermore, the demand letter was prepared before the parties had done any formal discovery or filed a lawsuit.  The demand letter was sent out as an attempt to resolve this case without any court intervention.  The plaintiff should not be harmed or prejudiced by sending such demand.    The demand letter was sent as a way to encourage the parties to settle the claims without court intervention.  It is a common practice for a demand to be made prior to the filing of a lawsuit.

In summary, the demand letter sent to Attorney Thomas Reilly does not state that there was any actionable misconduct on the part of the Defendant Miranda throughout the evening on March 7, 2004. Rather, the letter goes on to say that the Defendant Miranda and other officers did violate the plaintiff's rights under state and federal laws. As such, the defendant's motion for summary judgment should be denied.


C.    DEFENDANT MIRANDA IS NOT ENTITLED TO A SUMMARY JUDGMENT ON THE CLAIM FOR MALICOUS PROSECUTION


Under Count III of the Complaint, the plaintiff alleges that the Defendant Miranda fabricated the charge that the plaintiff assaulted the Defendant Miranda, filed a false police report, and maliciously charged the plaintiff with assault and battery on a police officer.

The Courts have held that in order to establish a claim for malicious prosecution, the plaintiff must show: (1) the original action was brought with malice; (2) the original action was without probable cause; and (3) the original action terminated in his favor. Beecy v. Pucciarelli, 387 Mass. 589, 593-594 (1982).  See also Hubbard v. Beatty & Hyde, 343 Mass. 258, 261 (1961).

3

In this case, the plaintiff was acquitted of the assault and battery upon the Defendant Miranda. The issue is whether or not the Defendant Miranda had probable cause to file the assault and battery charge against the plaintiff. The issue as to whether the resisting arrest and struggle rise to the level of probable cause to charge the plaintiff with assault and battery on the Defendant Miranda is a factual dispute for the jury to decide. The facts in this case clearly show that the plaintiff sustained some serious and visible injuries requiring medical attention. On the other hand, the Defendant Miranda suffered no injuries during the struggle, and did not require any medical care.

The evidence clearly shows that the Defendant Miranda did not objectively and reasonably believe that the plaintiff had assaulted him and or battered him. The Defendant Miranda informed his nephew the Co-Defendant Sweet that he was alright, and that he did not require any medical attention. The Defendant Miranda did not complain to any officers at the scene that he was assaulted and or battered by the plaintiff.

In summary, the evidence shows that the Defendant Miranda did act with malice and without probable cause in filing the assault and battery charge against the plaintiff, who subsequently was found not guilty of that charge. The issue as to whether or not the resisting arrest and struggle rose to the level of probable cause for the charge of assault on a police officer is a factual dispute that precludes summary judgment.

4

D.    THE DEFENDANT MIRANDA IS NOT ENTITLED TO SUMMARY JUDGMENT
ON THE CLAIMS FOR STATE AND FEDERAL CIVIL RIGHTS VIOLATION

I.    THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER
OR NOT THE DEFENDANT MIRANDA USED EXCESSIVE FORCE IN
ARRESTING THE PLAINTIFF

The plaintiff claims that he suffered bruises on his face, hands, leg, elbow, chest, leg, and back as a result of the struggle with the Defendant Miranda and the multiple kicks inflicted upon him by the Co-Defendant Sweet.  The Defendant Miranda denies that he or any other officers kicked or used excessive force in arresting the plaintiff.  Whether or not the Defendant Miranda used excessive force in arresting the plaintiff is an issue of material fact that precludes summary judgment.

In Hathaway v. Stone, 687 F. Supp. 708 (D. Mass., 1988) the Court denied the defendants' motion for summary judgment on the claims for assault and excessive force.  In Hathaway, supra, the plaintiff alleged that an officer, while in the presence of other officers, "threw her on the ground, kicked her and swore at her".  Id at 710.  The Court concluded that "…Officers Baird and Reed may be held liable if they were present when the plaintiff was beaten, they knew that such force was being used, and they failed to stop Officer Stone from using such force." Id at 712.  See also Jesionoski v. Beck, 937 F. Supp. 95 (D. Mass., 1996) where the court denied the defendants motion for summary judgment on claims for civil rights violation and assault and battery.

The facts of the instant case are similar to the facts in Hathaway case.  The plaintiff in this case was pushed onto the ground, dragged and kicked.  The plaintiff sustained injuries requiring medical attention.  The defendants in this case are disputing how the plaintiff sustained his injuries.  The issue as to whether or not the Defendant

5

Miranda used excessive force in arresting the plaintiff is a disputed fact for the jury to decide, and the motion for summary judgment must be denied.

II.     THERE IS A GENUINE ISSUE OF MATERIAL FACT AS TO WHETHER OR NOT THE DEFENDANT MIRANDA KNEW OR SHOULD HAVE KNOWN THAT ANOTHER OFFICER WAS ASSAULTING THE PLAINTIFF

The Defendant Miranda arrested the plaintiff, handcuffed the plaintiff, and placed the plaintiff in his police cruiser.  The plaintiff, while inside the police cruiser in handcuffs, was kicked at least three times by another officer later identified as Defendant Sweet.  The defendant at all relevant times was in charge of the plaintiff, and drove the plaintiff to the police barracks for booking.  The defendants have denied kicking the plaintiff inside or outside the police cruiser.   Like in Hathaway v. Stone, 687 F. Supp. 708 (D. Mass., 1988) case, whether or not the defendants knew or should have known that another officer was assaulting the plaintiff is an issue of material fact that the jury needs to decide and thus precludes summary judgment.  In Hathaway, supra, 712, the Court applied the test as to "whether a reasonable official in the defendant's position would have realized that his actions would violate the plaintiff's constitutional rights".   The Court in Hathaway found that "…a reasonable officer who saw another officer drag an arrestee from a car, throw her to the ground, and begin to kick her, as the plaintiff alleges, would realize that he was under a duty to stop the assault." Id at 713.  See also Jesionowski v. Beck, 937 F. Supp. 95 (D. Mass., 1996), Noel v. Town of Plymouth, 895 F. Supp. 346, 352 (D. Mass., 1995).  In light of the

6

above cases, there are genuine issues as to whether a reasonable officer standing in the shoe of the Defendant Miranda would have stopped the assault on the plaintiff in this case.

In summary, there are disputes of material facts as to whether or not the Defendant Miranda used excessive force to arrest the plaintiff and whether or not the Defendant Miranda should have stopped the assault on the plaintiff. Accordingly, the defendant's motion for summary judgment must be denied.

E.    THE DEFENDANT MIRANDA IS NOT ENTITLED TO A SUMMARY JUDGMENT
        ON THE CLAIM FOR NEGLIGENCE

The issues here are whether the delay in treatment was significant, and if the injuries suffered by the plaintiff were serious. The Defendant Miranda admitted in his police report and at his deposition that the plaintiff suffered some "scrapes" and "bumps" on his forehead, elbows, and hands, and that he became aware that the plaintiff had a pacemaker. The plaintiff suffered contusions and abrasions on his face, hands, elbow, chest, leg, and back. The plaintiff sought medical care and x-rays revealed a "scarring on his right lung' and the possibility of a "subtle fracture on his rib". The evidence clearly shows that the plaintiff sustained serious injuries that a reasonable officer would have obtained or provide medical assistance to the plaintiff who has a pacemaker.

Findings of negligence have been made where there has been significant delay in obtaining or providing medical care. In <u>Sonsolo v. George</u>, 58 F. 3d 791 (1st Cir., 1995) the jury found in favor of the plaintiff who had suffered a fracture pelvis during an arrest and the police did not provide medical care until after he was booked. Similarly,

in <u>Mahan v. Plymouth County House of Corrections</u>, 64 F. 3d 14 (1st Cir., 1995) the Court found in favor of the plaintiff who had requested prescription medication for depression and seizures and the correction officer did not respond for eight days.

The fact that an ambulance was summoned to the scene does not remove the Defendant Miranda from his obligation to care for his detainee the plaintiff.   The two ambulance medical technicians provided conflicting testimony during their depositions as to whether or not the plaintiff was able to understand or speak English.   One emergency medical technician testified that the plaintiff was able to understand some English, while the other testified that the plaintiff was neither able to understand nor speak English.   As such, there is a disputed fact as to whether the EMTS or the Defendant Miranda was able to communicate well enough in English with the plaintiff to have provided adequate and proper medical care.

In summary, the evidence shows that the plaintiff suffered serious injuries, the Defendant Miranda and both EMTS failed to provide medical treatment and the EMTS and the Defendant Miranda may not have been able to communicate with the plaintiff who is Portuguese .   In light of these facts, the summary judgment motion must be denied.

### F.    THE DEFENDANT IS NOT ENTITLED TO QUALIFIED IMMUNITY

The Defendant Miranda is not entitled to summary judgment on qualified immunity, where there are disputed issues of fact as to whether a reasonable officer would have used excessive force in arresting the plaintiff on March 7, 2004.  As stated

above, the issue as to whether or not the Defendant Miranda used any more force than was reasonably necessary to arrest the plaintiff is a disputed fact that precludes summary judgment on the qualified immunity claim. See Hathaway v. Stone, 687 F. Supp. 708 (D. Mass., 1988, Noel v. Town of Plymouth, 895 F. Supp. 346, 352 (D. Mass., 1995), Jesionowski v. Beck, 937 F. Supp. 95 (D. Mass., 1996).

CONCLUSION

For the reasons as stated above, the defendant's motion for summary judgment must be denied.

                              Respectfully submitted,
                              Mario E. Mendes,
                              By his attorneys,


September 29, 2006            /s/ Jose Couto Centeio
                              Alvin S. Nathanson, BBO # 367480
                              Jose Couto Centeio, BBO #554440
                              Nathanson & Goldberg, PC
                              2 Oliver Street
                              Boston, MA 02109
                              (617) 210-4800

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MARIO E. MENDES,<br>    Plaintiff,<br><br>v.<br><br>BRIAN SWEET and<br>JOAQUIM MIRANDA,<br>    Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. 05-11292DPW

## <u>PLAINTIFF'S RESPONSE TO THE DEFENDANT, JOAQUIM MIRANDA'S STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

Pursuant to Local Rule 56, the Plaintiff, Mario E. Mendes, responds to the Defendant's statement of undisputed facts as follows;

1.    Plaintiff admits that he was driving on Route 3 north on his way home to New Hampshire, but denies that the incident took place on March 8, 2004.  The Plaintiff further responds that the incident did occur on March 7, 2004 as shown on the Defendant's footnote.  (Plaintiff's Answer to Brian Sweet's interrogatories, Answer #7)

2.    Admit.

3.    Plaintiff denies the part as to the radar gun recorded speed, but admits the rest of the statements.  (Deposition of Plaintiff at p. 18).

4.    Admit.

5.    Admit.

6.    Admit.

7.    Admit.

8.    Plaintiff admits except to state that he has no personal knowledge that a tow truck was called or any conversation with the dispatcher.  (Deposition of Plaintiff at p. 22).

9.    Admit.

10.    Admit.

11.    Admit.

12.    Admit.

13.    Plaintiff denies that he pushed Trooper Miranda, but admits the rest of the statements.  (Deposition of Plaintiff at pp. 26-27).

14.    Plaintiff denies that he told Trooper Miranda he was leaving, but admits the rest of the statements.  (Deposition of Plaintiff at p. 19).

15.    Admit.

16.    Plaintiff denies that he never told Trooper Miranda that he had a pacemaker.  (Deposition of Defendant Miranda at pp. 123-124).  Plaintiff does not recall whether or not he told Trooper Miranda he had pacemaker.  (Deposition of Plaintiff at p. 81)

17.    Admit.

18.    Plaintiff denies that Trooper Miranda warned him about using pepper spray, but admits the rest of the statements.  (Deposition of Plaintiff at p. 27).

19.    Admit.

20.    Plaintiff denies the statement that the pepper spray had no effect on him.  (Deposition of Plaintiff at p. 39).  Plaintiff stated that the pepper spray bothered his eyes and made it difficult for him to breathe.  (Deposition of Plaintiff at p. 39).

21.    Admit.

22.    Admit.

23.    Admit.

24.    Admit.

25.    Admit.

26.    Admit.

27.    Plaintiff denies that he had no visible injuries, but admits the rest of the statements. (Plaintiff's Answer to Brian Sweet's Interrogatory #3, Deposition of Mr. Mendes at pp. 32, 33, 48-49, 94). Trooper Miranda admitted in his police report that Mr. Mendes suffered some "scrapes" and "bumps" (Trooper Miranda Arrest Report, Deposition of Trooper Miranda at pp. 121-122).

28.    Admit.

29.    Plaintiff denies the statements, and states that he suffered contusions and abrasions on his face, hands, elbow, chest, leg and back.  (Plaintiff's Answer to Brian Sweet's Interrogatory #3).

30.    Admit.

31.    Admit.

32.    Plaintiff denies the statement and states that at the time that the letter was drafted on October 20, 2004 no lawsuit had been filed or any discovery had been done.

Respectfully submitted,
Mario E. Mendes,
By his attorneys,

September 29, 2006

/s/ Jose Couto Centeio
Alvin S. Nathanson, BBO # 367480
Jose Couto Centeio, BBO #554440
Nathanson & Goldberg, PC
2 Oliver Street
Boston, MA 02109
(617) 210-4800

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARIO E. MENDES,<br>Plaintiff,<br><br>v.<br><br>BRIAN SWEET and<br>JOAQUIM MIRANDA,<br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

No. 05-11292DPW

<u>STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS AND SUPPORTING
EXHBITS OF THE PLAINTIFF SUBMITTED IN SUPPORT OF HIS OPPOSITION TO
THE DEFENDANT JOAQUIM MIRANDA'S MOTION FOR SUMMARY JUDGMENT</u>

Pursuant to Local Rule 56.1, the Plaintiff, Mario E. Mendes, submits this

additional statement of material facts with supporting attachments.

<u>STATEMENT OF UNDISPUTED MATERIAL FACTS</u>

1.     Mario E. Mendes is married to Vera L. Mendes and the couple lived at 117

Westwind Drive, Manchester, New Hampshire from 1995 to January 2006.  (Plaintiff's

Answer to Interrogatories attached as Exhibit 1, Answer #2).

2.     Mr. Mendes is Portuguese, and speaks very limited English.  (Deposition of

Trooper Miranda attached as Exhibit 2 at p. 54, Deposition of Emergency Medical

Technician Beth Corrigan attached as Exhibit 3 at pp. 40-41, 45, 48, Deposition of

Emergency Medical Technician Stephen Brady attached as Exhibit 4, pp. 15, 37, 46).

EMT Stephen Brady believed that Mr. Mendes was neither able to understand them nor

to speak English. (Exhibit 4 at p. 37). 3. Defendant Trooper Joaquim Miranda only speaks English and no other language. (Exhibit 2 at p. 56, 57).

4.    Mr. Mendes is five (5) feet and two (2) inches tall, and weighed about 145 pounds at the time of his arrest on March 7, 2004. (Trooper Miranda Arrest Report dated March 7, 2004 attached as Exhibit 5). Mr. Mendes believed that Trooper Miranda weighed about 350 pounds at the time of his arrest. (Deposition of Mr. Mendes attached as Exhibit 6 at p. 28).

5.    Trooper Miranda does not recall what his weight was at the time of the incident, except that it was over 200 pounds and that he is five (5) feet and four (4) inches. (Exhibit 2 at p. 9).

6.    On March 7, 2004 at approximately 9:30 p.m., Mr. Mendes was traveling on Route 3 north on his way home in New Hampshire when he was stopped by Trooper Miranda. (Exhibit 1, Answer #7, Exhibit 2 at p. 40). Earlier, Mr. Mendes was at his son's house in Bedford, Massachusetts. (Exhibit 1, Answer #7, Exhibit 6 at p. 17).

7.    Trooper Miranda purportedly stopped Mr. Mendes for speeding. (Exhibit 5). Mr. Mendes does not recall how fast he was driving. (Exhibit 6 at p. 18).

8.    Mr. Mendes stopped his automobile in the breakdown lane, and Trooper Miranda asked him for his license and registration.  (Exhibit 6 at p. 18, Exhibit 2 at p. 46).  Mr. Mendes produced his driver's license and registration.  (Exhibit 6 at p. 18)

9.    Trooper Miranda checked Mr. Mendes' driver's license, and learned that Mr. Mendes' New Hampshire license was valid, but that his Massachusetts's license had been suspended.  (Exhibit 5, Exhibit 2 at p. 52).

10.    Trooper Miranda called for a tow truck upon finding out that Mr. Mendes' right to drive in Massachusetts was suspended.  (Exhibit 5, Exhibit 2 at pp. 52, 60).  The tow truck driver arrived before Trooper Miranda returned to Mr. Mendes.  (Exhibit 1, Answer #7, Exhibit 2 at p. 61, Exhibit 6 at p. 18-19).

11.    Trooper Miranda returned to Mr. Mendes, and informed him to exit his car and that his license to operate in Massachusetts was suspended.  (Exhibit 1, Answer #7, Exhibit 6 at p.19, Exhibit 2 at p. 54).

12.    Mr. Mendes told Trooper Miranda that his license to operate in Massachusetts was not suspended, and that he had a letter to prove it inside his car. (Exhibit, 1 Answer #7, Exhibit 6 at p. 19).  Mr. Mendes attempted to retrieve the "Letter of Clearance" from his automobile.  (Exhibit, 1 Answer #7, Exhibit 6 at p. 19).  (The "letter of Clearance" dated December 22, 1998 from the Commonwealth of Massachusetts Registry of Motor Vehicles is attached as Exhibit 7)

13.    Trooper Miranda pushed Mr. Mendes away from his car as he was attempting to retrieve the "Letter of Clearance" from his car.  (Exhibit 1, Answer #7, Exhibit 6 at p. 19, 64-65).

14.    Trooper Miranda told Mr. Mendes that he was under arrest, and pulled his right hand back and placed a handcuff on his right wrist.  (Exhibit 5, Exhibit 6 at pp. 19, 94, Exhibit 2 at p. 66).   Mr. Miranda placed his left hand on his chest to protect his pacemaker. (Exhibit 5, Exhibit 6 at pp. 19, 27-28,  Exhibit 2 at p 67).

15.    Mr. Mendes told Trooper Miranda that he had heart problems. (Exhibit 1, Answer #7, Exhibit 6 at pp. 42, 78, 80-81).   Trooper Miranda admitted that at some point he learned that Mr. Mendes had a pacemaker.  (Exhibit 2 at pp. 123-124).

16.    Mr. Mendes and Trooper Miranda struggled with each other, and Trooper Miranda pushed Mr. Mendes onto the ground.  (Exhibit 6 at pp. 19).

17.    Trooper Miranda does not recall how long he was on the ground with Mr. Mendes. (Exhibit 2 at pp. 70-71).   Trooper Miranda admits that he was all over Mr. Mendes. (Exhibit 2 at p. 73).

18.     Trooper Miranda used a pepper spray on Mr. Mendes. (Exhibit 2 at p. 73). Trooper Miranda used the pepper spray on Mr. Miranda a couple of times, but does not recall how many times. (Exhibit 2 at p. 76).

19.     Trooper Miranda called for assistance.  (Exhibit 2 at pp. 78-79).  The tow truck driver grabbed Mr. Mendes legs and helped Trooper Miranda "dragged" Mr. Mendes away from traffic.  (Exhibit 2 at p. 82).

20.     Trooper Joseph Hickey arrived at the scene, and helped Trooper Miranda placed the handcuffs on Mr. Mendes left hand. (Exhibit 2 at pp. 87-88).  Mr. Mendes was placed in the back seat of Trooper Miranda's cruiser.  (Exhibit 2 at pp. 89).  At this point, there were six to eight policemen at the scene.  (Exhibit 6 at p. 29).  Trooper Miranda does not recall how many officers were at the scene, except to say "several".  (Exhibit 2 at p. 93).

21.     Trooper Miranda called for an ambulance to "decontaminate" both Mr. Mendes and himself, and to treat Mr. Mendes for scrapes and bruises.  (Exhibit 5, Exhibit 2 at pp. 91-92, 118).

22.     Emergency Medical Technicians Beth Corrigan and Stephen Brady arrived at the scene, and provided water to Mr. Mendes and Trooper Miranda for them to wash their eyes.  (Exhibit 2 at p. 94).  The EMTS did not provide any other treatment.  (Exhibit 2 at

p. 94).  Mr. Mendes was taken back to Trooper Miranda's cruiser after washing his eyes.  (Exhibit 6 at pp. 31, 33, 83-84).

23.    Trooper Miranda did not receive any other medical care at the scene or thereafter.  (Exhibit 2 at p. 94).

24.    At some point in time, the Defendant Trooper Brian Sweet arrived at the scene. (Exhibit 2 at p. 99).   Trooper Miranda told Trooper Sweet that he was all right.  (Exhibit 2 at p. 99).

25.    Trooper Sweet came by Trooper Miranda cruiser, and opened the car door on three separate occasions and kicked Mr. Mendes on his chest, right leg, and right knee. (Exhibit 1, Answer #7, Exhibit 6 at pp. 29-30, 31-34, 38, 83, 84).

26.    Mr. Mendes asked Trooper Sweet to pick up his eye glasses from the ground and Trooper Sweet broke the glasses with his foot.  (Exhibit 1, Answer #7, Exhibit 6 at pp. 29-30, 61, 83,84).

27.    Trooper Miranda admitted that Mr. Miranda had suffered some "scrapes" and "bumps" on his forehead, elbows, and hands.  (Exhibit 5, Exhibit 2 at pp. 121-122).  Mr. Mendes was breathing heavy, suffered contusions, and abrasions on his face, hands, elbow, chest, leg and back, had pain all over his body, and felt like he was dying. (Exhibit 1, Answer #3, Exhibit 6 at pp. 39, 40, 47).

28.    Trooper Miranda admitted that Trooper Sweet is his nephew.  (Exhibit 2 at pp. 137).

29.    Mr. Mendes was charged with assault and battery on a police officer, resisting arrest, disorderly conduct, speeding, operating with a suspended license.  (Exhibit 5).  A trial was held at the Lowell District Court, and Mr. Mendes was acquitted on all charges, except that he was found guilty on the charges of resisting arrest and speeding. (Exhibit 6 at p. 52).

30.    Mr. Mendes was picked up at the State Police barrack by his Wife, and taken to the emergency room at Elliot Hospital.  (Exhibit 1, Answer #7, Exhibit 6 at pp. 46-49). Mr. Mendes was treated in the emergency room, and discharged the same day. (Exhibit 6 at p. 47).  X-Ray taken at the hospital showed that Mr. Mendes suffered a "scarring in the right lower lung", and the possibility of a "subtle fracture" on his rib. (Copy of the X-Ray report dated March 10, 2004 from Dartmouth-Hitchcock hospital is attached as Exhibit 8).  Mr. Mendes followed up medical care with his primary care physician Dr. Paul Morbey.  (Exhibit 1, Answers #8 and 9, Exhibit 6 at pp. 48, 49).

31.    Mr. Mendes incurred medical bills and expenses in the amount of $4,521.19, and legal fees in defending the criminal charges in the amount of $10,000.00 and additional costs for towing his vehicle and to replace his eyeglasses.  (Exhibit1, Answer #10).

32.    Mr. Mendes continues to experience pain on his right shoulder, body, and right

arm, difficulties sleeping at night, and nightmares.  (Exhibit 6 at pp. 50, 53-54, 57).  Mr.

Mendes can no longer lift heavy objects, perform some yard work or shovel snow.

(Exhibit 6 at pp. 55, 57-60).


                                    Respectfully submitted,
                                    Mario E. Mendes,
                                    By his attorneys,


September 29, 2006                   /s/ Jose Couto Centeio
                                    Alvin S. Nathanson, BBO # 367480
                                    Jose Couto Centeio, BBO #554440
                                    Nathanson & Goldberg, PC
                                    2 Oliver Street
                                    Boston, MA 02109
                                    (617) 210-4800

# EXHIBIT  1
## (Plaintiff's Answers to Interrogatories)

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MARIO E. MENDES,<br>Plaintiff,<br><br>v.<br><br>BRIAN SWEET and<br>JOAQUIM MIRANDA,<br>Defendants | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 05-11292DPW |

## PLAINTIFF, MARIO E. MENDES, ANSWERS TO DEFENDANT BRIAN SWEET'S FIRST SET OF INTERROGATORIES

### GENERAL OBJECTIONS

1. Plaintiff hereby objects to each and every interrogatory to the extent it seeks information which is protected from discovery by the attorney-client privilege.

2. Plaintiff hereby objects to each and every interrogatory to the extent it seeks information which is protected from discovery by the work-product doctrine.

3. Plaintiff hereby objects to each and every interrogatory to the extent that it seeks information that is protected from discovery on the grounds that such information was compiled, gathered or created in anticipation of litigation, during the pendency of this lawsuit or not otherwise in the ordinary course of his business.

4. Plaintiff hereby objects to each and every interrogatory which seeks information in a manner not authorized or permitted under the Massachusetts Rules of Civil Procedure, including but not limited to the improper use of compound interrogatories in an attempt to circumvent the number of interrogatories authorized or permitted under Mass. R. Civ. P. 33.

Without waiving or limiting any of the general objections, the Plaintiff responds to each individual interrogatory as follows:

1

# INTERROGATORIES

Interrogatory No. 1

Please state describe your employment history for the last eight years including the name and address of each employer, the dates of employment, your title or office, a description of your duties with each employer, and the salary or wage you were paid by each employer. As part of your answer give the reason why you left each position. If you were self-employed or part of any partnership during that period, then give the dates, describe the work you did, give the name of your company or partnership, and give your gross and net earnings. If you were attending any school, identify the school and give the course of study.

ANSWER:    For the past six (6) years, I worked for Synergy Graphics located at 3A Lopez Road, Wilmington, MA 01887.  My job title was machine operator.  My salary ranged from $35,000 to $45,000.00.  My last earning was $19.40 an hour.  The company closed on November 5, 2005.   I worked previously for Precision Graphics for about eleven (11) years.  Precision Graphics merged with Synergy Graphics.  I do not remember the address for Precision Graphics.  My income with Precision Graphics was significantly higher than my last employer.  I have not worked since November 5, 2005.

Interrogatory No. 2

List in chronological order the addresses at which you have resided in the past eight (8) years, indicating the approximate dates at each addresses, commencing with the present, and identify each person residing with you and their relation to you.

ANSWER:    At present, I reside at 1023 Gage Avenue,  Deltona, Florida 32738 with my Wife, Vera L. Mendes and our Daughter, Glauccy Mendes and Granddaughter, Ayina Ludox. We have been living at this address since January 2006.  I previously lived at 117 Westwind Drive, Manchester, NH 03104 from 1995 to January 2006.

Interrogatory No. 3

Describe all of the injuries and complaints of any nature whatsoever (whether objective or subjective) which you allege occurred as a result of this incident or which you, or your doctors are aware or suspect.

(a)    List and describe each in specific detail, giving the exact location within or upon your body of all your injuries, and the nature of your complaint (whether physical, dental, emotion, nervous, mental or psychological).

ANSWER:    I suffered a collapsed lung, rib fracture and contusions and abrasions on my face, hands, elbow, chest, leg and back.  I suffered headache and pain on my chest and right shoulder.  I also became fearful of law enforcement officials.  I often have nightmares and restless nights.  I have not been able to sleep well at

nights since the incident. Please refer to medical records furnished in response to request for documents for further details of my injuries.

(b)    If you have completely recovered from each such injury and complaint, state the date you recovered from each such injury and complaint;

ANSWER:    The contusions and bruises healed after about two to three months.

(c)    List separately all of your present disabilities and complaints (whether objective or subjective), and the frequency and duration of your complaints of pain, the location of and degree of any limitations of motion you now have, and a detailed description of any scars you have at the present time, which you attribute to the incident.

ANSWER:    I continue to have pain on my chest and right shoulder. The pain on my right shoulder is daily. The pain on my chest is about 2/3 times a week. I still have nightmares and difficulties sleeping at night. I am still afraid of law enforcement officials. I do not have any scars.

(d)    Separately list and describe each of your claimed permanent disabilities.

ANSWER:    I continue to suffer a great deal of pain on my chest and right shoulder. The pain on my right shoulder is daily. The pain on my chest is about 2/3 times a week. I still have nightmares and difficulties sleeping at night. I am still afraid of law enforcement officials. It is difficult for me to do any physical activity.

(e)    if you claim any permanent scars, disfigurement or other cosmetic defect, present or potential, as a result of the incident, describe in detail the area of the body affected, the approximate dimension of the area, and the name and address of any person who has taken any photographs showing injury and when taken.

ANSWER:    N/A

(f)    If as a result of any injury in the incident sued upon, any doctor gave you a temporary or permanent disability rating, give the name and address of the doctor, what the rating covers, and when the rating was made, the percentage of rating and the reason therefore.

ANSWER:    Please refer to medical records furnished in response to request for documents.

(g)    If as a result of any injuries sustained in the incident you were unable to perform any of your normal and usual functions, duties or activities or whatever nature of any time since the incident (which you were able to perform before the incident), state such function, duty, and activity you were unable to perform, and also

separately state what functions, duties or activities, if any, you are still unable to perform and why.

ANSWER:   As a result of the injuries I sustained on the date of the incident, I was not able to perform the following activities:

1.   lift heavy objects;
2.   lift box of papers;
3.   home repairs and improvement;
4.   yard work such as mow lawn, repair sprinkler system and clear shrubs and leaves;
5.   shovel snow.

At present, I am not able to perform any of the above functions.  It is difficult for me to do any physical activity.

Interrogatory No. 4

Have you have been examined or have received any medical, psychiatric or other care or treatment from any doctor, chiropractor, therapist or practitioner as a result of injuries allegedly received in said incident? If so, please:

a. Identify each doctor or other practitioner who treated or examined you, indicating his specialty, if any, and each hospital, clinic or other facility in which you were treated or examined;

ANSWER:      Elliot Hospital
One Elliot Way
Manchester, NH 03103

Paul Morbey, MD.
Dartmouth-Hitchcock Clinic
P.O. Box 10547
Bedford, NH 03110

Robert M. Lavery, M.D.
New Hampshire Cardiology Consultants, P.C.
1 Elliot Way, Suite 100
Manchester, NH 03103

b. Provide a detailed description of the injuries or complaint for which you consulted or were treated by each doctor, practitioner, or facility identified;

ANSWER:      See my Answer to Interrogatory #3 above.

c. Give the dates of treatment or examination by each such person or facility;

ANSWER:    On March 8, 2004, I received medical care in the emergency room at Elliot Hospital. From March 10, 2004 to April 29, 2004, I was examined and treated by my Primary Care Doctor Paul Morbey.

d. Describe in detail the treatment or examination received from each such person or at each facility;

ANSWER:    Please refer to medical records furnished in response to request for documents.

e. Describe in detail the diagnosis and prognosis given by each practitioner or at each facility;

ANSWER:    Please refer to medical records furnished in response to request for documents.

f. Describe all medications and narcotics prescribed, identify by whom and for what purpose, where they were obtained, and the frequency and the period of time from date to date over which they were taken;

ANSWER:    I have been taking the following medications daily:

1.    Aspirin                         pain medication

2.    Toprol 50mg or Lopresor 50mg    heart medication

The heart medications are prescribed by my Cardiologist. The Aspirin medication is purchased at the local pharmacy.

g. Describe the nature, extent and duration by dates of any self-administered home care or therapy, and if recommended by any doctor or practitioner, give his name and address;

ANSWER:    None.

h. State whether you are still being treated, examined or attended by any doctor or medical practitioner; and

ANSWER:    I am not being treated by a medical practitioner.

i. Give the date of each doctor's or other practitioners written report, the addresses of those preparing each such report, the name of each doctor or other practitioner making any such report and the name and address of the present custodian of each such report.

ANSWER:    N/A

<u>Interrogatory No. 5</u>

Identify each doctor, chiropractor, or other health practitioner who you had seen, consulted or been treated by in the five years prior to the incident. For each such practitioner state;

ANSWER:    Plaintiff objects to this interrogatory on the grounds that it is overly broad as to scope and that the information sought is not relevant to the subject matter of the pending action, nor appears reasonably calculated to lead to the discovery of admissible evidence.    Subject to and without waiving this objection, Plaintiff states:

Dr. Paul Morbey
Dartmouth-Hitchcock Clinic
P.O. Box 10547
Bedford, NH 03110

Robert M. Lavery, M.D.
New Hampshire Cardiology Consultants, P.C.
1 Elliot Way, Suite 100
Manchester, NH 03103

CMC Catholic Medical Center (heart surgery)
Manchester, NH

a. the dates of treatment or consultations;

ANSWER:    Dr. Morbey has been my primary care physician for the past seven (7) years.    I see Dr. Morbey for my routine medical care and annual physical examination.    I do not recall the dates of my visits with Dr. Morbey.
I had an open heart surgery in 1982 and again in 1999.    I have been using a pacemaker since 1999.

b. the reason for the consultation or treatment received;

ANSWER:    I see Dr. Paul Morbey for my routine medical care and annual physical examination.

c. all medicines prescribed; and

ANSWER:    Toprol 50mg and Lopresor 50mg.

d. the diagnosis and prognosis given by that practitioner.

ANSWER:    I had an open heart surgery in 1982 and again in 1999.    I have been using a pacemaker since 1999.    I have been taking the heart medication Toprol since 1999.

6

<u>Interrogatory No. 6</u>

Within five (5) years prior to the alleged occurrence had you undergone or received any treatment for any mental or emotional disturbance? If so, please state as to any such treatment for any mental or emotional disturbance.

ANSWER:    I have not received any treatment for mental or emotional disturbance.
a.    the nature and extent of each such treatment;

ANSWER:    N/A

b.    the dates of each such treatment;

ANSWER:    N/A

c.    the location or place of each such treatment; and

ANSWER:    N/A

d.    the name and address of any doctor, physician, practitioner, hospital, clinic or institution involved in each such treatment.

ANSWER:    N/A

<u>Interrogatory No. 7</u>

Identify and describe in full and complete detail how the incident alleged in your complaint occurred including without limitations, the time of day, the sequence of acts and events, the precise location of each act and event, and what you and each other person present did, saw and heard during the time immediately preceding and immediately following the incident and during the incident itself.

ANSWER:    The incident occurred on March 7, 2004 at approximately 9:30 p.m. on Route 3 North. I had left my son's house in Bedford, Massachusetts and was on my way home. I was pulled over by State Trooper Joaquin Miranda. I stopped at the breakdown lane. I gave my New Hampshire driver's license and car registration to Trooper Miranda. Trooper Miranda took both documents. I waited inside my automobile. While inside my automobile, a tow truck arrived at the scene. Trooper Miranda returned to my automobile and asked me to come out of my vehicle. I came out of my automobile. Trooper Miranda told me that my license was suspended. I told Trooper Miranda that my license was not suspended and that I had a Letter of Clearance inside my automobile that shows that my license was not suspended. Trooper Miranda did not listen to me or allow me to retrieve the letter from my automobile. Trooper Miranda pushed me against my automobile. My chest struck the automobile. I continued to try to explain to Trooper Miranda about the Letter of Clearance and that I use a

pacemaker for my heart condition. I covered my pacemaker with my left hand so that it would not disconnect or become dislodged. Trooper Miranda did not listen to me. Trooper Miranda next pushed me onto the ground. My chest struck the ground. I became even more nervous and afraid that my pacemaker would get disconnected or dislodged and that I could die. I continued to try to protect my pacemaker with my hand. Trooper Miranda called for help and other law enforcement officers arrived. I was sprayed with pepper, handcuffed and placed inside the back seat of Trooper Miranda police cruiser.

While inside the police cruiser, Trooper Brian Sweet came over, opened the back door and viciously kicked me on my chest repeatedly. Trooper Sweet closed the door and walked away. Trooper Sweet returned and opened the door and again attempted to kick me. I was so afraid of dying that I bent down to avoid the kicks to my chest area. While I was bending down, I noticed my glasses were on the ground and asked Trooper Sweet for them. Trooper Sweet responded "oh these" and stomped on them. The other law enforcement officers were not in my immediate area while I was being attacked by Trooper Sweet.

I was taking by Trooper Miranda to the Andover State Police barrack and booked and charged with speeding, driving with a suspended license, disorderly conduct, resisting arrest, and assault and battery on police officer. At the police barrack, I was experiencing difficulty breathing and severe pain all over my body. I was not offered any medical care. I was released on my personal recognizance to my wife.

My wife took me to the Elliot Hospital emergency room the same night. The emergency room physician found that I had suffered a collapsed lung, fractured rib and contusions and abrasions on my face, hand, elbow, leg, chest and back. I was examined, treated and discharged with instructions to follow up with my primary care physician.

<u>Interrogatory No. 8</u>

State the names, addresses and telephone numbers of all persons that witnessed or may have knowledge of any part of the incident or your claim of damages. As part of your answer, state the following;

(a)     Identify all persons who may have seen or heard the incident referred to in your lawsuit. State the relationship of each witness to you;

ANSWER:     Trooper/Defendant:  Joaquin Miranda
            I am not related to the State Trooper

            Trooper/Defendant:  Brian Sweet
            I am not related to the State Trooper

I do not know the identity of the other witnesses at the scene of the incident.

(b)    Identify all persons who heard, or claim to have heard, any statements made by any person concerning how the incident happened or the person or persons at fault in the occurrence;

ANSWER:    See my Answer to Interrogatory #8 (a) above.

(c)    Identify all persons who have or claim to have any knowledge concerning the injuries or damages sustained by you in the incident; and

ANSWER:    Trooper/Defendant:    Joaquin Miranda

Trooper/Defendant:    Brian Sweet

Wife:    Vera L. Mendes

Daughter:    Glauccy Mendes

Emergency room physicians and nurses at Elliot Hospital

Dr. Paul Morbey

(d)    Of all persons who rendered or offered assistance at the scene of the incident, or who gave their names, or assisted you in making any report of the incident.

ANSWER:    See my Answer to Interrogatory #8 above.

Interrogatory No. 9

As to each person named in your answer to the preceding interrogatory, state:

(a)    Describe in detail what each person saw, heard and did, and describe how you became aware of that information;

ANSWER:    See my Answer to Interrogatories # 8 and 9 above.

(b)    Identify all documents containing any statement or account by each such person, describe the document, and identify the holder of the document.

ANSWER:    See Police Incident report prepared by Trooper Joaquin Miranda, booking report and internal affairs reports.

<u>Interrogatory No. 10</u>

Please give an account, itemized as fully and carefully as possible, of all losses and expenses or other damages which you claim were incurred by you as a result of the incident set forth in your complaint, stating specifically but not limited to those losses or expenses for medical care and attendance, and lost time from employment. If you claim lost wages or earnings, as part of your answer:

ANSWER:    I incurred the following medical bills:

| | |
|---|---|
| Elliot Hospital | $3,964.19 |
| Dartmouth-Hitchcock Clinic | $557.00 |
| Out of Pocket Expenses (co-pay + medications) | to be provided |

(a) provide a detailed list of the days and hours you were unable to work, and, for each day give the reason;

ANSWER:    I was not able to work the entire week from March 8, 2004 to March 12, 2004. My entire body was sore and in great pain. It was difficult for me to get out of bed. I was not able to perform my usual job duties which required lifting boxes, bending, kneeling and prolonged standing.

(b) give your hourly wage before the incident, after your return to work and currently;

ANSWER:    Prior to the incident, I was earning $19.00 an hour and working 40+ hours a week. My hourly rate was the same after I returned to work. My last earning was $19.40 an hour.

(c) state whether you received sick leave, worker's compensation or disability pay or insurance, and, if so, the dates and amounts of all such payments. Identify the source of any such payment.

ANSWER:    I used my vacation time while I was out work during the week of March 8, 2004. I do not recall the amount I was paid for the week.

(d) Identify each employer or business from which you lost work.

ANSWER:    Synergy Graphics
3A Lopez Road
Wilmington, MA 01887

Interrogatory No. 11

For each expert witness who is expected to testify on your behalf at the trial of this case:

ANSWER:    My attorney had advised me that a determination has not yet been made as to who might be called to testify on my behalf as an expert witness at trial.

(a)    identify said expert witness and his area of expertise;

(b)    describe the substance of the facts to which each expert witness will testify;

(c)    describe the opinions to which each expert witness will testify;

(d)    summarize the grounds for each opinion;

(e)    specify the amount of any monetary compensation provided or promised to each such expert witness, and state how much of that amount has been paid.

ANSWER: (a-e) See my Answer to Interrogatory #11 above.

Interrogatory No. 12

With regard to your allegations that Mr. Sweet intentionally inflicted emotional distress upon you, state the following;

(a)    describe separately and in detail each action of Mr. Sweet that you contend to be extreme and outrageous, utterly intolerable in a civilized society, or which was otherwise done for the purpose of inflicting severe emotional distress upon you;

ANSWER:    Plaintiff objects to this interrogatory to the extent that it requires him to make conclusions of law and apply law to fact which the plaintiff is not qualified to make. Without waiving or limiting this objection, Plaintiff states the following: See my Answer to Interrogatory #3, 4. 5, 7 and 10 above.

(b)    describe in detail the severe emotional distress that you suffered, giving the dates and type of all treatment or counseling that you received for that distress.

ANSWER:    Plaintiff objects to this interrogatory to the extent that it requires him to make conclusions of law and apply law to fact which the plaintiff is not qualified to make. Without waiving or limiting this objection, Plaintiff states the following: See my Answer to Interrogatory #3, 4. 5, 7 and 10 above.

Interrogatory No. 13

Describe in detail each act of Mr. Sweet that you claim constituted an assault and/or a battery, specifying which it constituted, and for each act describe state when and how it occurred, and specify all injuries arising from each act.

ANSWER:     Plaintiff objects to this interrogatory to the extent that it requires him to make conclusions of law and apply law to fact which the plaintiff is not qualified to make.  Without waiving or limiting this objection, Plaintiff states the following: See my Answer to Interrogatory #3, 4. 5, 7 and 10 above.

Interrogatory No. 14

State the basis, as that term is defined above, for your claim that Mr. Sweet acted with malice towards you.

ANSWER:     Plaintiff objects to this interrogatory to the extent that it requires him to make conclusions of law and apply law to fact which the plaintiff is not qualified to make.  Plaintiff also objects on the ground that the interrogatory states as malice is defined above but failed to provide the definition for "malice". Without waiving or limiting this objection, Plaintiff states the following:  See my Answer to Interrogatory #3, 4. 5, 7 and 10 above.

Interrogatory No. 15

With regard to the status of your motor vehicle license at the time of the incident, describe in detail why it was listed as suspended, give the reason why it had been previously suspended, give the date that it was reinstated and the reason, state whether you were aware that it was still listed as suspended, and describe in detail all steps that you took correct that listing.

ANSWER:     My license was not suspended at the time of the incident.  My license was previously suspended based on incorrect information which the registry of motor vehicle issued a Letter of Clearance.  I carried the Letter of Clearance in my automobile at all times.  I made several attempts to give a copy of the Letter of Clearance to the Defendants at the scene of the incident but they refused to listen to me or to examine the letter.

Interrogatory No. 16

Describe separately and in detail each act of Mr. Sweet that you claim constituted any of the following, and for each act describe state when and how it occurred, and specify all injuries arising from each act;

(a)     a beating;

ANSWER:     Plaintiff objects to this interrogatory to the extent that it requires him to make conclusions of law and apply law to fact which the plaintiff is not qualified to make.  Without waiving or limiting this objection, Plaintiff states the following: See my Answer to Interrogatory #3, 4. 5, 7 and 10 above.

(b)     physical abuse or brutality;

ANSWER:  Plaintiff objects to this interrogatory to the extent that it requires him to make conclusions of law and apply law to fact which the plaintiff is not qualified to make.  Without waiving or limiting this objection, Plaintiff states the following: See my Answer to Interrogatory #3, 4. 5, 7 and 10 above.

(c)    excessive force.

ANSWER:    Plaintiff objects to this interrogatory to the extent that it requires him to make conclusions of law and apply law to fact which the plaintiff is not qualified to make.  Without waiving or limiting this objection, Plaintiff states the following: See my Answer to Interrogatory #3, 4. 5, 7 and 10 above.


SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS _14_ DAY OF FEBRUARY 2006.

_____
Mario E. Mendes


As for Objections:

02-16-06

Jose Couto Centeio, Esquire
BBO# 554440
NATHANSON & GOLBERG, P.C.
Two Oliver Street
Boston, MA 02109
617-210-4815
F:\windoc\jcc\pi\mendesanswerints.doc


13

# EXHIBIT  2
## (Defendant Miranda's Deposition)

1  A.    My badge number is 1130.

2  Q.    What is your height and weight?

3  A.    Height is five-four.  Weight -- I don't know what my

4  weight is at this time.

5  Q.    Do you remember what your weight was back in March of

6  2004, approximately?

7  A.    No, I don't.

8  Q.    Do you know what range it fluctuates?

9        MR. SILVERFINE:  Objection to form.  You can

10  answer.

11  A.    I don't know exactly what the weight is or -- close to

12  it.

13  Q.    Is it more than 150?  Less than 200?

14  A.    Again, I don't know what the range would be.

15  Q.    Because the weight is relevant to this matter.

16        MR. SILVERFINE:  Objection to form.  There's no

17  question.

18  Q.    But is -- your weight has been below 200 pounds?

19  Above 200 pounds?

20  A.    It has been above 200 pounds.

21  Q.    Do you recall back in March of 2004 if it was below

22  200 pounds or above 200 pounds?

23  A.    Probably above 200 pounds.

24  Q.    And you're telling us today it's possibly above 200

1  A.    A day.

2  Q.    Besides the six that you recall now, are there any

3  other ones --

4        MR. SILVERFINE:  I object to the form.  You can

5  answer.

6  A.    In the last four years?

7  Q.    Correct.

8  A.    Nothing in the last four years that I can remember.  I

9  don't recall what the other ones were but -- I can't recall.

10  Q.   And you've told us in the last four years you did not

11  receive any special training on the use of deadly force;

12  correct?

13        MR. SILVERFINE:  Objection as to the form.

14  A.    Just the in-service training.

15  Q.    And that took place back at the MDC academy, correct,

16  in 1988?

17  A.    Yes.

18  Q.    And since then you have not taken any?

19  A.    I don't recall.

20  Q.    Do you recall the date of the incident involving

21  Mr. Mario Mendes?

22  A.    Yes.

23  Q.    What date was it?

24  A.    March 7th, 2004.

1   stationary spot?

2           MR. SILVERFINE:  Objection as to the form.

3   Q.    What did you do when you found out about the speed?

4   What did you do next?

5   A.    Observed the vehicle pass me and proceeded after the

6   vehicle.

7   Q.    When you proceeded after the vehicle, had you had your

8   lights on?

9   A.    Yes.

10  Q.    And what happened after you had your lights -- siren

11  on?

12          MR. SILVERFINE:  Objection as to the form.

13  A.    I followed him for a distance.

14  Q.    When you say "a distance," for how long?

15  A.    I don't know.  Approximately a mile.

16  Q.    And then what happened next?

17  A.    The vehicle pulled over.

18  Q.    And when you say "pulled over," did he pull to the

19  left or to the right?

20  A.    He pulled over to the right.

21  Q.    That would be the stopping area; correct?

22          MR. SILVERFINE:  Objection as to the form.  If you

23  know.

24  A.    Breakdown area, breakdown lane.

1    A.    He reported that his New Hampshire license was valid,

2    but his right to operate in Massachusetts was suspended due

3    to payment default, I believe.

4    Q.    And that was the information that the dispatcher

5    relayed back to you?

6    A.    Yes.

7    Q.    And what did you do with that information?

8    A.    I don't understand.

9    Q.    They told you that his Massachusetts license was

10   suspended.  What did you do after you got that information?

11   A.    I then issued a criminal summons for operating after

12   suspension, unlicensed operation, and speeding.  And I

13   called for a tow truck.

14   Q.    Now, if a person has a New Hampshire license, can they

15   use that New Hampshire license to operate a motor vehicle in

16   Massachusetts?

17          MR. SILVERFINE:  Objection as to the form.

18   A.    Can they use that?

19   Q.    Correct.

20   A.    Yes.

21   Q.    So if a person has multiple licenses, all the licenses

22   have to be maintained in a valid status; correct?

23   A.    I don't understand multiple licenses.

24   Q.    If I have a New Hampshire license and a Florida

Page 54

1    (Question read.)

2    MR. SILVERFINE:  Objection as to the form.  You

3    can answer.

4    A.    I don't know what New Hampshire does.  I don't know.

5    Q.    At the beginning when you stopped and you were telling

6    him it was for speeding; correct?

7    A.    Yes.

8    Q.    And then after you validate his information, it came

9    back that his license was suspended in Massachusetts, you

10   went back.  And what did you tell him?

11   A.    I told him that his license was suspended in

12   Massachusetts and that he couldn't drive the vehicle and it

13   was going to be towed.

14   Q.    And what was his response?

15   A.    He was outside the car.  He said, No.  I'm leaving.

16   I'm going to Rome.

17   Q.    And was the word "Rome," home?  Or that's what you

18   heard?

19   A.    I heard distinctively, "Rome."

20   Q.    Did he tell you any other words?

21   A.    Just that he was leaving.  He wasn't -- he was going

22   to Rome.  I think he said it twice, if I recall.

23   Q.    What happened next?

24   A.    He attempted to get in his vehicle.

Page 56

1   A.    I don't recall.

2   Q.    Were you able to tell if he was a foreigner?

3         MR. SILVERFINE:   Objection.

4   A.    I don't recall at that time.

5   Q.    You looked at his license and registration.  Was the

6   vehicle under his name, Mario Mendes?

7   A.    I don't recall at this time.

8   Q.    But you looked at his license and you saw his name?

9   A.    Yes.

10  Q.    And were you able to tell if he was of Spanish,

11  Portuguese, or any background?

12  A.    I couldn't tell what it may be.

13  Q.    Do you speak any other language yourself?

14  A.    No.

15  Q.    Do you speak Spanish?

16  A.    No.

17  Q.    Do you understand Spanish?

18  A.    No.

19  Q.    Do you speak Portuguese?

20  A.    No.

21  Q.    Do you understand Portuguese?

22  A.    No.

23  Q.    Because of your last name, Miranda, which could be

24  from a Portuguese background, I want to get an understanding

Page 57

```
 1   that you do not speak Portuguese.  Correct?

 2   A.    Correct.

 3              MR. SILVERFINE:  Objection as to form, and he's

 4   already answered that.

 5              MR. ROGAL:  Objection.  Because his last name is

 6   Miranda doesn't mean --

 7              MR. CENTEIO:  No, but that's what I'm trying to

 8   find out.

 9              MR. ROGAL:  We're not stereotyping, are we?

10              MR. CENTEIO:  No, but I'm just finding out.

11   Q.    So you did not speak to him in any other language?

12   A.    No.

13   Q.    English --

14   A.    English.

15   Q.    -- correct, was the only language you spoke?  And you

16   were -- up until this point that he was trying to get back

17   into the car, you understood him a hundred percent?

18   A.    Yes.

19   Q.    And you felt that he understood you a hundred percent?

20   A.    Yes.

21   Q.    You didn't think there was any language barrier?

22   A.    Correct.

23   Q.    And you didn't hear him say, I need to get you a

24   document?
```

Page 60

1   Q.    How frequently were the cars passing by?

2   A.    I don't recall.

3   Q.    Was it a car every second?  A car every minute?

4   A.    I don't recall how frequently they were going by.

5   Q.    And up until this point, it was only your cruiser and

6   Mr. Mendes at the scene; correct?

7   A.    No.

8   Q.    Okay.  You were telling him that his vehicle was going

9   to be towed and he can go with the tow truck driver?

10  A.    Yes.

11  Q.    Was there any other cruiser at the scene?

12  A.    No.

13  Q.    No?  Any other vehicles at the scene?

14  A.    Yes.

15  Q.    What vehicle?

16  A.    Tow truck.

17  Q.    Who summoned the tow truck?

18  A.    I did.

19  Q.    When was that done?

20  A.    While I was in the cruiser.

21  Q.    Do you recall, was that after the information came in

22  from the dispatcher that his Massachusetts license was

23  suspended?

24  A.    Yes.

Page 61

1  Q.    Did you immediately call the tow truck company?

2  A.    Yes.

3  Q.    And from the time that you summoned the tow truck

4  company to the time the tow truck company arrived at the

5  scene, how many seconds or minutes would you say?

6  A.    I don't recall.

7  Q.    Was it less than five minutes?  More than five

8  minutes?

9  A.    It had to be more than five minutes.

10  Q.    But from coming back and interacting with Mr. Mendes

11  and then at the time that you closed the door, the tow truck

12  had arrived; correct?

13  A.    He had arrived before I approached the car.

14  Q.    When you say he had arrived before --

15  A.    The second time.

16  Q.    Oh, I see.  But not the first time?

17  A.    Not the first time.  The second time.

18  Q.    So you don't know how long it had taken for the tow

19  truck company to arrive at the scene?

20  A.    No, I don't recall how long.

21  Q.    Was it more than 10 minutes?

22  A.    I really don't recall how long it was.

23  Q.    Do you recall how far away the tow truck company was?

24  A.    I don't know where -- I don't.  I don't know where he

Page 66

1    A.    He said, No, I'm leaving.  And he pushed me.  And I

2    responded to him, Put your hands behind your back; you're

3    under arrest.  He said, No, I'm leaving.  And then a

4    struggle ensued.

5    Q.    And explain to us what was the struggle.

6    A.    As I attempted to put a cuff on his right hand, he

7    began to resist.  I then -- as a struggle ensued, I then --

8    they put him up against the car.  I had --

9    Q.    At that point, how was he facing?  Was he facing his

10   car or the back of his car?

11   A.    He was facing the side of his car between the driver's

12   door and the passenger's door, in that area.

13   Q.    Were you on his side, or in the back of him, or in

14   front of him?

15   A.    I was behind him.

16   Q.    And you had his right hand; correct?

17   A.    I believe it was his right hand.

18   Q.    And at that point had you had the handcuff on the

19   right hand?

20   A.    At one point in time I did.

21   Q.    What happened next?

22   A.    He then continued to resist.  He resisted and --

23   Q.    When you say resisted, because it was the law or --

24   that's a conclusion.  How do you define resist?

DUNN & GOUDREAU

Page 67

1    MR. SILVERFINE:  Objection as to the form.

2    A.    Resist.  He refused to allow himself to be handcuffed.

3    Q.    What did you do next?

4    A.    I continued to try to cuff his left hand.

5    Q.    At that point had you had the cuff over on the right

6    hand?

7    A.    At one point in time, yes.

8    Q.    I'm trying to understand that.  So there was no cuff

9    on either hand at this point?

10   A.    I don't know how to answer.  At one point in time I

11   just managed to get a handcuff, I believe, on his right

12   hand.

13   Q.    And then what happened?

14   A.    He then proceeded to lock up his arm, left arm, I

15   believe, in the front of him.

16   Q.    When you say in the front of him, where did he place

17   his left hand?

18   A.    In front of him.

19   Q.    When you were in front of him, was the left hand

20   touching his body?  Or was he -- was it on the car?  Or was

21   it just --

22   A.    It was in the front of him between the car and his

23   body.

24   Q.    And did he tell you at that point in time that he had

Page 70

1   A.     We continued to struggle.  At one point we went to the

2   ground.   I tried -- while we were on the ground, I kept

3   telling him to submit to the arrest.  If he -- he

4   continued -- as he was on the ground, he was trying to drag

5   himself further in the lane, trying to crawl and get up.

6   Q.     Before you move on, he was on the ground.  Were you

7   also on the ground?

8   A.     Yes.

9   Q.     How was he facing on the ground?

10  A.     I believe he was either -- he was on his side.

11  Q.     In relation to him, how were you facing?

12  A.     I don't exactly recall.

13  Q.     Were you on the side of him?  On top of him trying to

14  get his hand?

15  A.     I was all over him.

16  Q.     For how long would you say you were on the ground with

17  him?

18  A.     I don't -- I couldn't tell you.

19  Q.     Minutes?

20  A.     I couldn't -- to be honest with you, I can't tell you.

21  I don't know how long it was.

22  Q.     And you told us that he was trying now -- this is

23  where I stopped you.  You can continue.  He tried to get on

24  the travel lane.

Page 71

1    A.    We were already in the travel lane.

2    Q.    For how long do you believe you were in the travel

3    lane?

4    A.    I don't know.

5    Q.    Were any vehicles passing by you at that time?

6    A.    Yes.

7    Q.    How many vehicles would you say had passed by?

8    A.    I don't know.  I had only seen a couple.  At that

9    point in time I wasn't counting cars.

10   Q.    Would you say more than five?

11   A.    I have no idea.  All I know is I saw two sets of

12   headlights coming from my head.  That's all I remember.

13   They swerved out of the way.

14   Q.    What did you two do next?

15   A.    I told him to submit to the arrest.  If he didn't

16   submit to the arrest, I was going to pepper spray him with

17   pepper Mace.

18   Q.    What would you say the passage of time has been now

19   from the time that he was next to his car and you told him

20   he was under arrest until the time you told him, I'm going

21   to use the pepper spray?  What would you say?  Five minutes?

22   10 minutes?

23   A.    I don't -- I don't remember.  It seemed like an

24   eternity.

Page 73

1    Q.    And how did you do that?

2    A.    With one hand I was trying to apply pressure so that

3    he would take his hand a submit to the arrest with his left

4    hand.

5    Q.    Did that work?

6    A.    No.

7    Q.    How many times did you try that technique?

8    A.    I don't recall.  Several times.

9    Q.    More than three times?

10   A.    I don't recall exactly.

11   Q.    Did you use any other pain techniques?

12   A.    I don't recall if I did or not.

13   Q.    Okay.  Now, while you were still on the ground, were

14   you on top of him?  On the side?

15   A.    I was all over him at one point in time.

16   Q.    Were you on your knees as you were trying to grab his

17   hand at some point?

18   A.    I was on my knees at one point in time.

19   Q.    What happened next?

20   A.    At which point I did -- I warned him several times

21   again.  And then --

22   Q.    But you don't know how many times?

23   A.    I don't know how many times.  And then I gave him a

24   burst of pepper spray.

Page 76

1    pressed down so that the chemicals were released?

2    A.    No, I don't.

3    Q.    Was it a couple seconds?

4    A.    I don't know.

5    Q.    Did you have to spray him a couple times?

6    A.    I believe I did.

7    Q.    Do you recall if it was more than two times?

8    A.    I can't recall.

9    Q.    More than five times?

10   A.    I cannot recall.

11   Q.    From the time that you pulled the OC spray and the

12   time you sprayed him, where was Mr. Mendes facing?

13   A.    In the travel lane.

14   Q.    Was he facing the ground?  Or was he facing the side

15   or --

16   A.    Rolling around.

17   Q.    And at that point how far of a distance was your body

18   relative to his body?

19   A.    I was right next to him.

20   Q.    How were you positioned?  He was on the ground.  Was

21   it his entire body had covered the ground?

22   A.    Yes, I believe so.

23   Q.    What about you?  Were you down on your knees?  Or how

24   did you --

Page 78

1   They become very passive, and all they want to do is get

2   that stuff off their face.  It becomes very irritant so they

3   try to put their hands to their face -- some people do.  It

4   varies.

5   Q.    How did Mr. Mendes react to the spray?

6   A.    As I said, it was little to no effect.

7   Q.    And at that point were you able to put both handcuffs

8   on his hands?

9   A.    No.

10  Q.    What happened?

11  A.    He still continued to resist.

12  Q.    Were you two still on the ground?

13  A.    Yes.

14  Q.    And how many minutes had passed up until this time?

15  A.    Again, I don't recall how long it was.

16  Q.    More than 10 minutes?

17  A.    I don't know.

18  Q.    More than 20 minutes?

19  A.    I don't recall.

20  Q.    What happened next?

21  A.    Traffic was bearing down on me -- on us.  And I yelled

22  to -- I called for backup on the radio.

23  Q.    How were you able to do that?  Is the radio still

24  something that comes over your shoulder and you can just

Page 79

1    lean?  Or do you have to physically use your cell phone?  Or

2    how do you do that, make the call?

3    A.    I had to reach over and key the mic and request a code

4    one and call for backup.

5    Q.    What is code one?

6    A.    Officer needs assistance.

7    Q.    And at that point you don't have to tell them the

8    location because they knew where you were; correct?

9    A.    I don't know.  Most of the time when that comes in,

10   most of them know where you are.  I believe they had known

11   from the previous stop.

12   Q.    That call goes directly to the Danvers dispatch

13   headquarters?

14   A.    To what?

15   Q.    The Danvers dispatch headquarters?

16   A.    It goes out all over.

17   Q.    Oh, I see.  When you say "all over," who hears it, by

18   the way?

19   A.    Whoever may be monitoring Tac one, state patrol one.

20   Q.    And that could be anybody in a state police cruiser?

21   Or can also the local police pick them up?

22   A.    I don't know about the local police.

23   Q.    What is the policy?  You use code one.  Does the

24   dispatcher get that?  Or everybody who has that radio open

Page 81

Q.    What would you estimate the passage of time?  More than 20 minutes?  More than 30 minutes?

A.    I couldn't tell.  I don't know.

Q.    What happened next?

A.    I saw the tow truck driver.  He was standing outside the car.  I yelled at him to give me a hand.

Q.    This was after you had used the code one to call the dispatch?

A.    Yes.

Q.    What did the tow truck driver do?

A.    He came over and --

Q.    Do you remember his name?

A.    Charles Clancy.

Q.    And was he a small-build fellow?  Medium-build?  Heavy-build fellow?

A.    I don't --

Q.    Average?

A.    Yeah.  I would say maybe a little above average.

Q.    So just medium build?

A.    Yeah.  I'd probably say that's correct.

Q.    What was his height?

A.    I don't know what his height was.

Q.    Do you remember approximately what his weight was?

A.    No.  I don't know how much he weighed.

Page 82

1   Q.     Was he a young fellow?  Middle-aged fellow?  Old

2   fellow?

3   A.     I want to say middle aged.

4   Q.     Was he accompanied by anyone else?

5   A.     Not that I know of.

6   Q.     Do you recall what specifically you told him?

7   A.     Give me -- I don't recall anything specific other

8   than, Give me a hand.

9   Q.     And at that point in time you had been with Mr. Mendes

10  for several minutes; correct?

11  A.     Yes.

12  Q.     How did he respond, the tow truck driver?

13  A.     He proceeded to come over and grab Mr. Mendes's legs.

14  Q.     And at that point where were you in relation to the

15  road that Mr. Mendes -- were you still on the travel lane?

16  A.     At that point in time, I believe he was still in the

17  travel lane.

18  Q.     What happened next?

19  A.     We physically dragged him in, pulled him -- dragged

20  him in from the travel lane to avoid getting run over.

21  Q.     And this was back on March 7th.  Do you recall what

22  the weather was that particular evening?

23           MR. ROGAL:  Objection.  Asked and answered.

24  A.     I'm sorry.  I stated earlier I believe the weather was

Page 87

1    on the ground?

2    A.    Yes.

3    Q.    And you just told us that another state trooper

4    cruiser arrived?

5    A.    Yes.

6          MR. SILVERFINE:   Objection.

7    Q.    Who was that?

8    A.    Trooper Hickey.

9    Q.    Do you recall what his cruiser number was that night?

10   A.    No, I don't.

11   Q.    And was he accompanied by any other state trooper in

12   his vehicle?  Was he alone in his vehicle?

13   A.    He was alone in his vehicle.

14   Q.    What happened next?

15   A.    He then proceeded to my location.

16   Q.    Where was his vehicle when he first arrived?

17   A.    I have no idea.  No idea.

18   Q.    You don't know --

19   A.    I have no idea --

20          THE COURT REPORTER:  I'm sorry.  One at a

21   time.

22   A.    I have no idea.  That's the last thing I was looking

23   for was to see where his car was.

24   Q.    How many minutes do you think it took for Trooper

Page 88

1    Hickey to arrive at the scene?

2    A.    I don't know.

3              MR. SILVERFINE:   Objection.

4    Q.    More than three minutes?

5    A.    I don't know.   A lifetime.

6    Q.    What happened when he arrived?

7    A.    He immediately came to my assistance.

8    Q.    And at that time when he arrived, both you and

9    Mr. Mendes were on the ground, and the tow truck was still

10   helping you hold Mr. Mendes on the ground; correct?

11   A.    Yes.

12   Q.    And then what did you and Mr. Hickey and the tow truck

13   do next?

14   A.    Trooper Hickey then used his flashlight as a lever,

15   inserted it between his arm, and used it as a lever to

16   remove the arm from in front of the -- from being locked up

17   underneath him.   And we were able to place the cuffs on him.

18   Q.    And at this time when Trooper Hickey came, Mr. Mendes

19   was face down on the ground; and Trooper Hickey put the

20   flashlight in between his left hand to try to disengage that

21   hand.   Correct?

22   A.    Yes.

23   Q.    And then what happened?

24   A.    We cuffed him and got him to his feet, walked him over

Page 89

1    to the cruiser, 818 --

2    Q.    That is your cruiser?

3    A.    That is my cruiser.

4    Q.    What happened from there?

5    A.    We placed him in the back seat of my car.

6    Q.    And when you placed him in the back seat of your car,

7    was he sitting directly behind the driver -- the driver's

8    seat?  Or was he sitting on the opposite end?

9    A.    When I placed him in, he was sitting in the area of --

10   I want to say the center of the car, center of the rear

11   seat.

12   Q.    And if somebody is placed in the back of your cruiser,

13   can somebody from the outside open the door?

14           MR. SILVERFINE:  Objection as to the form.  You

15   can answer.

16   Q.    Can the door be opened from the outside?

17   A.    Yes.

18   Q.    Without any locks or any systems?  Meaning is it

19   unlocked?  Anybody can just open it?

20   A.    It depends on whether you lock the door or not.

21   Q.    Do you recall if you had locked the door?

22   A.    I don't remember if I had or not.

23   Q.    Now, with somebody inside, can the person inside open

24   the door?

Page 91

Q.    Because you told us that Trooper Hickey came.  He went down where you and the tow truck driver, Mr. Clancy, was disengaging his left hand.  And you were able to place the cuff on both hands, and then you walked him to your cruiser.

A.    Right.

Q.    Do you recall how many seconds or minutes it took?

A.    No, I don't recall that.

Q.    What happened next?

A.    I believe I called for an ambulance for decontamination.

Q.    Before you called the ambulance, do you recall if you called for additional backup?

A.    I don't recall.  I don't recall.

Q.    So you only made one phone -- code one phone call for assistance?

        MR. SILVERFINE:  Objection.

A.    As I stated earlier, I may have made a second call.  I don't remember right now.

Q.    And then you recall that you yourself called for an ambulance; correct?

A.    I believe so.  I don't remember for sure.  I don't recall.

Q.    What was the purpose for calling an ambulance?

A.    As I stated, the purpose would have been for

Page 92

1    decontamination of myself and Mr. Mendes.

2    Q.    Did the ambulance arrive?

3    A.    Yes, they did.

4    Q.    How soon after you placed the call did the ambulance

5    arrive?

6    A.    I don't know.  I have no idea.

7    Q.    More than five --

8    A.    I have no idea, sir.

9         THE COURT REPORTER:  I'm sorry.  You have to wait

10   for him to finish.

11        THE WITNESS:  I'm sorry.

12   Q.    Did one ambulance show up?  Or did more than one

13   ambulance show up?

14   A.    I don't recall.  I know at least one showed up.

15   Q.    How many people arrived with the ambulance?

16   A.    I believe there was two.

17   Q.    Do you know their names?

18   A.    I don't recall at this moment what their names are.

19   Q.    Do you recall if any fire trucks arrived at the scene?

20   A.    I don't recall if there was or not.

21   Q.    Do you recall if any other ambulance arrived at the

22   scene?

23   A.    I don't recall that.

24   Q.    So now you have Mr. Mendes' vehicle, your vehicle, the

Page 93

1    tow truck, and the ambulance and Trooper Hickey's vehicle.

2    At this point when the ambulance arrived, was there any

3    other vehicles?

4    A.    I believe there may have been several Chelmsford

5    officers.

6    Q.    When you say "several," did they each arrive

7    separately?  Or did they arrive in one car?

8    A.    I have no idea.

9    Q.    Do you remember how many Chelmsford police cruisers

10   were there?

11   A.    No, I don't.

12   Q.    Did any other state troopers arrive?

13   A.    I believe some had.

14   Q.    How many state troopers --

15   A.    I have no idea.

16   Q.    -- arrived?  More than three cars?

17   A.    I have no idea.

18   Q.    More than five cars?

19   A.    I have no idea, sir.

20   Q.    The ambulance came.  Did the ambulance provide any

21   medical assistance?

22   A.    I believe they did.

23   Q.    Who did they provide assistance to?

24   A.    Mr. Mendes.

1   Q.    Did you receive any treatment at the scene?

2   A.    I did not.

3   Q.    Did you receive any treatment thereafter?

4   A.    Yes.  Just decontamination.

5   Q.    Where did you receive your treatment?

6   A.    I did that in the front at my cruiser.

7   Q.    So that was done by the ambulance?

8   A.    That was done by myself.

9   Q.    How was that done?

10  A.    Washing my face and hands with water, saline.

11  Q.    Who provided you with the --

12  A.    Both myself and I think the ambulance driver.

13  Q.    And that was done at the scene?

14  A.    Yes.

15  Q.    Did you receive any medical attention or care

16  thereafter?

17  A.    No.

18  Q.    How was Mr. Mendes treated at the scene?

19  A.    I don't know.

20  Q.    Were you present when the EMT was provided with any

21  treatment?

22  A.    No, I was not.

23  Q.    From when the ambulance came, do you recall -- how did

24  Mr. Mendes get out of his vehicle?  And where did he receive

Page 99

1   A.     Yes.

2   Q.     Do you recall at what point in time Trooper Sweet

3   arrived at the scene?

4   A.     No, I don't recall what time he came in.

5   Q.     Mr. Mendes' vehicle was there.  Your cruiser was

6   there.  The tow truck was there.  Trooper Hickey was there.

7   The ambulance was there.  Do you recall if Trooper Sweet had

8   arrived before them or after them?

9   A.     I don't know when he arrived.

10  Q.     When Trooper Sweet arrived, did he speak with you at

11  all?

12  A.     Yes.

13  Q.     What did he say?

14  A.     Inquired into my well-being.

15  Q.     What did he ask you?

16  A.     How am I.  Am I all right?

17  Q.     And what did you say?

18  A.     I said, I think so.

19  Q.     Did you have any other conversations with him?

20  A.     No, not to the effect of that.

21  Q.     Do you know who took Mr. Mendes out of the vehicle to

22  go receive EMT care?

23  A.     No, I do not.

24  Q.     Do you recall Mr. Sweet having any conversation with

1   Q.    Does Exhibit No. 2 have anything to do with that?

2          MR. SILVERFINE:  Objection.  That's why they have

3   juries.

4   A.    I don't know.

5          MR. CENTEIO:  I'm asking him his opinion.  He's a

6   police officer, a state trooper.

7          MR. SILVERFINE:  That's why they have jury

8   trials.

9          MR. ROGAL:  This is off the record.

10          (Discussion off the record.)

11  Q.    While Mr. Mendes was at the scene and you had summoned

12  the ambulance, you told us you called the ambulance just to

13  provide some decontamination work; is that correct?

14          MR. SILVERFINE:  Objection.

15  A.    I believe so.

16  Q.    Did you have any concern for calling the ambulance

17  besides decontaminating the impact of the pepper spray?  Was

18  there any other reason for contacting the ambulance?

19  A.    Yes, because we both received some scrapes and

20  bruises.

21  Q.    I'm going to show you some pictures to go into that

22  then.  Did Mr. Mendes tell you that he was having difficulty

23  breathing?

24  A.    There was no mention --

DUNN & GOUDREAU

Page 121

1    shown on Exhibit 6A?

2    A.    No.

3    Q.    Showing you Exhibit 6B, which is showing pictures --

4    three of his back and one of his left hand, had you noticed

5    any of these bruises on him at all that night?

6    A.    No.

7              MR. SILVERFINE:   Objection.

8    A.    No.

9    Q.    Showing you Exhibit 6C, which shows the hand in the

10   picture and the knee, had you observed any bruises or cuts

11   or scrapes on Mr. Mendes's hand when he --

12   A.    I believe the hand.

13   Q.    And can you tell how big the scrapes or cuts were?

14   A.    No.

15   Q.    Had you seen blood on his hand?

16   A.    No.

17   Q.    Do you remember if it was the left or right hand?

18   A.    I don't remember.  I remember he had scrapes on his

19   hands.

20   Q.    Did you observe any scrapes on his knees?

21   A.    He had pants on.  I didn't take his pants off.

22   Q.    Did you see any blood coming out of any pants or --

23   A.    No.

24   Q.    Was his hand bleeding from the scrape, cuts or bruise?

Page 122

1  A.    No.

2  Q.    I show you Exhibit 6D and ask you to take a look at

3  it.  And it's showing pictures of three sides of his face

4  and also an elbow.  Had you observed any bruise on his

5  elbow?

6  A.    No.

7  Q.    Had you observed any bruise on his forehead?

8  A.    Yes.

9  Q.    Do you recall what part of his forehead he had a

10  bruise on?

11  A.    It was in the head area.

12  Q.    Was it bleeding?

13  A.    No.  It was red.

14  Q.    Did you see any blood on his face that evening?

15  A.    Never saw any blood on him.

16  Q.    Did he have a cut on his face?

17  A.    I don't recall.

18  Q.    At the booking, do you recall seeing any blood on his

19  face?

20  A.    I never saw any blood.

21  Q.    Did you see any blood on his body at all?

22  A.    No.

23        MR. SILVERFINE:  He answered three or four times

24  now.

Page 123

1    A.    No.

2            MR. CENTEIO:  I asked hand.

3            MR. SILVERFINE:  He's been pretty clear on that.

4    Q.    I show you 6E, which is -- 6E is -- you saw a bruise

5    on his forehand and his hand.  That's what that is.

6            MR. SILVERFINE:  Objection as to that --

7    Q.    We'll skip that.  It's the same thing.  I'm going to

8    show you another picture, which is different.  It's showing

9    the elbow and his chest area.  Had you seen any bruise on

10   his chest that evening?

11   A.    No, I did not.

12   Q.    Had you seen any cut on his elbow that evening?

13   A.    No, I did not.

14   Q.    Had you seen any blood on his chest or elbow that

15   evening?

16   A.    No, I did not.

17   Q.    Exhibit 6G is showing a lump.  Had you seen any lump

18   on his chest at all that evening?

19   A.    No, I did not.

20   Q.    And you've told us that you were not aware that he

21   used a pacemaker that evening?

22   A.    That evening, no.

23   Q.    Did at some point you learn that he used a pacemaker?

24   A.    Yes.

Page 124

1   Q.    At what point did you learn that?

2   A.    I don't recall when it was.

3   Q.    Who showed up to pick him up at the Andover police

4   station?

5   A.    I don't know.

6   Q.    Did you meet with any of his family members?

7   A.    No.

8   Q.    Do you know how long he was there at the station?

9   A.    No.

10  Q.    Was he there an hour?  Less than an hour?

11  A.    I don't know.

12  Q.    You booked him and then you left him, and that was the

13  case?

14        MR. SILVERFINE:  Do you understand his question?

15        THE WITNESS:  No.

16  Q.    Did you stay with him throughout the time he was at

17  the station?

18  A.    No.

19  Q.    Okay.  Did you have any conversation besides asking

20  him to make a phone call?

21  A.    Booking information.

22  Q.    And were you able to get all that information clearly?

23  A.    Yes.

24  Q.    You were able to understand him throughout the time

# EXHIBIT  3
## (EMT Beth Corrigan's Deposition)

Page 40

| | | |
|---|---|---|
| 1 | A. | No.  I spoke with my partner, when he first got |
| 2 | | the request to come to the deposition, and he |
| 3 | | kind of refreshed my memory a little bit. |
| 4 | Q. | And the partner you're referring to is who? |
| 5 | A. | Steve Brady. |
| 6 | Q. | Besides Stephen Brady, did you speak with anyone |
| 7 | | before coming here today? |
| 8 | A. | No. |
| 9 | Q. | Did you ask Mr. Mendes to sign Exhibit Number 2? |
| 10 | A. | No. |
| 11 | Q. | What was the reason for not asking him to sign |
| 12 | | it? |
| 13 | A. | Because his only request was that he needed his |
| 14 | | eyes washed out.  He didn't complain of any |
| 15 | | other medical complaint.  We did offer to take |
| 16 | | him to the hospital and he said no to that |
| 17 | | request. |
| 18 | Q. | Do you speak any other languages besides |
| 19 | | English? |
| 20 | A. | No. |
| 21 | Q. | Did you have any difficulty understanding |
| 22 | | Mr. Mendes that particular night? |
| 23 | A. | At times, yes. |
| 24 | Q. | Did he speak to you in English? |

Page 41

1   A.   I believe it was broken English, if I remember

2        correctly.

3   Q.   Did he speak to you in any other languages?

4   A.   Possibly Spanish.

5   Q.   Were you able to understand any of his Spanish

6        or other languages he spoke to you?

7   A.   No.

8   Q.   If you can recall, do you remember the first

9        conversation you had with him and what was the

10       conversation with Mr. Mendes?

11  A.   No.

12  Q.   Do you recall what conversation Mr. Mendes had

13       with you that night?

14  A.   Not that I recall.

15  Q.   Do you recall how many words you two exchanged?

16  A.   Not that I recall.

17  Q.   Do you recall how long your conversation lasted

18       with Mr. Mendes that evening?

19  A.   Not that I recall.

20  Q.   For how long did you have a conversation with

21       Mr. Mendes that night?

22  A.   I don't know.

23  Q.   Was it more than a minute?

24  A.   I don't know.

Page 45

1   Q.   Was there any cut on his pants?

2   A.   Not that I recall.

3   Q.   Did you see any blood on his T-shirt?

4   A.   Not that I recall.

5   Q.   Any blood on his pants?

6   A.   Not that I recall.

7   Q.   Besides the hand, did you make any observations

8        of blood on any other part of his body?

9   A.   Not that I remember.

10  Q.   Do you recall which hand you saw the blood on?

11  A.   No.

12  Q.   You told us, while he was in your presence, you

13       did not notice problems with his breathing?

14  A.   No.

15  Q.   While he was in your presence, you told us you

16       knew in words he was anxious?

17  A.   Uh-huh.

18  Q.   Did he appear also confused?

19  A.   Not that I recall.  He spoke broken English.

20       It's kind of hard to tell if someone is confused

21       if they're not speaking the English language.

22  Q.   Did you make any observation about his breath?

23  A.   Not that I recall.

24  Q.   In general, if you arrive at the scene and

Page 48

1   Q.   Did you see anyone kick Mr. Mendes?

2   A.   Not that I recall.

3   Q.   Did you see anyone yell at Mr. Mendes?

4   A.   Not that I recall.

5   Q.   Did you see anyone scream at Mr. Mendes?

6   A.   Not that I recall.

7   Q.   And you've told us that Mr. Mendes did not

8        complain about eyeglasses, correct?

9   A.   Not to my knowledge, no.

10  Q.   While you were there, was Mr. Mendes screaming?

11  A.   Not that I recall.

12  Q.   Was Mr. Mendes yelling?

13  A.   Not to my knowledge.  I don't remember him

14       yelling.

15  Q.   While you were there, do you remember Mr. Mendes

16       having any conversation with anyone else besides

17       you?

18  A.   Possibly my partner.

19  Q.   While you were on scene, was it your impression

20       that he was able to communicate well in English?

21  A.   No.

22  Q.   How would you characterize his ability to

23       understand English; poor, fair, good, excellent?

24  A.   I would say fair, maybe.

# EXHIBIT 4
## (EMT Stephen Brady's Deposition)

Page 15

1   A.   No.  I don't remember if he was cuffed to the

2        front or cuffed to the rear, but I remember him

3        being handcuffed.  And I don't remember if they

4        released him, took the handcuffs off, while we

5        were treating him.

6   Q.   Do you remember having a conversation with an

7        officer upon arrival?

8   A.   Nothing that would stand out.

9   Q.   Did you know the officer?

10  A.   I did not know the officer.

11  Q.   The officer you spoke to, was he also being

12       treated?

13  A.   I don't remember treating the officer, but

14       according to this, Beth may have.

15  Q.   Do you recall conversing with the gentleman, the

16       civilian who we'll call Mr. Mendes?

17  A.   I don't remember if he spoke English at all, or

18       very well, or couldn't really even answer our

19       questions.

20  Q.   Do you recall having difficulty with him,

21       understanding him?

22  A.   I don't remember him speaking English very

23       well.  So, I don't think we were able to get

24       anything out of him.

Page 37

1     us.

2    Q.   Now, you recall that Mr. Mendes had some

3         language difficulties?

4    A.   Yes.  I don't remember him being able to answer

5         our questions that we could understand and I

6         believe it was because he didn't speak English.

7    Q.   Do you know what language he spoke?

8    A.   Not one that I recognized.

9    Q.   Is it your recollection that he did not speak or

10       understand any English, or that it was somewhat

11       less than perfect understanding?

12   A.   I can't tell you with certainty either way.

13   Q.   Now, Ms. Corrigan was under the impression that

14       he did understand questions she asked him; that

15       she was able to understand a good bit of what he

16       responded to her.  Does that change your

17       recollection in any way?

18            MR. CENTEIO:  Objection.

19   A.   No, not really.  My personal recollection is

20       that he didn't speak English that well or at

21       all.

22   Q.   Do you know who was asking questions, you or

23       Ms. Corrigan?

24   A.   More than likely it would have been Beth, but it

Page 46

```
 1        your internal affairs testimony he did not

 2        comprehend English?

 3   A.   Yes.

 4   Q.   Do you recall from your memory that night, did

 5        you have any conversation with Mr. Mendes?

 6   A.   Nothing significant that I can recall.  I may

 7        have asked him the assessment questions or Beth

 8        may have.  I don't recall.

 9   Q.   When you asked those assessment questions, did

10        he respond in English?

11   A.   Not that I recall.

12   Q.   Did Mr. Mendes say anything to you that evening?

13   A.   He may have.  Nothing significant that I can

14        recall.

15   Q.   When you say he may have, if he had said

16        anything to you, did he say it in English?

17   A.   Maybe, yes.  Maybe, no.  I can't say with

18        certainty.

19   Q.   Do you recall any words whatsoever that

20        Mr. Mendes could have mentioned to you in

21        English that night?

22   A.   I can't recall.

23   Q.   Can you recall what language he was speaking

24        that evening?
```

# EXHIBIT  5
## (Defendant Miranda's Police Report)

# Massachusetts State Police
## Arrest Report

Printed By: MSP2232

Print Date: /2004 21:55

## Incident Information

Incident #: **2004-0A1-0389**
SBTN: **TSA1200401465**
Date/Time: **03/07/2004 21:55**
Court Loc.: **LOWELL DC**
City: **CHELMSFORD**
Invest. Type: **MOTOR VEHICLE VIOLATION**

Loc.Street/Route#: **RT 3, DIR N, PROX SOUTH OF, EXIT**
City/Town: **CHELMSFORD**
Invst.Officer #: **1555**   Name: **TROOPER MIRANDA, JO**
Duty Station: **A-1**
Address: **RTE. 125**
City, State: **ANDOVER, MA**      Zip: **01810**
Telephone: **(978) 475-3800**



## Subject Information

Wanted: **N**
Name: **MENDES, MARIO E**
DOB: **03/16/1939**
POB: **PORTUGAL**
Address: **117 WESTWIND DRIVE**
City: **MANCHESTER**
State: **NH**         Zip **03104**
Phone:
SSN: **001881141**
Marital Status: **MARRIED**
Father's Name: **JOSEPH MENDES**
Mother's Maiden: **MARIA ESTAVES**
Spouse's Madien: **RODRIGUEZ,VERA**

Sex: **MALE**
Age: **064**
Race: **WHITE**
Height: **502**
Weight: **145**
Hair: **GRAY**
Eye Color: **HAZEL**
Build: **THIN**
Complex: **LIGHT**
Num. Of Children: **2**
Occupation: **PRINTER**
Emp./School: **SYNERGY**
Address: **3A LOPEZ RD WILMINGTON MA**

## Charges

| | |
|---|---|
| 90-23-D | LICENSE SUSPENDED, OP MV WITH |
| 90-18-A | SPEEDING IN VIOL SPECIAL REGULATION |
| 265-13D-A | A&B ON POLICE OFFICER |
| 268-32B | RESIST ARREST |
| 272-53-F | DISORDERLY CONDUCT |

## Vehicle Information

License#: **016490339/A087**
State: **MA**    Class: **D**
Status: **REVOKED**
Vehicle. Owner: **MENDES, MARIO E**
Owner Address: **117 WESTWIND DRIVE**
City: **MANCHESTER**
State: **NH**    Zip: **03104**
Lic Susp/Rev Date: **04/03/1999**
Reason: **PAYMENT DEFAULT**
Veh. Reg Number: **1634567**    State: **NH**
Issued: **11/28/2003** Expiration: **11/2004**
Veh Susp/Rev Date:
Reason:
Vehicle Stolen: **N**
Vehicle Towed By: **LOWELL AUTOMATI**
M/V Inv Attached: **N**    Evi. Seized: **N**
VIN:
Vehicle Year: **2002**
Vehicle Make: **TOYOTA**
Vehicle Color: **GREY**

## Custody Information

Assisted Officer#:                          Name:
Rights Adv. Officer#: **1555**       Name: **TROOPER MIRANDA, JOAQUIN P**
Photo Taken: **N**              Printed: **N**
Photo Taken By#: **1555**        Name: **TROOPER MIRANDA, JOAQUIN P**
Desk Officer#: **2328**          Name: **TROOPER CHOQUETTE II, ROBER**
Person Called: **VERA MENDES**   Number: **603-644-8105**

Breath Test Refused:        BT1 Given By#:
BT1 Date/Time:              BT1 Result:
BT2 Date/Time:              BT2 Result:
BT3 Date/Time:              BT3 Result:
BT Action:
Incident Involve Abuse-Defined in Section 209A?   **N**   Medication: **N**
Medication Info:

Bailed By/Released To:
Person Contacted If Detox:
Subject Status:

Investigating Officer/ID#:
**TROOPER MIRANDA, JOAQUIN P 1555**

Reviewing Officer/ID#:

## Associated Persons

| Association | Name |
| --- | --- |
| WITNESS | CLANCY, CHARLES |

## Narrative

1. On 03/07/2004 at approximately 21:49 hrs, I was performing selective enforcement on Route 3 n/b in the area between the B&M Rail Road tracks and Route 40 in the town of Chelmsford. The weather and roads were clear. The flow of motor vehicle traffic was light to medium. The road consists of two lanes north and south and is currently under construction. It is maintain by the Mass Highway Dept. The posted speed is 55 mph.

2. At this time I observed a vehicle traveling in the left lane at a high rate of speed. I estimated its speed to be 80 to 85 mph and then verified the speed to be 83 mph with my Radar unit. I then activated my lights and siren and initiated a motor vehicle stop of the vehicle. The vehicle was a Toyota Corolla bearing New Hampshire registration 1634567.
The vehicle was stopped in the area of exit 33.

3. I approached the vehicle and made contact with the operator a w/m/a. I informed him of my observations and requested his lice license and registration. As he searched for his license he stated that everybody is speeding but him. I again requested his

Paper work .He produce a NH license, which identified him as Mendes, Mario E of 117 West Wind Dr. Manchester NH with a DOB of 03/16/39 NewHampshire License #03MSM39161NH

I proceeded back to my cruiser and had Station "A" dispatched run his information. It was reported that he has a valid NewHampsire license. It was also reported that his Mass license and Right to operate was Suspended under License # 016490339 and A08710652 due to Payment Defaults. I requested a tow and issued Criminal citation M0684879 for Operating after suspension, Unlicensed operation and for speed as I awaited the arrival of the tow truck.

When the tow truck arrived I proceeded back to the Toyota I requested Mr Medes to step out of his vehicle. He exited the vehicle and closed the door. I informed that his Mass license was suspended and I presented him with the criminal summons. I then told him that his vehicle was going to be towed. He stated "NO" I will not let it I am going to Rome!" I told him it was being towed and he could go with the Tow truck operator. He again stated "NO" Then stated I am leaving and attempted to get into his vehicle. He attempted to open the door and I shut it. He then pushed me away and swung at me. I then informed him that he was under arrest and to put his hand behind his back. He stated "NO I am leaving ". A struggled ensued. Mendes refused to allow himself to be cuffed. I was able to place one cuff on his right wrist and he tried to pull away. At one point we were struggling in the right travel lane. Mendes continued to resist by pushing me and flailing arm. He struck me in the chest several times. I then forced Mendes to the ground and he still struggled. We were now both on the ground partially in the right travel lane. Mendes locked his left arm under chest. Verbal and Pain compliance techniques failed. At this point I was in fear for my safety! I was in the travel with vehicle approaching me. All verbal and Pain compliance techniques failed. I informed Mendes numerous times that I was going to spray him with Pepper Mace if he continued to resist. He was now trying to get up I then sprayed with my Pepper Spray .It had little or no effect. I called for a code one and requested back up. The tow truck driver Charles Clancey grabbed Mendes's legs to keep him from kicking and we manage to pull him from the travel lane. Mendes continued to resist. It was not until Trooper Joseph Hickey of the Andover Barracks arrived that we were able to get the second cuff on him.

I requested an ambulance for decontamination and to assess Mendes condition. He had received several scrapes and bumps to his Forehead, Elbows and Hands during the struggle from being on the ground. Trinity Ambulance arrived on scene and EMTs Brady and Corrigan assist Mendes. He was then placed into my cruiser I advised him of his rights and transported him to the Andover Barracks. At the barracks he was booked and advised of his rights again. He made a phone call to his wife Vera Mendes to arrange for bail. Mendes was charged with Oper after Suspension. Unlicensed, Speeding, Disorderly Person, Resisting Arrest and Assault And Battery on a Police Officer. Motor vehicle violation were cited on # M0684880 due to changing the citation to an arrest. It was issued in hand at the barracks,

| Investigating Officer/ID#: | Reviewing Officer/ID#: |
| --- | --- |
| TROOPER MIRANDA, JOAQUIN P 1555 | |

# EXHIBIT  6
## (Plaintiff Mendes' Deposition)

1 you were coming home from your son's house; is that

2 correct?

3      A.    Yes.

4      Q.    What had you done that day?

5      A.    (By Witness) We had a wall that divided

6 the living room from the kitchen.  And we took down

7 the wall and put up supports.  And we also started

8 installing wood floors in the living room.

9      Q.    And you put supports, you mean, you put a

10 beam across the ceiling?

11      A.    Yeah.

12      Q.    And that was you and your son?

13      A.    Yes.

14      Q.    What time did you leave your son's?

15      A.    (By Interpreter) I don't remember exactly,

16 around 9:00, 9:00 p.m.

17      Q.    How fast were you driving when you got

18 stopped by the police officer?

19      A.    I wasn't driving too fast, because my car

20 wasn't that good.  I believe I was over the speed

21 limit because the road was under construction.

22      Q.    Were you driving a 2002 Toyota Corolla?

23      A.    Yes.

24      Q.    Anything wrong with that car?

25      A.    Problem with the car?

1      Q.     Were there any problems with the car?

2      A.     No.

3      Q.     The trooper cited you as driving 83 miles

4 an hour in a 55 mile an hour zone.

5      A.     (By Witness) I don't know.

6      Q.     You don't know how fast you were going?

7      A.     No.

8      Q.     You were stopped on Route 93; is that

9 correct?

10      A.     Three, three north.

11      Q.     Did you know either Trooper Miranda or

12 Trooper Sweet?

13      A.     No.

14      Q.     Do you believe they knew you prior to this

15 incident?

16      A.     I don't know.

17      Q.     What happened after you were stopped?

18      A.     (By Interpreter) After I stopped the car

19 on the side of the road, the police stopped behind my

20 car.  They came to my car and asked for my driver's

21 license and registration.  I opened the glove

22 compartment and I gave both of them and gave them to

23 the trooper.  And he returned to his car.  It took

24 approximately ten minutes for him to come back to my

25 car.  And when he returned to my car, the tow truck

1 was already in front of my car, had been there for,

2 maybe, five minutes.

3      Q.     And did the trooper say anything to you?

4      A.     No.  He asked for me to exit the car,

5 which I turned off the engine and exited the car.  I

6 left the car.  He told me I had no driver's license.

7 And I told him no.  And I had the letter to show it to

8 him.  And he told me that he didn't want to see

9 anything.  And he asked me where I would like to go.

10 I told him I would like to go home.

11        He told me I was being arrested.  Again, I

12 told him no.  I was going to show him the letter.  And

13 I started walking toward the car.  And when I went to

14 grab the letter, he pushed me against the car.  And I

15 put my left hand over my pacemaker, because I was

16 slammed against the car.  And he put the handcuff on

17 my right wrist and pulled behind my back.  And pushed

18 me to the floor.  I went face down on the floor.

19      Q.     Let me stop you.  Did the trooper tell you

20 your car was going to be towed?

21      A.     No.  He did not tell me the car was going

22 to be towed.  But the tow truck was in front of my

23 car, so I assume it was going to be towed.

24      Q.     Did that make you angry?

25      A.     No, no.  Because I would go with the tow

27

1      A.      No.

2      Q.      At some point, you were sprayed with

3  something?

4      A.      I believe it's what they call pepper

5  spray, when I was on the ground.

6      Q.      Who sprayed you?

7      A.      Trooper Miranda.

8      Q.      Did he give you any warning?

9      A.      No.

10      Q.      He didn't tell you I'm going to spray you?

11      A.      No.

12      Q.      And where was he when he sprayed you?

13      A.      I don't know.  We were both on the ground.

14  I don't know if he had his elbow or his knee on my

15  back.

16      Q.      At that point, did he have both of your

17  hands handcuffed?

18      A.      No.

19      Q.      Were you still trying to keep him from

20  handcuffing the left hand?

21      A.      (By Witness) I tried to keep my pacemaker.

22      Q.      You tried to keep your pacemaker off the

23  ground; is that correct?

24      A.      Yes.

25      Q.      And you said that you did two things to do

1   that, right, first you kept your left hand over your

2   pacemaker, correct?

3       A.      Yes.

4       Q.      And that kept the trooper from getting

5   your left hand behind your back, correct?

6       A.      Basically, yes.

7       Q.      And you also pushed up to try to get your

8   chest off the ground; is that correct?

9       A.      I could not lift my chest off the floor.

10      Q.      Weren't you pushing up to try to do that?

11      A.      No.

12      Q.      Why couldn't you lift your chest up?

13      A.      (By Interpreter) First of all, because the

14  tow -- the driver from the tow truck was holding my

15  legs.  Second of all, because Miranda weighing around

16  350 pounds, maybe, more.

17      Q.      Okay.  So you believe Trooper Miranda

18  weighed at least 350 pounds?

19      A.      I believe so.

20      Q.      How tall was he?

21      A.      He wasn't very tall, maybe about a little

22  more than me.  But standing next to each other, he

23  would be three times my size.

24      Q.      Did he fall on top of you?

25      A.      I don't think so.  I believe he did --

29

1  didn't, or he would have killed me.

2      Q.      After he sprayed you with pepper spray,

3  what happened next?

4      A.      The second policeman arrived at the scene,

5  and they talked to each other.  I don't know what they

6  discussed.

7      Q.      Were you just on the ground at this time?

8      A.      Yeah.

9      Q.      Had he handcuffed both hands?

10     A.      (By Witness) One hand, right hand only.

11     Q.      He just had one hand handcuffed?

12     A.      Yes.

13     Q.      And now, Trooper Miranda leaves you with

14  just one hand handcuffed, and he's talking to the

15  other officer?

16     A.      He talk with the other officer.  And other

17  officer, how it's easy and step on my back.

18     Q.      Do you know who that other officer was?

19     A.      Sweet.

20     Q.      Did any other police officers show up as

21  well?

22     A.      Maybe around six to eight policemen came

23  to the location.  Nobody talked to me.  Only Sweet.

24  When he came to the car, he kicked me three times.

25  And I asked him to grab my glasses, and he stepped on

30

1   my glasses.

2        Q.     Let me just -- because I want to go

3   through in sequence.  Was Trooper Sweet the second

4   officer there?

5        A.     Yes.

6        Q.     So when Trooper Sweet arrives, you're on

7   the ground with handcuffs on one hand and you've been

8   sprayed; is that correct?

9        A.     Yes.

10       Q.     And Miranda and Sweet talk, and Sweet says

11  something about it being easy; is that correct?

12       A.     Yes.

13       Q.     What happens next?

14       A.     He stepped on my back.  And when he

15  stepped on my back and I let go of my left arm, and

16  then they pulled my left arm behind my back.

17       Q.     Why did you let go of your left arm then?

18       A.     The way he stepped on my back, I was not

19  able to keep my arm in the front of my body.  Nobody

20  would be able to.

21       Q.     What did he do that forced you to --

22       A.     He stepped on my back, and my arm

23  automatically left the position it was.

24       Q.     So they handcuffed the other hand then.

25  What happens?

1      A.      They put me in the car.

2      Q.      Trooper Miranda's car?

3      A.      Yes.

4      Q.      Then what happens?

5      A.      They close the door.  All the policemen

6   were talking in a group.  Office Sweet came around,

7   and he came to the car and kicked me in the chest the

8   first time, closed the door.  And he came around the

9   second time, opened the door and tried to kick me

10  again.  But this time, I lift my right knee.

11     Q.      I want to ask questions in sequence.

12  You're in the back of the cruiser, correct?

13     A.      Yes.

14     Q.      Which side in the back are you in?

15     A.      On the right side.

16     Q.      You're handcuffed behind your back?

17     A.      Yes.

18     Q.      And which side did Trooper Sweet kick you

19  in?

20     A.      (Indicating.)

21     Q.      The right side?

22     A.      The right side.

23     Q.      Did Trooper Sweet say anything to you?

24     A.      The first time, no.

25     Q.      Now, did you know Trooper Sweet before

32

1   this?

2       A.      No.

3       Q.      And how are you able to identify him now?

4       A.      I know the reason.  I met in the courtroom

5   the first time we go in the courtroom.  It's supposed

6   to he was going to testify at the court, courthouse.

7       Q.      Trooper Sweet opens the door and kicks

8   you.  Could you show me how he did that.

9       A.      Open the door, and he put his foot inside

10  of the car and kicked, kicked me in the (indicating).

11      Q.      Could you just stand up and show me how

12  he's able to do that.

13      A.      He opened the door (indicating) and put

14  his leg inside of the car and hit me in the chest.

15      Q.      So he stands on one leg and kicks you with

16  the other?

17      A.      Yes.

18      Q.      And then he closed the door again?

19      A.      (By Witness) Closed the door again.

20      Q.      But he came back another time?

21      A.      Yes.

22      Q.      How much longer?

23      A.      Not that -- too long, because -- maybe one

24  to two minutes, maybe less.

25      Q.      What was Trooper Sweet doing during this

33

1    time?

2         A.      Nothing.   This time nobody was doing

3    anything, just talking.

4         Q.      So you didn't see him do anything from the

5    time he kicked you the first time until the time he

6    came back the second time?

7         A.      No.

8         Q.      So he opens the door again?

9         A.      Opens.

10        Q.      What does he do?

11        A.      When he opened the door, I already started

12   lifting my leg up.   And he kicked me on the right, on

13   the right side, on the right leg.

14        Q.      So you sat back and lifted your legs up?

15        A.      Yes.   I put my body back.

16        Q.      You're afraid he was going to kick you

17   again?

18        A.      Yes.

19        Q.      And he kicked you in the right knee?

20        A.      Yes.

21        Q.      Did that leave a bruise?

22        A.      It was a light bruise.   It was dark, but

23   it hurt a lot.

24        Q.      Did it leave a bruise?

25        A.      No.   Just a small mark, no bruise.

34

1    Q.    Not the next day or the day after?

2    A.    No.

3    Q.    Did Trooper Sweet say anything to you that

4 time?

5    A.    The third time he came back and he asked

6 if I wanted more.

7    Q.    So he comes back again.  How much longer

8 again after the second time?

9    A.    Almost turn around this room and come back

10 again.

11    Q.    He opened the door again?

12    A.    He didn't open the door, because I was

13 able to move to the other side of the car.  And the

14 window was open.

15    Q.    So he just spoke to you through the

16 window?

17    A.    Yeah.

18    Q.    Did you respond?

19    A.    I only asked him to pick up -- to grab my

20 glasses.

21    Q.    When did you do that?

22    A.    The third time he came to the car.  And he

23 asked me if I wanted more.

24    Q.    Was the car door open?

25    A.    (By Witness) No.  It's closed, the car

38

1    Q.    Now, so you've -- Trooper Sweet came to

2  the car three times while you were in the back, and

3  twice he kicked you, right?

4    A.    Yes.

5    Q.    Each time he kicked you once?

6    A.    Yes.

7    Q.    And did he come up to the car or kick you

8  anymore times after that?

9    A.    (By Witness) After ask to pick my glass,

10  he don't come back.

11    Q.    Did anything else go on between you and

12  Trooper Sweet after that?

13    A.    No.

14    Q.    At some point, an ambulance came?

15    A.    Yeah.  Ambulance came and there was a man

16  and a woman in the ambulance.  And the man came with a

17  bottle-looking object.  And asked me to put my face

18  up.  And when he lifted the bottle, I turned my face

19  the other way, because I didn't know what he had in

20  the bottle.  And the policeman said it was water.  It

21  was to wash the face.  And they put a towel over my

22  shoulders, because it was cold that night.  And

23  somebody said in the ambulance that I had heart

24  problems.  And the woman from the ambulance said to

25  turn around and said that I was fine.  And they left.

1    Q.    Did the ambulance come before or after the

2    incident with Trooper Sweet?

3    A.    (By Witness) Ambulance come after.

4    Q.    How did the pepper spray affect you?

5    A.    Let's say my eyes, I couldn't see

6    anything.  And my breathing was very heavy.  That's

7    all I can say.  It's something more or whatnot.

8    Q.    Did it make your eyes water?

9    A.    I don't know if because of the pepper

10   spray.  It was like I was sweating a lot.

11   Q.    Did it make your nose run?

12   A.    No.

13   Q.    Did it make it hard for you to breathe?

14   A.    Yes.

15   Q.    What do you wear glasses for?

16   A.    For small letters.  If I take off my

17   glasses, I cannot see anything, small letters.

18   Q.    Can you see far away?

19   A.    Yes.

20   Q.    When the ambulance came, someone took you

21   out of the cruiser?

22   A.    Yeah.

23   Q.    Who was that?

24   A.    It was a policeman.  I don't know exactly

25   who, because there were six or eight.  He came to the

1  car and he tried to lift me, but I said, please that I

2  was going to leave.  It took me a little while to exit

3  the car, to leave the car.  But nobody pulled me.  I

4  left by myself.

5      Q.    So if I understand you, they came to the

6  car and they were going to take you out, but you said,

7  I can do it myself?

8      A.    I asked, please, because my whole body

9  hurt.  It was -- I felt it was easier for me to do it

10  by myself, because my body hurt so bad that if

11  somebody else did it, I knew I was going to be in

12  pain.

13      Q.    Was it either Trooper Miranda or Trooper

14  Sweet that took you to the ambulance?

15      A.    They didn't take me to the ambulance.  The

16  ambulance came to the place and put the water on my

17  face.  The driver came to me and put the water on my

18  face.  And that's all.

19      Q.    The ambulance is the one that came to you?

20      A.    I don't know if it was exactly the driver.

21  I know it was the man.

22      Q.    Just so we're clear, there were two people

23  that came from the ambulance, correct?

24      A.    Yes.

25      Q.    There was a man and a woman, correct?

42

1  next to me, was close to me.

2      Q.      Why didn't you tell that person you were

3  hurting all over?

4      A.      Because one of the policeman told him that

5  I had a heart problem.  It was when the lady said I

6  was fine.

7      Q.      When did the lady say you were fine?

8      A.      After they put water on my face.

9      Q.      Did the lady examine you?

10     A.      No.

11     Q.      Did you tell her you were having problems

12 with your heart?

13     A.      No.  I had told Miranda that I had heart

14 problems.  And I believe that the Trooper Miranda

15 probably told the other policemen.

16     Q.      Did you think you were having trouble with

17 your heart at that time?

18     A.      I wasn't really thinking about my heart at

19 that time.

20     Q.      Did you think you were having trouble with

21 your pacemaker at the time?

22     A.      I worry about my pacemaker all the time,

23 I'm at my house or outside.

24     Q.      That's fine.  But at that point when the

25 ambulance attendants are there, did you think there

46

1     A.      My wife and my daughter came to the police

2  station with my granddaughter.  She's only nine months

3  old at this time.  And we went to pick up the car

4  first, because it was very close.  We went home.  My

5  wife and I left my daughter and my granddaughter at

6  home, changed cars, and we went to the hospital.  My

7  wife and I did not enter the house at this time.

8     Q.      Whose idea was it to go to the hospital?

9     A.      My wife asked if I wanted to go to the

10  hospital, and I said yes.  I wasn't feeling good.  And

11  we went to the hospital.

12     Q.      So why didn't you go right to the hospital

13  and have them drop you off from the police station?

14     A.      The distance was going to be about the

15  same for me going straight to the hospital or go pick

16  up the car at home.  It was going to be around five

17  miles.

18     Q.      Mr. Mendes, why were you still carrying

19  those letters in 2004?

20     A.      Because the New Hampshire, when they

21  stopped, they told me to carry the letters all the

22  time.

23     Q.      It's five years later.  You still think

24  your license was suspended?

25     A.      No.  Because I renew my license two times

47

1    after this accident, this incident.

2         Q.      Did you ever receive a letter saying your

3    license was suspended for failing to appear in court

4    or failing to pay fines in Massachusetts?

5         A.      Well, we picked up letters, we knew there

6    was some problem in Massachusetts.  It was my name

7    with a different Social Security.  I never lived at

8    the address that the tickets came from.

9         Q.      Exhibit 2, it says license number and

10   starts with AAU.  Do you know whose license number

11   that --

12        A.      No.

13        Q.      Did you tell those investigators that you

14   spoke -- you felt like you were dying?

15        A.      It's possible.  I don't recall.

16        Q.      Did you ever feel like you were dying

17   during this incident?

18        A.      Almost.

19        Q.      Well, you almost felt like you were dying?

20        A.      Yeah.

21        Q.      You went to the emergency room.  You had

22   some treatment there.  You were released.  What

23   treatment did you have after that time?

24        A.      (By Witness) After?  I went to have my

25   physician three or four times after because the same

48

1    problem.

2        Q.      What's the same problem?

3        A.      Problem with the rib cage broken or

4    something similar, because of my lungs.  And I took

5    medication and antibiotic for approximately a month.

6    I think so.

7        Q.      So you took medication for approximately a

8    month after that.  Have you taken any medication

9    related to this incident?

10       A.      I take heart medication every day.

11       Q.      Is the heart medication because of

12   something the troopers did to you?

13       A.      (By Witness) This medication, no.

14       Q.      After a month, have you taken any

15   medication since then because of anything the troopers

16   did to you?

17       A.      No.

18       Q.      When was the last time you saw a doctor

19   for anything you alleged the troopers did to you?

20       A.      The last time I went to the doctor because

21   of this incident was in March 2004.  I don't know

22   exactly the date.

23       Q.      What doctor?

24       A.      Dr. Murby (ph).  That's my physician.

25       Q.      What did he tell you?

49

1    A.    He told me I didn't have to take anymore

2  medication at the time for the rib cage.  I don't

3  know.  Maybe it was another time before.

4    Q.    Did someone tell you you had an injury to

5  your ribs?

6    A.    In my ribs, yeah.  Physician told me.

7    Q.    Which one?

8    A.    Dr. Murby.

9    Q.    Did you ever suffer an injury to your ribs

10  after this time?

11    A.    Not accidents.  But it feels painful

12  sometimes.

13    Q.    How often?

14    A.    Depends.  If faster or if I try to lift

15  something heavier, it hurts.

16    Q.    A little bit, dull pain, sharp pain?

17    A.    It's not very strong, but it's not very

18  small either.

19    Q.    So if you lift something too much, you

20  move something too fast, you get some pain in your

21  right side?

22    A.    Yes.

23    Q.    Otherwise, do you get any pain in your

24  right side?

25    A.    When I lay down at night.  Because I --

50

1  over my right arm, I cannot sleep on the left side.

2  Maybe because my pacemaker.  I cannot sleep on the

3  left side.

4      Q.    So you have to sleep on your right side?

5      A.    Yes.

6      Q.    Prior to this incident, did you have any

7  pain on your right side?

8      A.    No.  I was able to sleep all night.  You

9  could lift the bed, and I would be carried with the

10  bed.

11      Q.    And that's not true now?

12      A.    No.

13      Q.    You have trouble sleeping now?

14      A.    Yes.

15      Q.    How often?

16      A.    I'm going to say every night I have

17  problems.  I wake up three to four times a night.

18      Q.    And that's because of the pain in your

19  right arm?

20      A.    It's pain on the right arm after the

21  incident (indicating).

22      Q.    Now, as you say that, you kind of keep

23  motioning the shoulder.  Is it the shoulder, the whole

24  arm or what?

25      A.    From the elbow to the shoulder.

52

1          A.      No.   I went to a doctor for -- because at

2     the courthouse, they said they wouldn't let me say the

3     word "crazy."  I went two to three times.  And the

4     third time, he gave me a letter.  He would need to

5     send the letter to the probation officer.  The doctor

6     mailed the letter to the probation officer, but he

7     never had a reply from them.

8          Q.      Where is the letter now?

9          A.      It must be with the probational (sic)

10    officer.

11         Q.      Did you ever give a copy to your

12    attorneys?

13         A.      I don't think so.  I don't think so.

14         Q.      You went to -- you had a trial in this

15    case?

16         A.      I believe so.

17         Q.      You testified?

18         A.      Yes.

19         Q.      And you were convicted of what?

20         A.      The judge gave me a speeding ticket and

21    something else that I don't know what it is.

22         Q.      Weren't you convicted of resisting arrest?

23         A.      It's possible.  It's possible.  I don't

24    know.

25         Q.      Did you have an attorney at that trial?

53

1    A.    Yes.

2    Q.    Were you satisfied with the attorney?

3    A.    Yes.

4    Q.    And were -- you were ordered to go to

5 anger management counseling after the trial; isn't

6 that correct?

7    A.    (By Witness) I don't know.

8    Q.    Isn't that why you went to this doctor?

9    A.    I don't know what they call it.

10    Q.    Weren't you ordered to go see a doctor

11 after the trial by the judge?

12    A.    Not the judge.

13    Q.    Who ordered you to see a doctor?

14    A.    The office of probation.

15    Q.    Why didn't you appeal your conviction?

16    A.    I had a very tight life, and I didn't have

17 a lot of money to pay.  And I have spent $10,000 with

18 my lawyers and I didn't have another $10,000 to spend

19 again.

20    Q.    So your lawyers -- you paid $10,000

21 dollars to your lawyers for the criminal case?

22    A.    Yes.

23    Q.    And you missed a week of work?

24    A.    Yes.

25    Q.    And you had vacation time to cover that?

54

1        A.      Yeah.   I had vacation to cover it.   I
2   didn't have anymore vacation time.

3        Q.      Did you miss any other days of work?

4        A.      No.

5        Q.      Aside from medical bills and attorney's
6   fees, did you have any other expenses or costs because
7   of this incident?

8        A.      Tow truck.   I paid the courthouse,
9   probation officer.   That's all.

10       Q.      Do you claim to have nightmares from the
11  incident?

12       A.      Yes.

13       Q.      What are the nightmares?

14       A.      I'm scared of everything.   Before this
15  incident, I would be in bed sleeping.   And like I
16  said, they could carry the bed with me.

17       Q.      What are the nightmares?

18       A.      Policemen, especially.

19       Q.      How often do you have nightmares?

20       A.      Every night, sometimes two, three times a
21  night.

22       Q.      Are there any activities you've had to
23  give up as a result of this incident?

24       A.      Only at work.   The owner of the company
25  called me in his office one day and he wanted to

55

1    transfer me to a different location.  And I asked him

2    about pay.  And he said that I would have to be paid

3    less.  And I told him -- and I told him I wasn't going

4    to go to a different location.  And if he wanted, he

5    could fire me.  But I wasn't going to go.  If he

6    wanted me to go, he would have to pay me the same.

7        Q.    So did you go to a different location?

8        A.    For one or two weeks.  He asked me to go

9    to a different department, and I went for one to two

10   weeks.  And I went back.

11       Q.    Well, the question was:  Did you -- are

12   there any activities you stopped as a result of the

13   incident?

14       A.    The activities would be around the yard,

15   around the house, things that I did before the

16   incident.

17       Q.    Your first answer was only at work.  What

18   did you stop at work?

19       A.    The company closed.

20       Q.    Were there any activities that you could

21   not do at work because of anything that happened

22   because of this incident?

23       A.    The majority of the activity that used to

24   do before, heavy lifting, another person would do it

25   for me.  I stopped lifting the paper, because I wasn't

57

1    newspaper, the newspaper comes in rows, one row, foot
2    or whatever.  It's sheets.
3         Q.    So somebody has to keep bringing paper to
4    it; is that right?
5         A.    Yes.  Somebody took my place.
6         Q.    And you couldn't do that after March of
7    2004?
8         A.    Like I say, times I go, the work is a
9    little slow.  I'll go and fill the machine.
10        Q.    Why can't you lift that paper that time?
11   What stops you?
12        A.    My right arm.  Because sometimes I will
13   lift.  And then my right arm will give in.
14        Q.    What activities did you have to stop at
15   home?
16        A.    The yard.
17        Q.    Like what?
18        A.    (By Witness) Everything, the -- I put
19   sprinklers, make walls.  I have a lot of rocks in the
20   yard.  I make walls because the -- at a slant.  And I
21   make it even, and I have to stop.
22        Q.    You make field stone walls?
23        A.    Yes.
24        Q.    Did you do that after this incident?
25        A.    After, do nothing.

58

1    Q.    You didn't work in the yard?

2    A.    (By Witness) Sometimes I'll go and prune

3    some plants I have in the backyard, lots of plants,

4    flowers, prune sometimes once.  I can't build walls

5    again or whatever.

6    Q.    You can build walls or you cannot build

7    walls?

8    A.    I can't.

9    Q.    Did you do any raking afterwards?

10   A.    (By Witness) I can rake a little slowly,

11   you know.

12   Q.    Did you ever mow the lawn afterwards?

13   A.    I have -- the ones that you sit on, the

14   driver's lawn mower.  And I'm able to sit and mow.

15   Q.    So you did that?

16   A.    (By Witness) Yeah.  So I can carry the

17   bags.  When fill it up the bags, I can't.  I have to

18   call my wife or somebody to pick the bags up.

19   Q.    So you would run the riding mower --

20   A.    (By Witness) Yes.

21   Q.    But she would have to empty the bags for

22   you?

23   A.    (By Witness) Yeah.

24   Q.    How about the snow?

25   A.    (By Witness) Snow, I can't shovel.

59

1   Q.      Do you have a snow blower?

2   A.      (By Witness) I have a snow blower.  I have

3   a tough driveway.  I have a -- the right side mostly

4   seven, eight foot high.  And the rest, you have to

5   push all snow.  The front of the driveway first.  I

6   can't push to both sides of the driveway.

7   Q.      Could you use your snow blower after this

8   incident?

9   A.      (By Witness) No.

10  Q.      So you never used the snow blower again?

11  A.      (By Witness) No.

12  Q.      It's not a power snow blower?

13  A.      (By Witness)  It's a power.  I have to

14  keep pushing.  It don't move by itself.

15  Q.      So who did the snow blowing afterwards?

16  A.      (By Witness) My wife.

17          THE INTERPRETER:  Can I take one-minute

18      break?

19          MR. ROGAL:  Sure.

20  BY MR. ROGAL:

21  Q.      Are there any other activities you had to

22  stop as a result of this incident?

23  A.      No.  I really didn't have any other

24  activities.

25  Q.      Anything else you can't do?

60

1     A.     Lifting weights, heavy objects, I can't.

2     Q.     How much can you lift?

3     A.     Maybe I can lift ten to 15 pounds.

4     Q.     Your daughter suggested you lost weight?

5     A.     She didn't suggest.  She actually stated

6 that I had lost weight, approximately 15 pounds.

7     Q.     And what do you attribute that to?

8     A.     I don't have any idea.  I have never lost

9 this much weight.  Usually, I lose weight in the

10 summer, two to three pounds.

11     BY MR. ROGAL:  I don't have anything

12     further.  Thank you.

13          CROSS-EXAMINATION

14 BY MR. SILVERFINE:

15     Q.     Good afternoon, Mr. Mendes.  My name is

16 Jeremy Silverfine.  I'm representing Trooper Miranda

17 in this suit that you brought.  I'm going to be asking

18 you a series of questions.  And if I repeat some of

19 the questions that my brother counsel has asked you,

20 it's not to confuse you.  It's just that I'm trying to

21 get clarification.  And likewise, if there's anything

22 you don't understand, please let us know.

23     Have you -- besides the statement that you

24 gave to the two state police investigators, have you

25 given any other statements, that you're aware of?

61

```
 1        A.      No.

 2        Q.      Have you ever given a written statement to

 3   anyone?

 4        A.      No.

 5        Q.      What happened to the glasses that were

 6   on -- you were wearing that night of March 2004?

 7        A.      They are broken.

 8        Q.      Did you ever get them back?

 9        A.      No.

10        Q.      Did you ever see them again?

11        A.      No.

12        Q.      Just let me finish the question before you

13   answer, if you would.

14                Did you ever ask anyone for them?

15        A.      I asked Officer Sweet to grab the glasses.

16   But after that, I have not seen the glasses.

17        Q.      Did you return to the scene to look for

18   them?

19        A.      No.  I never went back to the location.

20        Q.      Why didn't you go back to see if you could

21   find the glasses?

22        A.      The road was under construction.  I --

23   probably somebody took it.

24        Q.      You took photographs when you came back

25   from the hospital, correct?
```

1    A.    Nobody talked to me.

2    Q.    Nobody talked to you?

3    A.    No.

4    Q.    They just ignored you?

5    A.    I don't know.

6    Q.    So you want to leave it that, nobody said

7  a word to you, they just put you on the ground, they

8  didn't say anything, like, get your hands behind your

9  back, sir, it will go much easier?

10    A.    No.    They asked for my left hand.

11    Q.    And you wouldn't give it to them?

12    A.    I protect my pacemaker.

13    Q.    Did you tell them, I have a pacemaker

14  here, sir?

15    A.    I don't remember.

16    Q.    You never told them that, did you?

17    A.    I don't remember.    I can tell you I tell

18  him or not.    I know I tell I have a heart problem.

19    Q.    You're standing there, and a guy is

20  telling you to put your hands behind your back.

21  You're concerned about the pacemaker.    Instead of just

22  saying, I have a pacemaker here, you don't say

23  anything?

24    A.    I don't remember.

25    Q.    Well, how is he supposed to know you had a

1  I right?

2      A.      You tell me if I'm right or not.  Let me

3  say something to you, please.  If you have accident,

4  you have to tell to them, ambulance people, you have

5  this or you have this or they come to check you.

6      Q.      But how would they check you if you don't

7  say anything?  I'm not hurt, I'm not fine.  Are they

8  mind readers, sir?

9      A.      Somebody tell the ambulance people, I have

10 a heart problem.

11     Q.      I don't understand your last answer.

12     A.      (By Interpreter) Somebody told the

13 ambulance people I have a heart problem.

14     Q.      Who told them?

15     A.      (By Witness) Some officer.  I don't know.

16     Q.      Who did you tell that would be able to

17 tell them?

18     A.      The only one I tell I have a heart problem

19 is the Officer Miranda.  That's the only one I --

20     Q.      When did you tell him that?

21     A.      When?

22     Q.      When.

23     A.      (By Interpreter) When he came to the car

24 and asked me to leave the car.

25     Q.      Right in the beginning you said you had a

81

1    heart problem?

2        A.    (By Witness) Yes.

3        Q.    You said you had a heart problem?

4        A.    Yes.

5        Q.    Right from the beginning?

6        A.    Yes.

7        Q.    And what did you say to him about that?

8        A.    (By Interpreter) I told him I have heart
9    problem only.

10        Q.    And you said you had a pacemaker as well?

11        A.    I don't remember if I told him about the
12    pacemaker or not.

13        Q.    And so while your left hand was protecting
14    your pacemaker, you never said a word about it to
15    Trooper Miranda at any time?

16        A.    (By Witness) No.

17        Q.    When your wife arrived that morning, did
18    you tell her about all the complaints you had at the
19    police station, all your physical problems you had?

20        A.    No.

21        Q.    By the way, on that particular night,
22    March 8th, how long did the police officer follow you
23    before you were pulled over?

24        A.    (By Interpreter) Maybe a mile, maybe a
25    mile.  If he had asked me to stop before on the side,

83

1    A.    This here (indicating)?

2    Q.    Yeah.  Did you have a receipt for that?

3    A.    No.  I know how much it cost, so I don't

4  have receipt.

5    Q.    Do you have any receipts for that?

6    A.    No.  I threw the receipt away.

7    Q.    And I think my other counsel asked you

8  this, but did you make any complaints at the police

9  station that night before you left?

10    A.    No.

11    Q.    Besides the incident where you said you

12  were pulled over by another local police department,

13  have you had any other run-ins with police officers

14  before?

15    A.    No.

16    Q.    Has anything ever happened before that you

17  would not trust an officer when you were speaking with

18  him?

19    A.    No.  I never had any problems.

20    Q.    And just so I understand the sequence, are

21  you -- are you saying that Trooper Sweet opened the

22  door and kicked you first and then stepped on the

23  glasses?

24    A.    Yes.

25    Q.    Is that your --

1    A.    Yes.  He kicked me on the ribs.  Then he

2  kicked me on the legs.  Then he broke the glasses.

3    Q.    Where the stop occurred where you were

4  pulled over, what was the lighting like that night?

5    A.    It was a clear night.  There wasn't any

6  light on the road, just the lights from the car.

7    Q.    So that particular area where you were

8  pulled over was dark without the illuminated lights

9  from the car?

10    A.    Not completely dark, but you wouldn't be

11  able to read the letter.

12    Q.    Did Trooper Miranda approach you with a

13  flashlight?

14    A.    I don't remember if there was a lantern --

15  flashlight.

16    Q.    When he first came over to ask you for

17  your license and registration and he was standing next

18  to the car, did he have a flashlight with him?

19    A.    I don't remember.  I had the windows open

20  when he arrived.

21    Q.    What was the temperature that night?

22    A.    I don't remember the temperature, but it

23  was a little cold.

24    Q.    How were you dressed?

25    A.    Like right now.

94

1    A.    Yes.

2    Q.    If a police officer says you're under

3  arrest, you are supposed to cooperate with that police

4  officer.  You understand that, right?

5    A.    I know that I had to cooperate, but I just

6  wanted to show him the letter, because I knew if he

7  saw the letter, he would have no reason to arrest me.

8  And then if he wanted to read the letter and arrest

9  me, that would be okay, no problem.

10    Q.    So you would have started cooperating

11  after you -- he read the letter?

12    A.    Yes.

13    Q.    What -- with Trooper Miranda, what force

14  did he use that was excessive?

15    A.    He almost broke my arm pulling it back,

16  almost broke it.

17    Q.    The right arm?

18    A.    Right arm.

19    Q.    Any other force that Trooper Miranda used

20  that was excessive?

21    A.    That I remember, no.

22    Q.    Have you ever been treated for gallbladder

23  stones?

24    A.    No.

25    Q.    Who told you you had a collapsed lung?

# EXHIBIT  7
## (Letter of Clearance)



# *The Commonwealth of Massachusetts*

## *Registry of Motor Vehicles*

### *One Copley Place, 4th Floor, Boston 02116*

**Richard D. Lyons**
*Registrar*

Mail:
P.O. Box 199100
Boston, MA 02119-9100

Mario E. Mendes

December 22, 1998

Lic. # A08710652        State:  MA        DOB: 03-16-1939

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## LETTER OF CLEARANCE

____    The above driver's privilege to operate a motor vehicle in Massachusetts is hereby reinstated as of .

____    The above driver's privilege to operate a motor vehicle in Massachusetts is hereby reinstated, PENDING EYE TEST AND WRITTEN EXAMINATION.

____    The above named driver's privilege to operate a motor vehicle in Massachusetts is hereby reinstated, PENDING EYE TEST, WRITTEN EXAM, AND DRIVING EXAM.

____    The suspension or revocation of the above driver's license or privilege to operate in Massachusetts dated _____ HAS BEEN EXPUNGED.

____    No revocations or suspensions appear on the above driver's record.

_X_    No _active_ suspensions or revocations appear on the above driver's record. Under SS# 016490339 he is not the same person suspended in the State of MA.

____    The above driver's privilege to operate a motor vehicle in Massachusetts is hereby reinstated as of:_____ with the following conditions:_____
_____

____    There is no record of the above driver being licensed or having a driving record in the state of Massachusetts.

Clerk: RMV  Date: 12/22/98          Richard D. Lyons, Registrar

# EXHIBIT  8
## (X-RAY REPORT)

\* \* \* \* \* \* \* \* \* \* \* ELECTRONIC REPRODUCTION \* \* \* \* \* \* \* \* \* \* \* \*

DARTMOUTH-HITCHCOCK                          RADIOLOGY REPORTS

ENCOUNTER DATE:  03/10/2004                  MENDES,MARIO M
                                             086808


DOB:  (M)03/16/1939

EXAM(S): CHEST PA AND LATERAL



REQUESTING PROVIDER:    MORBEY MD,PAUL
                  Cc:

REASON FOR EXAM:  MVA/HIT CHEST/R/O PNEUMONIA

There is scarring in the right lower lung, best appreciated on lateral view.
Frontal view shows a pneumothorax where the pleural reflexion is pulled away from
the right lower chest wall. The pleural reflexion is approximately a cm away from
the costophrenic angle. The apex is poorly seen. The overlying ribs are suspected
of having a subtle fracture present but it's not detected on this film.

Conclusion:   1. Acute pneumothorax, right chest, with about a 10 percent
pneumothorax, without evidence of tension.

2. Scarring in the right lower lung.

3. Post-surgical changes from aortic valve replacement.

4. Pacing electrode, right atrium, right ventricle.

The referring physician was called on Sunday at approximately 1:30 with the results
of this exam.


G ERIC GESLIEN, MD/lea

Doc   #2942953
Dic:  03/14/2004
Tra:  03/15/2004  8:34 A


E-mail sent to: Radman      03/15/2004 10:33

Electronically signed by: GESLIEN MD, G ERIC    03/15/2004 10:33